UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ICEM S.P.A.,<br>AURORA ASSICURAZIONI S.P.A.,<br>    Plaintiffs,<br><br>v.<br><br>HARVEY INDUSTRIES, INC.,<br>RACHEL CASTRICONE and<br>TRACEY BOULDOUKIAN,<br>    Defendants. | Civil Action No.: 07-CV-10819-RCL |

**DEFENDANT, RACHEL CASTRICONE'S CONCISE STATEMENT OF
MATERIAL FACTS OF RECORD AS TO WHICH
RACHEL CASTRICONE CONTENDS THERE
IS NO GENUINE ISSUE TO BE TRIED[1]**

**BACKGROUND REGARDING PLAINTIFFS AND RACHEL CASTRCIONE**

1.      ICEM S.P.A. (*hereinafter*, "ICEM") owns and operates the Grand Hotel Parco dei Principi (*hereinafter*, "the Hotel") in Rome, Italy, which consists of 182 guest rooms on 7 floors.  (*See* Ex. 1, Compl., p. 2, ¶¶ 9-10.)

2.      Aurora Assicurazioni S.P.A. (*hereinafter* "Aurora") is an insurance company incorporated in Italy that insured ICEM on May 1, 2004.  (*See* Ex. 1, Compl., p. 2, ¶ 5; p. 4, ¶ 22.)

3.      On May 1, 2004, there was a fire at the Hotel.  (*See* Ex. 2, Parties' Rule 16 Stmnt, p. 1, § I. A.)

4.      Aurora indemnified ICEM for certain property damage and other damage that was caused by the fire at the Hotel pursuant to its insurance policy with ICEM and Aurora became subrogated to some of ICEM's claims.  (*See* Ex. 1, Compl., p. 4, ¶ 23.)

---

[1] The facts set forth herein as undisputed are set forth solely for the purpose of *Defendant, Rachel Castricone's Motion for Summary Judgment.*

5.      ICEM also sustained damages that were not covered under its policy with Aurora. (*See* Ex. 1, <u>Compl</u>. P. 4, ¶ 24.)

6.      On April 29, 2004 Rachel Castricone (*hereinafter* "Castricone") began staying at the Hotel in Room 305. (*See* Ex. 3, <u>Castricone Answer to Compl.</u>, p. 3, ¶ 13.)

7.      On May 1, 2004, Castricone was in Room 305 when a fire began in the Hotel. (*See* Ex. 4, Castricone Dep., pp. 61-62, ¶¶ 12-14.)

**FIRST EVIDENCE OF A FIRE AT THE HOTEL**

8.      On May 1, 2004 at 05:08:46 a.m. an LCD on a remote annunciator illuminated, which is the first evidence of a fire in the Hotel according to Ali Reza (*hereinafter* "Reza"). (*See* Ex. 5, Report of Plaintiff's Cause and Origin Expert, Ali Reza, p. 43.)

**FACTUAL ALLEGATIONS PERTAINING TO CASTRICONE ON MAY 1, 2004[2] BEFORE, DURING AND AFTER THE FIRST EVIDENCE OF FIRE AT THE HOTEL**

9.      Before the first evidence of a fire on May 1, 2004, the Hotel's Camera Number 5 recorded Castricone and Matthew Fiderio (*hereinafter* "Fiderio") entering a lobby elevator at 4:41:07 a.m. (*See* Ex. 6, Image from the Hotel's Camera 5, 04:34:47 a.m. - May 1, 2004.)

10.     The Hotel's Camera Number 9 recorded Castricone and Fiderio exiting an elevator on the third floor at 04:42:39 a.m. (*See* Ex. 7, Image from the Hotel's Camera 9, 04:40:19 a.m. - May 1, 2004.)

11.     The Hotel's Camera No. 9 recorded Castricone and Fiderio entering room 305 at 4:42:58 a.m. (*See* Ex. 8, Image from the Hotel's Camera 9, 04:40:38 a.m. - May 1, 2004.)

12.     When Castricone and Fiderio entered room 305 Tracey Bouldoukian (*hereinafter* "Bouldoukian") was in bed. (*See* Ex. 4, Castricone Dep., pp. 51-52, ¶¶ 17-; Ex. 10, Fiderio Dep., p. 35, ¶¶ 4-19.)

---

[2] All times stated herein that are not part of a citation are times adjusted to "real time" based on times calculated by Plaintiff's cause and origin expert, Ali Reza, P.E. (*See* Ex. 5, <u>Report of Plaintiff's Cause and Origin Expert, Ali Reza, P.E.</u>, p. 18, Table 2.) The times stated in the citations are times that appear on the video for each respective camera that is cited to.

13.     After entering room 305, Castricone and Fiderio went outside onto the balcony where each smoked a cigarette. (Ex. 10, Fiderio Dep., pp. 36-37, ¶¶ 22-7; Ex. 4, Castricone Dep., pp. 52-54, ¶¶ 16-12.)

14.     Castricone smoked substantially all of her cigarette while on the balcony. (*See* Ex. 10, Fiderio Dep., p. 38, ¶¶ 10-11; Ex. 4, Castricone Dep., p. 58, ¶¶ 2-7.)

15.     After smoking her cigarette out on the balcony, Castricone extinguished her cigarette in the Hotel's ashtray that was on a table located on the balcony that either she or Bouldoukain had previously brought outside onto the balcony. (*See* Ex. 4, Castricone Dep., pp. 57-58, ¶¶ 12-17, pp. 55-56, ¶¶ 23-13; Ex. 10, Fiderio Dep., p. 39, ¶¶ 7-20, p. 40, ¶¶ 2-5.)

16.     After Fiderio finished his cigarette he threw it off the balcony. (*See* Ex. 10, Fiderio Dep., p. 38, ¶¶ 12-22.)

17.     After Castricone and Fiderio finished smoking, Fiderio recalled that Castricone picked up the ashtray and "put it down on the floor of the balcony" and he did not recall seeing the ashtray again after it was placed on the balcony floor. (*See* Ex. 10, Fiderio Dep., p. 44, ¶¶ 11-21.)

18.     Fiderio never saw Castricone place the contents of the ashtray in a wastebasket in room 305 and does not place the ashtray in room 305. (*See* Ex. 10, Fiderio Dep., p. 44, ¶¶ 22-25.)

19.     Castricone left the ashtray on the balcony. (*See* Ex. 4, Castricone Dep., pp. 156-57, ¶¶ 23-14.)

20.     The Hotel's Camera No. 9 depicts Fiderio leaving room 305 at 4:54:19 a.m. (*See* Ex. 9, Image from the Hotel's Camera 9, 04:52:59 a.m. - May 1, 2004.)

21.     After Fiderio left Castricone got ready for bed, got into her bed in Room 305, and fell asleep. (*See* Ex. 4, Castricone Dep., pp. 61-62, ¶¶ 12-14.)

22.    After Castricone fell asleep Bouldoukian woke her up and room 305 had a dark heavy smoke in it. At this time there were no flames in room 305. (*See* Ex. 4, Castricone Dep., pp. 62-63, ¶¶ 7-24; Ex.11, Bouldoukian Dep., p. 91, ¶¶ 7-24.)

23.    At this time, Castricone and Bouldoukian left room 305 and woke their parents, who were staying in other adjoining rooms 306 and 307, respectively. (*See* Ex. 4, Castricone Dep., p. 64, ¶¶ 1-22, p. 20, ¶¶ 1-17; Ex.11, Bouldoukian Dep., p.131, ¶¶ 9-22.)

24.    The Hotel's Camera Number 9 shows the door to room 305 open at 5:17:51 a.m. (*See* Ex. 14, Images from the Hotel's Camera 9, 05:15:29 a.m. - May 1, 2004 and 05:15:31 a.m. - May 1, 2004.)

25.    After Castricone and Bouldoukian left room 305 and woke their parents, Castricone looked in room 305, saw smoke, but did not observe any flames in room 305. (*See* Ex. 4, Castricone Dep., p. 64-66, ¶¶ 1-24.)

26.    After Castricone woke her parents, David Castricone proceeded to go into room 305 by using a connecting door that connects rooms 305 and 306. He stood at the foot of the bed, located closest to the door of room 305, and looked to his left and right and up and down, and observed smoke in the room that was just above his head, coming down from the ceiling. David Castricone did not see an open flame within room 305, as his observations were limited to smoke only. David Castricone then left room 305 through the connecting door between room 305 and 306, and re-entered room 306. (*See* Ex. 35, Aff. of David Castricone, dated December 02, 2009.)

27.    Bouldoukian returned to room 305 to get her pants and during this time did not observe any flames. (Ex.11, Bouldoukian Dep., pp.134-35, ¶¶ 5-1.)

28.    Thereafter, Castricone, Bouldoukian and their parents headed for the stairway and knocked on doors on their way to the emergency stairwell. (*See* Ex. 4, Castricone Dep., p. 67, ¶¶ 1-9, p. 20, ¶¶ 1-17; Ex.11, Bouldoukian Dep., p.140-41, ¶¶ 24-8, pp. 141-42, ¶¶ 24-24.)

29.     The Hotel's Camera Number 6 recorded Patti Castricone in front of the reception

desk at 5:21:15 a.m.  (*See* Ex. 13, Image from the Hotel's Camera 6, 05:14:55 a.m. - May 1,

2004.)

30.     The Hotel's Camera Number 6 recorded Castricone walking in front of the lobby

elevators at 5:21:17 a.m.  (*See* Ex. 12, Image from the Hotel's Camera 6, 05:14:57 a.m. - May 1,

2004.)

31.     The Hotel's Camera Number 6 recorded Castricone, Bouldoukian, and Patti

Castricone in front of the reception desk at 5:25:47 a.m.  (*See* Ex. 15, Image from the Hotel's

Camera 6, 05:18:27 a.m. - May 1, 2004.)

32.     The Rome fire department ultimately extinguished the fire.

**ELECTRICAL ISSUES IN THE HOTEL IN AND AROUND ROOM 305 PRIOR TO
THE HOTEL FIRE**

33.     David Castricone stayed in room 306 at the Hotel while Castricone stayed in

room 305 and during this time David Castricone experienced a series of electrical problems.  The

first electrical problem occurred when David Castricone first checked into room 306 on April 29,

2004.  He put his card in the Hotel door for room 306 to open it and the lights in room 306 went

out.  This happened a second time on the same evening (April 29, 2004) when David Castricone

returned to his room and the card he inserted into his door caused the lights to go out.

Thereafter, on April 30, 2004, the lights went out again when his wife, Patti Castricone, was

using a blow dryer in room 306.  (*See* Ex. 16, David Castricone Dep., pp. 6-9, ¶¶ 11-9; Ex. 17,

Aff. of David Castricone, ¶¶ 1-7, dated June 25, 2009.)

34.     Castricone while in room 306 during the evening of April 30, 2004, which is a

room adjacent to room 305 and shares a common wall with room 305, experienced an electrical

problem while using a hairdryer.  Specifically, while Castricone was using the hairdryer all the

lights in room 306 went out and the room lost power.  (*See* Ex. 4, Castricone Dep., pp. 202-3, ¶¶ 12-24.)

35.   Kim Meixel, a hotel guest that stayed in room 304[3] between April 28, 2004 and May 1, 2004, heard what sounded like "the heat coming on followed by crackling sounds emanating from within the walls" shortly before someone pounded on her door warning her of the presence of a fire.  (Ex. 23, Aff. of Kim E. Meixel, ¶¶ 1-4.)

36.   Immediately after Tracey Bouldoukian woke up her parents, Karl Bouldoukian immediately smelled a strong electrical odor.  (*See* Ex. 18, Karl Bouldoukian Dep., p. 14-15, ¶¶ 17-24, pp. 58-59, ¶¶ 4-4, pp. 59-60, ¶¶ 20-3.)

37.   Richard Jacques, a hotel guest staying on the third floor on April 30, 2004 and May 1, 2004, experienced several electrical problems in his room.  He turned on the air conditioning in his room and it stopped working and then worked intermittently through the hours leading up to the fire.  In addition, circuit breakers in his room kept tripping causing power outages.  (Ex. 24, Aff. of Richard Jacques.)

38.   John E. Anderson, a hotel guest staying on the second floor, observed several electrical problems and had several lights that were inoperable in his room while staying in the Hotel between April 30, 2004 and May 1, 2004.  (Ex. 19, Aff. of John E. Anderson, ¶¶ 1-4.)

39.   Patti Crouch, a hotel guest that was staying on the fourth floor on May 1, 2004, experienced problems with lights in her room, had several electrical outlets in her room that were inoperable, and observed an outlet in her room emit smoke and sparks.  (Ex. 20, Aff. of Patti Couch.)

---

[3] Room 304 is adjacent to room 305 and shares a common wall with room 305.

40.     Kathleen Tavella, a hotel guest that was syaying on the first floor between April 30, 2004 and May 1, 2004, used a hair dryer provided by the Hotel that caused the lights in her hotel room's bathroom to flicker.  (Ex. 21, Aff. of Kathleen Tavella.)

41.     Richard Mute, a hotel guest that was staying on the fourth floor on May 1, 2004, has reported that several electrical outlets in his room were inoperable and he observed an outlet in his room emit smoke and sparks.  (Ex. 22, Aff. of Richard Mute.)

42.     Judith Fishman, a hotel guest between April 30, 2004 and May 1, 2004, plugged a hairdryer into a wall socket in her room's bathroom and observed sparks and smoke emanate from the area around the plug.  (Ex. 25, Aff. of Judith Fishman.)

**SEIZURE OF THE HOTEL**

43.     On May 1, 2004, after the fire was extinguished, the Rome Police seized the Hotel.  (*See* Ex. 26, Rome Police Headquarters corr. to Public Prosecutor's Office, dated May 1, 2004 – Bate Stamp PL002983-2984.)

44.     Also, on May 1, 2004 various agencies of the City of Rome gathered evidence from the Hotel, which is outlined in further detail in paragraphs forty-five (45) to forty-eight (48).

45.     Upon seizure of the Hotel the Rome Police on May 1, 2004, seized four digital recorders containing recorded images of the various floors before, during and after the fire. Rome's Criminal Laboratory Department also intervened on May 1, 2004, and confiscated several samples of combustion residue from Rooms 305 and 312.  (*See* Ex. 27, Rome Police Headquarters corr. to Public Prosecutor's Office, dated May 3, 2004 at 3 – Bate Stamp PL002986-89; Ex. 28, Order Pursuant to Art. 276 of the Italian Code of Criminal Procedure.)

46.     On May 4, 2004 the City of Rome seized room 305's wastepaper bin.  (*See* Ex. 28, Order Pursuant to Art. 276 of the Italian Code of Criminal Procedure.)

47.     Other than the evidence listed in paragraphs 45 and 46, there is no indication that the City of Rome seized any other physical evidence from room 305.

48.     The City of Rome's agencies that conducted the inspection of the Hotel did not seize any ashtrays, cigarettes or any cigarette remnants from room 305. (*See* Ex. 36, Aff. of Maria Luisa Pompole, ¶¶ 1-7.)

49.     The City of Rome's agencies in conducting their inspection of the Hotel did not seize any electrical material from either rooms 304, 305 or 306 or any other portion of the Hotel. (*See* Ex. 36, Aff. of Maria Luisa Pompole, ¶¶ 1-7.)

50.     On July 21, 2004, the City of Rome's Public Prosecutor's Office fully released its seizure of the Hotel and the Hotel took full possession of the Hotel.  (*See* Ex. 29, Order of Release of Seized Property, dated July 21, 2004 – Bate Stamp PL003002-03.)

**ICEM AND AURORA's HANDLING OF EVIDENCE AFTER LEARNING OF FIRE**

51.     Immediately after the fire, ICEM, the operator of the Hotel, sent a written claim to Aurora regarding the fire and Aurora, through Cincotti Studio (*hereinafter* "Cincotti"), began its work at the Hotel on May 4, 2004.  (*See* Ex. 30, Aurora Dep., p. 12, ¶¶ 13-14; Ex. 31, Cincotti Report, p. 8 – Bate Stamp PL002951.)

52.     Also, within two weeks of the incident both ICEM and Aurora had retained legal counsel.

53.     Aurora's procedures regarding the investigation of the fire was to "verify the existence of the policy; second, to make sure that the premium – premiums have been regularly paid; third, to – to hire experts who are expert in the field of what occurred; and in fourth place, to insure that the agent to whom – who has – makes contact with the insured, to inform him of what the company intends to do, how it intends to proceed; and further, files that are managed by specialized personnel who operate out of our office in San Donato Milanese." (*See* Ex. 30, Aurora Dep., pp. 12-13, ¶¶ 13-14.)

54.     Cincotti, pursuant to Aurora's procedures, was charged with looking into both "the nature of the damage and its origin and quantifying the damage" on behalf of Aurora. (*See* Ex. 30, Aurora Dep., pp. 12-13, ¶¶ 13-14.)

55.     Cincotti prepared an expert report (*hereinafter* "Cincotti Report") for Aurora that concerns the fire damage to the Hotel. (*See* Ex. 30, Aurora Dep., p. 21, ¶¶ 4-14 *and* Exhibit 2 to Aurora Dep.; Ex. 31, Cincotti Report – Bate Stamp PL002942-2981.)

56.     The Hotel had its third floor cleared of remnants between May 5, 2004 and August 23, 2004, which included "furnishings and fittings, carpet, furniture, TV and fridge and some bathroom fixtures... [and] fine rubble, windows, doors, fan-coils, false ceilings, carpet and wall coverings from corridor." (*See* Ex. 31, Cincotti Report, p. 33 – Bate Stamp PL002976.)

57.     The Hotel demolished all third floor air conditioning and heating systems. (*See* Ex. 31, Cincotti Report, p. 33 – Bate Stamp PL002976.)

58.     Between July 22, 2004 and December 2004, smoke-blackened walls and ceilings were pressure washed.  In September 2004, ICEM "called several firms to start work on the reconstruction of walls and on the electrical/plumbing systems, carpentry structures and upholstery and carpets.  The Hotel was completely renovated by December 2004. (*See* Ex. 31, Cincotti Report, p. 7 – Bate Stamp PL002950.)

59.     Niether ICEM nor Aurora, while doing work on the third floor, secured or found any ashtrays, cigarettes or any cigarette remnants from room 305 as the Plaintiffs did not disclose the existence of this material in their Rule 26 disclosure. (*See* Ex. 34, Pls.' Rule 26 Disclosure.)

60.     Niether ICEM nor Aurora, while doing work on the third floor, secured any electrical material from room 305 as the Plaintiffs did not disclose the existence of this material in their Rule 26 disclosure. (*See* Ex. 34, Pls.' Rule 26 Disclosure.)

61.     In March 2005, three months after the hotel was destroyed and renovated, Castricone received her first notice that she was being blamed for the fire. (*See* Ex. 38, Notice.)

**THE OPINIONS OF PLAINTIFF'S EXPERTS ALI REZA & DAREN SLEE**

62.     Plaintiffs' cause and origin expert, Reza opines that the fire at the Hotel on May 1, 2004 was caused by improperly disposed of cigarette embers or cigarettes in room 305. (*See* Ex. 32, Reza Dep., pp. 44-45, ¶¶ 21-2, p. 252, ¶¶ 3-24.)

63.     Reza testified that, "the only clear evidence that I have where smoking materials might have been discarded is when Ms. Castricone brought the ashtray back into the room.  Mr. Fiderio has indicated that he recalls that she *might have* brought the ashtray back into the room, and he does not recall that she had an ashtray in the room." (*See* Ex. 32, Reza Dep., p. 252, ¶¶ 3-24.)

64.     Fiderio, however, testified that Castricone picked up the ashtray and "put it down on the floor of the balcony" and he did not recall seeing the ashtray again after it was placed on the balcony floor. (*See* Ex. 10, Fiderio Dep., p. 44, ¶¶ 11-21.)

65.     Plaintiffs other expert, Darren Slee (*hereinafter* "Slee") opines that the "fire was not caused by an electrical root cause." (*See* Ex. 33, Slee Dep., p. 20, ¶¶ 7-12.)

66.     Slee has based his opinion on the expert report prepared by the Italian public prosecutors. (*See* Ex. 33, Slee Dep., p. 54, ¶¶ 12-22.)

67.     Daren Slee, in reaching his opinion, testified that he can only conclusively rule out electrical faults as a cause of the fire by relying on "the reports of the Rome Fire Department and the public prosecutors." (*See* Ex. 33, Slee Dep., p. 44, ¶¶ 11-17.)

68.     A copy of the report that Slee relied on was marked as Exhibit 5 during Slee's deposition (hereinafter referred to as "Rome Report"). (See Ex. 37, Rome Report.)

69.     The authors of the Rome Report concluded that the subject fire did not have an electrical origin, but the report is virtually silent as to what the authors did to rule out an electrical origin.  (*See* Ex. 37, Rome Report.)

70.     Slee, during his deposition, was questioned about what the authors of the Rome Report did in their investigation, prior to arriving at their conclusion that the fire did not have an electrical origin.  Slee testified that the authors "looked at the copper circuits in the areas *not directly affected by the fire*.  They looked at the electrical panel on the third floor, and they looked at the room of origin and the contents of the room."  (*See* Ex. 33, Slee Dep., p. 51-53, ¶¶ 5-7.)

71.     Slee further testified that the authors looked into the electrical system and determined that it was compliant with European standards, but does not describe their examination.  (*See* Ex. 33, Slee Dep., p. 53, ¶¶ 8-17.)

72.     Lastly, Slee testified that the authors of the Rome Report looked at the timeline of the events leading to the fire to help them rule out electrical causes, and that they did not find any evidence of electrical activity or arcing in the room of origin."  (*See* Ex. 33, Slee Dep., p. 53, ¶¶ 18-21.)

73.     Slee's statement that the authors of the Rome Report "did not find any evidence of electrical activity or arcing in the room of origin" does not appear in the Rome Report.  (*See* Ex. 32, Reza Dep., p. 110, ¶¶ 13-22; Ex. 37, Rome Report.)

74.     Slee testified that he believes that the authors of the Rome Report looked into evidence of electrical activity based on a conversation he had with Reza.  Reza, who is plaintiff's alternative cause and origin expert, became frustrated by the lack of information in the Rome Report so he spoke to a Mr. Vaccaroni (*hereinafter* "Vaccaroni").  Vaccaroni told Reza that Italian fire investigators do not explicitly mention lack of evidence in their reports.  (*See* Ex. 33, Slee Dep., p. 55, ¶¶ 7-18; Ex. 32, Reza Dep., p. 113-114, ¶¶ 10-20.)

75.     Slee believes that the Italians look for evidence, but do not necessarily mention something that they do not find.  (*See* Ex. 33, Slee Dep., p. 55, ¶¶ 7-18.)

76.     Based upon this conversation that Reza had with Vaccaroni, Slee *concluded* that the authors of the Rome Report *must have* conducted a proper examination of the electrical evidence in room 305.  (*See* Ex. 33, Slee Dep., p. 55, ¶¶ 7-22.)

77.     Further, based upon Slee's conversation with Reza, Slee believes that the authors of the Rome Report, conducted their investigation in generally the same manner that they are conducted in the U.S., but do not document their investigation the same meticulous way.  Based on this information, Slee accepted the Rome Report, with its omissions, as reliable and, therefore, rendered his conclusive opinion. (*See* Ex. 33, Slee Dep., p. 65-66, ¶¶ 1-2.)

78.     Further, Slee, in reaching his opinion accepted, "Mr. Reza's opinion about timeline and the events that occurred."  (*See* Ex. 33, Slee Dep., 20, ¶¶ 7-17.)

79.     Reza, like Slee, conclusively opined that the fire did not have an electrical origin based upon the Rome Report, despite Reza's frustration and acknowledgments of the lack of information about any examination of the electrical material in room 305 in the Rome Report. (*See* Ex. 32, Reza Dep., pp. 113-114, ¶¶ 10-22.)

80.     Reza's justification for relying on the Rome Report, as indicated above, is based solely on a conversation he had with Vaccaroni, who told him that the Italians do not put negative information like "no arcing" in their reports.  (*See* Ex. 32, Reza Dep., pp. 113-114, ¶¶ 10-20.)  Based exclusively on this conversation, Reza *assumed*, as did Mr. Slee, that the authors of the Rome Report looked for electrical activity in room 305.  (*See* Ex. 32, Reza Dep., pp. 113-114, ¶¶ 10-20.)

[signature only on next page]

Respectfully submitted,
By the defendant,
Rachel Castricone,
By her attorney,

/s/ Paul J. Gillespie

Paul J. Gillespie, Esq.
BBO No.: 192280
GILLESPIE & ASSOCIATES
200 Broadway, Suite 106
Lynnfield, MA 01940
Tel: 781-581-1700
Fax: 781-599-2544

Dated:December 4, 2009

### CERTIFICATION

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 4, 2009.

/s/ Paul J. Gillespie

Paul J. Gillespie, Esq.