## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ICEM S.P.A.,
AURORA ASSICURAZIONI S.P.A.,
     Plaintiffs,

v.

Civil Action No.: 07-CV-10819-RCL

HARVEY INDUSTRIES, INC.,
RACHEL CASTRICONE and
TRACEY BOULDOUKIAN,
     Defendants.

## DEFENDANT, RACHEL CASTRICONE'S MEMORANDUM IN SUPPORT OF HER MOTION TO STRIKE THE OPINIONS OF PLAINTIFFS' LIABILITY EXPERTS, ALI REZA AND DAREN SLEE OF EXPONENT FAILURE ANALYSIS ASSOCIATES, INC., ON THE GROUNDS THAT THE PLAINTIFFS FAILED TO PRESERVE KEY EVIDENCE[1] [2]

The defendant, Rachel Castricone, submits this Memorandum in support of Defendant, Rachel Castricone's Motion to Strike the Opinions of Plaintiffs' Liability Experts, Ali Reza and Daren Slee of Exponent Failure Analysis Associates, Inc., on the Grounds that the Plaintiffs Failed to Preserve Key Evidence.

## I.    INTRODUCTION

### A.    BACKGROUND REGARDING CAUSE OF ACTION AND PARTIES

This is an action that stems from a fire that occurred on May 1, 2004 in Rome, Italy at the Grand Hotel Parco dei Principi  (*hereinafter*, "the Hotel").  The Plaintiffs allege that they sustained damages as a result of the Hotel fire that they attribute to Rachel Castricone ("Castricone").  The Plaintiff, ICEM S.P.A. (*hereinafter, "*ICEM")

---

[1] The facts set forth in this Memorandum have been drawn from Defendant, Rachel Castricone's Concise Statement of Material Facts pf Record as to Which Rachel Castricone Contends There Is No Genuine Issue To Be Tried, which was filed at the same time that that this Memorandum was filed.  The defendant, consequently, cites to Rachel Castricone's Concise Statement whenever possible.

[2] The facts set forth herein are set forth solely for the purpose of Defendant, Rachel Castricone's Motion to Strike the Opinions of Plaintiffs' Liability Experts, Ali Reza And Daren Slee Of Exponent Failure Analysis Associates, Inc., on the Grounds that the Plaintiffs Failed to Preserve Evidence.

owns and operates the Hotel in Rome, Italy, which consists of 182 rooms on 7 floors. (*See* Castricone's Concise Statement of Undisputed Material Facts, p. 1, ¶ 1.)  Aurora Assicurazioni S.P.A. ("Aurora") is an insurance company incorporated in Italy that insured ICEM on the date of the fire.  *Id.* at 1, ¶ 2.  Aurora indemnified ICEM for certain property damage and other damage caused by the fire.  Aurora became subrogated to some of ICEM's claims.  *Id.* at 1, ¶ 4.  Also, ICEM claims that it sustained damages from the fire that were not covered by its insurance policy with Aurora.  *Id.* at 2, ¶ 5.

**B.  FACTS PERTAINING TO FIRE AND PLAINTIFFS' FAILURE TO PRESERVE KEY EVIDENCE**

Castricone was in room 305 when the Hotel fire began.  *Id.* at 2, ¶ 7.  The fire was ultimately extinguished and the Rome Police immediately seized the Hotel after the fire on May 1, 2004.  *Id.* at 7, ¶ 43.  Also, immediately after the fire, ICEM, the owner and operator of the Hotel, sent a written claim to Aurora regarding the fire.  *Id.* at 8, ¶ 51.  Aurora, through Cincotti Studio ("Cincotti"), began its work at the Hotel 3 days after the fire, May 4, 2004.  *Id.* at 8, ¶ 51.  Further, within two weeks of the fire both Aurora and ICEM had retained legal counsel.  *Id.* at 8, ¶ 52.

Upon seizure of the Hotel, the Rome Police on May 1, 2004 seized four digital recorders that contained recorded images of various floors of the Hotel before, during and after the fire.  *Id.* at 7, ¶ 45.  Rome's Criminal Laboratory Department also confiscated several samples of combustion residue from Rooms 305 and 312 and two samples of combustion residue material from the floor of the corridor adjacent to the entrance to room 305 on May 1, 2004.  *Id.* at 7, ¶ 45.  On May 4, 2004, the City of Rome seized room 305's waste paper bin.  *Id.* at 7, ¶ 46.  Aside from what is described above, the City of Rome's agencies did not seize any other physical evidence from room 305.  *Id.* at 8, ¶ 47.  The City of Rome did not seize any ashtrays, cigarettes or any cigarette remnants

from room 305.  (*See* Castricone's Concise Statement of Undisputed Material Facts, p. 8,

¶ 48.)  The City of Rome did not seize any electrical material from either rooms 304, 305

or 306 or any other portion of the Hotel.  *Id.* at 8, ¶ 49.  On July 21, 2004, the City of

Rome's Public Prosecutor's Office fully released its seizure of the Hotel and the Hotel

took full possession of the Hotel.  *Id.* at 8, ¶ 50.

Before and after the Hotel was fully released by the City of Rome, ICEM, under

the supervision of Aurora, had its third floor cleared of fire remnants between May 5,

2004 and August 23, 2004, which included "furnishings and fittings, carpet, furniture,

TV and fridge and some bathroom fixtures… [and] fine rubble, windows, doors, fan-

coils, false ceilings, carpet and wall coverings from [its] corridor." *Id.* at 9, ¶ 56.  ICEM

also demolished all third floor air conditioning and heating systems.  *Id.* at 9, ¶ 57.

Between July 22, 2004 and December 2004, smoke-blackened walls and ceilings were

pressure washed.  *Id.* at 9, ¶ 58.  In September 2004, ICEM, "called several firms to start

work on the reconstruction of walls and on the electrical/plumbing systems, carpentry

structures and upholstery and carpets." *Id.* at 9, ¶ 58.  The Hotel, in the presence of

Aurora, was completely renovated by December 2004.  *Id.* at 9, ¶¶ 54-58.

During the Hotel's reconstruction, Cincotti, on behalf of Aurora and in

compliance with Aurora's procedures, was charged with looking into both, "the nature

of the damage and its origin and quantifying the damage" on behalf of Aurora.  *Id.* at 9, ¶

54.  In other words, Aurora, ICEM's insurance company, either knew or should have

known that ICEM was destroying and renovating what was left of the third floor,

including room 305, between May 2004 and December 2004.  Further, during the week

following the fire, and based upon all the police activity in and around the Hotel, both

Aurora and ICEM knew or should have known that the authorities were focusing their attention on the cause of the fire to the third floor and room 305.

Approximately two years after the fire, and more than one year after key evidence was discarded, the Plaintiffs brought suit against the Defendants in this Court. *By the time suit was brought, room 305 and the areas in around room 305 had been completely destroyed and any remnants not seized by the Rome Police had been discarded.* The only evidence available to the Defendants for physical inspection, with regard to the cause of the fire, was the material seized by the City of Rome. The Plaintiffs, despite electrical problems in the Hotel leading up to the fire, failed to take into custody or preserve any of the wiring, outlets, electrical appliances, wall studs, switches or other potential electrical causes of the fire, none of which was seized by the City of Rome. Aurora's and ICEM's failure to preserve key evidence has significantly handicapped and prejudiced the Defendants' experts' ability to investigate the cause and origin of the fire.

William Gale who is Harvey Industries, Inc.'s cause and origin expert testified that, "the cause of the fire is unknown and can no longer be investigated in a meaningful manner due to a failure of hotel management to ensure a proper investigation was performed at the time of the loss, and that the prerequisite data and documentation, including all relevant physical evidence, was collected and preserved as prescribed by the standard of care for fire and the origin insofar as we can get to the specific origin and cause, which we do not know at this point. (*See* Ex. 1, Gale Dep., pp. 58-59, ¶¶ 18-3.) John Malcolm, who is Castricone's cause and origin expert, opines that because there was no proper investigation to eliminate an electrical failure as the cause of the Hotel's fire and room 305 was quickly destroyed when it was released by the City of Rome the Defendants cannot determine if an electrical failure caused the fire. (*See* Ex. 2, Report

of John D. Malcom, pp. 15-16.)  Wayne Miller, Tracey Bouldoukian's cause and origin

expert, opines that because several potential ignition scenarios and cause-related factors

relating to electrical failure could not be thoroughly investigated or eliminated several

potential ignition sources cannot be eliminated as having caused the fire.  (*See* Ex. 3,

Report of Wayne Miller of Wright Group Inc., p. 32)

     Further, various individuals who stayed in the Hotel at the time of the fire indicate

that there were electrical problems in the Hotel just prior to the start of the fire.  The

Affidavits of these individuals, which are exhibits to Castricone's Concise Statement of

Undisputed Material Facts, indicate:

- Kim Meixel, a hotel guest that stayed in room 304[3] between April 28,

  2004 and May 1, 2004, heard what sounded like "the heat coming on followed by

  crackling sounds emanating from within the walls" shortly before someone

  pounded on her door warning her of the presence of fire.  (*See* Castricone's

  Concise Statement of Undisputed Material Facts, p. 6, ¶ 35.)

- David Castricone stayed in room 306 at the Hotel while Rachel

  Castricone stayed in room 305 and during this time David Castricone

  experienced a series of electrical problems.  The first electrical problem occurred

  when David Castricone first checked into room 306 on April 29, 2004 when he

  put his card in the Hotel door for room 306 to open it and the lights in room 306

  went out.  This happened a second time on the same evening (April 29, 2004)

  when David Castricone returned to his room and the card he inserted into his

  door caused the lights to go out.  Thereafter, on April 30, 2004, the lights went

---

[3] Room 304 is adjacent to room 305 and shares a common wall with room 305.

out again when his wife, Patti Castricone, was using a blow dryer in room 306.

(*See* Castricone's Concise Statement of Undisputed Material Facts, p. 5, ¶ 33.)

- Rachel Castricone while in room 306 during the evening of April 30,
2004, which is a room adjacent to room 305 and shares a common wall with
room 305, experienced an electrical problem while using a hairdryer.
Specifically, while Rachel Castricone was using the hairdryer all the lights in
room 306 went out and the room lost power. *Id.* at 5, ¶ 34.

- Richard Jacques, a hotel guest staying on the third floor on April 30, 2004
and May 1, 2004, experienced several electrical problems in his room. He turned
on the air conditioning in his room and it stopped working and then worked
intermittently through the hours leading up to the fire. In addition, circuit
breakers in his room kept tripping causing power outages. *Id.* at 6, ¶ 37.

- John E. Anderson, a hotel guest staying on the second floor, observed
several electrical problems and had several lights that were inoperable in his
room on the second floor while staying in the Hotel between April 30, 2004 and
May 1, 2004. *Id.* at 6, ¶ 38.

- Patti Crouch, a hotel guest that was on the fourth floor on May 1, 2004,
experienced problems with lights in her room, had several electrical outlets in her
room that were inoperable, and observed an outlet in her room emit smoke and
sparks. *Id.* at 6, ¶ 39.

- Kathleen Tavella, a hotel guest that was on the first floor between April
30, 2005 and May 1, 2004, used a hair dryer provided by the Hotel that caused
the lights in her hotel room bathroom to flicker. *Id.* at 7, ¶ 40.

- Richard Mute, a hotel guest that was on the fourth floor on May 1, 2004, has reported that several electrical outlets in his room were inoperable and that he observed an outlet in his room emit smoke and sparks. (*See* Castricone's Concise Statement of Undisputed Material Facts, p. 7, ¶ 41.)

- Judith Fishman, a hotel guest between April 30, 2004 and May 1, 2004, plugged in a hairdryer in a wall socket in her room's bathroom and observed sparks and smoke emanate from the area around the plug. *Id.* at 7, ¶ 42.

- Immediately after Tracey Bouldoukian woke up her parents, Karl Bouldoukian immediately smelled a strong electrical odor. *Id.* at 6, ¶ 36.

Despite all of the above electrical issues, the Plaintiffs failed to properly preserve the fire scene for inspection by the Defendants.[4]

## II. ARGUMENT

### THE PLAINTIFFS FAILED TO PRESERVE KEY EVIDENCE, WHICH HAS PREJUDICED THE DEFENDANTS, AND THE PROPER REMEDY FOR PLAINTIFFS' FAILURE TO PRESERVE EVIDENCE IS EXCLUDING THE OPINIONS OF ALI REZA AND DAREN SLEE

The Plaintiffs in this case had access to key evidence and had a reasonable opportunity, as well as an obligation, to preserve any and all material that was not seized by the City of Rome during it investigation. Despite this access, the Plaintiffs failed to preserve key evidence in the area where they claim the fire originated. ICEM, in the presence of it insurer, Aurora, cleared all fire remnants from the third floor of the Hotel and completely renovated the Hotel's third floor, making it impossible for any of the defense experts to conduct an adequate investigation into the cause of the fire. The

---

[4] Ironically, there was a second fire on June 24, 2004 in room 209, which involved a spontaneous electrical fire in the ceiling that housed the air system. The fire produced a thick black smoke that energized the alarm. A witness, this fire was contained by the use of a fire extinguisher. (*See* Ex. 4, Arnaldo Carpinone De Riso Dep. pp. 14-15, ¶¶ 14-5, pp. 17-18, ¶¶ 12-3, pp. 20-23; ¶¶ 6-14; Ex. 5, Report of Italian Fire Brigade.)

Plaintiffs failure to preserve key evidence from the third floor or room 305 has unfairly prejudiced all of the Defendants' cause and origin experts.

Fair access to available evidence is at the heart of the doctrine of spoliation and the remedy for spoliation is a matter of federal law. *See* Headley v. Chrysler Motor Corp., 141 F.R.D. 362, 364 (D. Mass. 1991) (approving and adopting decision of Cohen, M.J.). The term "spoliation" refers not only to the intentional or malicious destruction or alteration of relevant evidence, but also to the negligent failure to preserve such evidence. *See* Townsend v. American Insul. Panel Co., 174 F.R.D. 1, 4 (D. Mass. 1997) (Collings, M.J.). Once it is established that relevant evidence has been destroyed, "the next step is to decide the appropriate sanction to be imposed upon the spoliator." *Id.* The options, "include dismissal of the case, the exclusion of evidence, or a jury instruction on the 'spoliation inference' "--that is, a permissible inference that the evidence destroyed would have been unfavorable to the spoliator. *Id.* (internal quotations omitted).

The key factors to be considered by a court in imposing sanctions for spoliation are, "the degree of fault of the offending party," the degree of prejudice to the non-offending party, and whether that prejudice can be cured by other means. *See* Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 29 (1st Cir. 1998); Headley, 141 F.R.D. at 365. Exclusion of evidence is perhaps the most common remedy, and it is clear that a district court has discretion to exclude evidence wherever "necessary to prevent the non-offending side from suffering unfair prejudice," *even where* the exclusion may be fatal to the spoliating party's claims. *See* Sacramona, 106 F.3d 444, 446 (1st Cir. 1997) (emphasis added). The justification for imposing so severe a sanction is not merely, "punishment for egregious conduct" by the spoliating party, or "deterrence" of such

conduct in other cases. *Id.; Trull v. Volkswagen of America, Inc.*, 187 F.3d 88, 95 (1st Cir. 1999). Rather, "the primary aim is remedial," and "[f]airness to the opposing party... plays a substantial role in determining the proper response to a spoliation motion." *Id.*

In a case such as the one currently before this Honorable Court, a party's failure to preserve crucial evidence can truly handicap a defendant, because careful expert examination of a fire scene is crucial to properly respond to an opponent's theory as to how a fire occurred. *See, e.g., Trull*, 187 F.3d at 95 (failure to preserve accident vehicle); Sacramona, 106 F.3d at. 446 (destructive examination and cleaning of accident wheel, and loss of other evidence through delay); Northern Assur. Co. v. Ware, 145 F.R.D. 281, 283 (D. Me. 1993) (failure to preserve fire scene); Headley, 141 F.R.D. at 365 (failure to preserve accident vehicle). Absent a fair opportunity to examine key evidence, a case may be unfairly transformed into a highly unsatisfactory "battle of the experts." *See* Trull, 187 F.3d at 96; Headley, 141 F.R.D. at 366.

While a court should consider the degree of fault involved in a party's spoliation of evidence--e.g., whether the evidence was destroyed maliciously and in bad faith--it is clear that "bad faith is not essential," and if evidence is not preserved even "through carelessness, and the other side is prejudiced," a district court "is entitled to consider imposing sanctions, including exclusion of the evidence." Sacramona, 106 F.3d at 447. Indeed, there are cases in which evidence has been excluded as a sanction where the loss of evidence was negligent--that is, was done or permitted despite notice of the importance of the evidence destroyed--rather than provably malicious or by design. *See, e.g., Trull*, 187 F.3d at 95-96 (plaintiff negligently failed to preserve accident vehicle); Headley, 141 F.R.D. at 362-67 (plaintiff negligently failed to preserve accident vehicle); Sacramona,

106 F.3d at 446-50 (plaintiff's expert cleaned accident wheel, destroying key markings, and plaintiff waited three years to give defendant notice of claim, resulting in loss of other potentially important evidence).

In Northern Assurance, a case arising from a structural fire in a private home, the plaintiff insurer had received prompt notice of the incident and had retained an adjuster, just like Aurora did in this case.  The adjuster reportedly advised the homeowners not to touch the house until all necessary investigation was completed, to which they agreed. Northern Assur. Co. v. Ware 145 F.R.D. at 281-84. The fire was initially investigated by a state fire marshal, who identified a malfunction in an electrical cable as the ignition source, and also by an expert fire investigator retained by the insurer, who took photographs and prepared a report identifying the origin as a chimney and the cause as a faulty stove pipe. *Id.* at 281-82.  Within three months after the fire, the homeowners had removed the remains of the house. *Id.* at 282.  Four months later, the insurer for the first time notified the stove pipe manufacturer, distributors and installer of a potential subrogation claim. *Id.*  When suit was brought, the defendants moved to dismiss the complaint, or in the alternative to preclude plaintiff's expert fire investigator from testifying, based on the spoliation of the fire scene. *Id.*

The Northern Assurance Court (Carter, C.J.) began by recognizing that the defendants had "plainly" been "severely prejudiced" in developing their response to the plaintiff's claims, in that they were unable to have an expert inspect either the electrical cable cited by the fire marshal as the likely cause of the fire, or the evidence cited by plaintiff's expert in support of his opinion that the fire was caused by the stove pipe. *Id.* at 283.  The prejudice to the defendants was "mitigated somewhat" by the availability of

the fire marshal and the records of his neutral investigation, and the preservation of some fuses from the scene, but could not "really be cured." *Id.*

The Northern Assurance court found that even though the plaintiff insurer had not acted intentionally or maliciously in failing to preserve the scene for inspection by the defendants, the "[p]laintiff's actions can easily be termed reckless.  This is not a case in which the conduct of a lay person, inexperienced in the conduct of litigation, has resulted in the destruction of evidence. This is a case brought by an insurance carrier pursuing its subrogation rights after having paid off an insured's claim. Insurance companies are no strangers to litigation, and it seems likely that [p]laintiff had litigation in mind when, very soon after the fire, it had its own expert examine the site. The information provided by [p]laintiff's expert made litigation a distinct possibility, if not a likelihood.  Although insurance companies, no doubt, may be under pressure speedily to conclude their dealings with their insureds, the need to do so does not relieve them from the necessity of acting responsibly with respect to the preservation of relevant evidence when they are in possession of information that makes it likely that litigation will ensue... Knowing what it did, [p]laintiff was palpably remiss in failing to make reasonable arrangements within the range of possibility to preserve the evidence at the scene that was relevant to determining the causation of the fire." *Id* at 283-84.

The Northern Assurance court observed that the insurer could have satisfied its obligation either by taking steps to preserve the remains of the house until some time after suit was commenced, or, to the extent this was infeasible, by memorializing the condition of the house "by precise and detailed reports and photographs made by those knowledgeable in the field of fire causation analysis," as opposed to the "selective" preservation and photographing that occurred. *Id.* at 284.  The court, consequently,

concluded that the conduct of the plaintiff insurer raised "questions of profound importance to the integrity of the legal process... A fair trial requires that both parties be heard and that both parties be permitted wherever possible to marshal and present evidence relevant to their positions in the litigation. We must accept, without recourse, that that ideal may be defeated by the accidental, random, or unintended dissipation of evidence by persons having no interest in its preservation, by those benignly unenlightened to its future importance, or by the operation of the law of entropy uninfluenced by human agency.... It is not too much to expect, however, that a party knowledgeable of litigation strategy, tactics, and policies who invokes the aid and jurisdiction of the Court and its processes not have acted unfairly to preclude the opportunity of an adversary to be apprised of the existence of a defense to a plaintiff's claims." *Id.* Accordingly, the court ordered, the plaintiff would be barred from presenting the testimony or conclusions of its expert fire investigator, except in limited rebuttal in the event the defendants elected to call the state fire marshal to testify. *Id.*

The same relief was ordered by the court in Headley v. Chrysler Motor Corp., a products liability action arising out of an automobile accident, in which the plaintiffs failed to preserve the accident vehicle following inspection by one of his two expert witnesses. *Id.*, 141 F.R.D. at 362-64. The court rejected plaintiffs' argument that they, too, had been prejudiced by the spoliation and that the "equal 'prejudices,' in some manner, cancel each other out," likening the contention to "the legal yarn in which a child, having just been convicted of matricide and patricide, sought mercy from the court for the reason that he was then an orphan." *Id.* at 366 & n.20; *and see* Trull, 187 F.3d at 95-96 (rejecting similar argument).

In Sacramona v. Bridgestone/Firestone, Inc., a design-defect case arising from an accident during the mounting of an automobile tire at a gasoline service station, the district court (Gorton, J.) found that the defendant tire and wheel manufacturers had not received notice of the claim until three years after the accident, by which time the station had been sold, and the tire, mounting machine, and various manuals and documents had been lost. *Id.,* 106 F.3d at 445-46. Further, the plaintiffs' experts had materially altered the subject wheel during their examination and cleaning of it, before the defendant manufacturers were given any opportunity to examine it, in particular by removing markings that might have indicated whether the tire had been mismatched in size with the wheel, as was plaintiff's theory. *Id.* at 446. The district court ruled that all evidence concerning the wheel should be excluded, and that the defendants were entitled to summary judgment dismissing plaintiff's claims, both on the ground that the wheel evidence was essential to plaintiff's claims, and on the ground that the defendants had been prejudiced by the unreasonably delayed notice of plaintiff's claims, barring as a matter of law any claim for breach of warranty under Massachusetts law. *Id.*

The First Circuit affirmed and found that the sanction of exclusion of the wheel evidence--or, at least, exclusion of evidence supporting the plaintiff's contention that the tire was mismatched with the wheel was within the district court's discretion. *Id.* at 446-48. It was undisputed that other evidence present at the scene of the accident--the tire, other wheels and tires in the customer's van, and equipment and manuals in the garage-- had been lost, and might have been preserved with earlier notice to the defendants. *Id.* at 449. "[T]o show prejudice based on lack of notice," the court made clear, "the defendants needed only to prove that evidence was lost that might well have helped them, and that they have done." *Id.*

Application of the foregoing principles to the undisputed facts in the present case makes it clear that precluding the Plaintiffs from offering the opinions of their cause and origin experts, Ali Reza and Daren Slee is warranted.  Aurora began its work at the Hotel on May 4, 2004 and oversaw the destruction and renovation of the Hotel's third floor.  There is no question that ICEM and Aurora were actually or constructively aware within a matter of days after the fire that the fire appeared to have originated from either the third floor or room 305.  The City of Rome's immediate investigation into the cause of the fire, which was on May 1, 2004, focused on the third floor of the Hotel and, in particular, room 305.  Neither Aurora nor ICEM, however, took steps to ensure that either room 305 or the contents of the room were properly preserved, even after the Hotel was fully released by the City of Rome.  No effort was made to preserve the fire scene, or to photograph and document it in the objective detail required of a fire investigation.

As the court concluded in Northern Assurance, the actions of ICEM and Aurora in failing to preserve critical evidence, "can easily be termed reckless," particularly as one is a sophisticated insurance carrier and the other is a sophisticated business entity that were both represented by counsel almost immediately after the fire.  The prejudice to Defendants from the destruction of evidence in this case "cannot really be cured," and is not mitigated.  Nor is the prejudice in a case such as this mitigated, as the courts have made clear, by the fact that plaintiff, too, may be disadvantaged by the lack of evidence.  Headley, 141 F.R.D. at 366; Trull, 187 F.3d at 95-96

Under the circumstances of this case, which includes the multitude of electrical issues in the Hotel prior to the fire, this Court should remedy the Plaintiffs' spoliation of evidence by precluding ICEM and Aurora from offering the opinions of Ali Reza and Daren Slee as ICEM and Aurora, as a matter of fundamental fairness, should not be

placed in a position of being able to make allegations as to the cause of the fire and resulting damage, while the defendants are largely or wholly precluded from responding to such claims with alternative explanations due to the spoliation of critical evidence by the Plaintiffs.

## III.    CONCLUSION

For the reasons set forth herein, Castricone's motion should be ALLOWED.

Respectfully submitted,
By the defendant,
Rachel Castricone,
By her attorney,

Dated: December 4, 2009

/s/ Paul J. Gillespie
Paul J. Gillespie, Esq.
BBO No.: 192280
GILLESPIE & ASSOCIATES
200 Broadway, Suite 106
Lynnfield, MA 01940
Tel: 781-581-1700
Fax: 781-599-2544

### CERTIFICATION

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 4, 2009.

/s/ Paul J. Gillespie

Paul J. Gillespie, Esq.