# Exhibit A
# to the Pencu Affidavit

*Failure Analysis Associates*



**Privileged and Confidential:  Prepared at the Request of Counsel**

# Engineering Investigation of the Parco dei Principi Hotel Fire



**Privileged and Confidential:  Prepared at the Request of Counsel**

# Engineering Investigation of the Parco dei Principi Hotel Fire

Prepared for

John E. Tener, Esq.
Robinson & Cole LLP

Prepared by

Ali Reza, P.E.
Exponent Failure Analysis Associates, Inc.
5401 McConnell Ave
Los Angeles, CA 90066

May 27, 2009

© Exponent, Inc.

Doc. no.  LA32609.000 A0T0 0509 AR01

**Privileged and Confidential:  Prepared at the Request of Counsel**

# Contents

|  |  | Page |
|---|---|---|
| **List of Figures** | | **iv** |
| **List of Tables** | | **viii** |
| **Executive Summary** | | **ix** |
| | Compensation, publications, and prior testimony | x |
| **1.** | **Introduction** | **1** |
| **2.** | **Hotel Parco dei Principi** | **3** |
| | Building layout | 3 |
| | Room 305 | 11 |
| | Reception desk and hotel management equipment | 13 |
| **3.** | **Investigation and Analysis** | **15** |
| | Security camera analysis | 15 |
| | Temporal alignment of security camera footage and phone records | 16 |
| | Badge system | 18 |
| | Fire alarm system | 19 |
| | Detailed fire and smoke modeling | 24 |
| | FDS results | 27 |
| **4.** | **Sequence of Events on Incident Date** | **35** |
| | Timeline – Actions of guests before fire | 35 |
| | Timeline – During fire | 42 |
| | 5th floor | 52 |
| **5.** | **Fire Origin and Cause** | **57** |
| | Public Prosecutor expert report | 57 |
| | Castricone experts | 58 |
| | Bouldoukian expert | 59 |
| | Hotel experts | 60 |



**Privileged and Confidential:  Prepared at the Request of Counsel**

Compliance with NFPA 921, Guide for Fire and Explosion Investigations        60

Exponent opinions on causation        62
    Causation via smoking materials        62
    Electrical causation ruled out        65

**6.        Codes Compliance        73**

**7.        Conclusions        73**


Appendix A    FDS, Smokeview, and PyroSim
Appendix B    DVD of Video Camera Analysis
Appendix C    DVD of Video Camera and FDS Analysis
Appendix D    Compensation, Publications, and Prior Testimony of Ali Reza, P.E.



**Privileged and Confidential:  Prepared at the Request of Counsel**

# List of Figures

Page

Figure 1.  Aerial image of Parco dei Principi Hotel.  3

Figure 2.  Main stairway (double door) on guest floor with alternate stairway on the
right side of the photograph.  4

Figure 3.  Three guest elevators to the left of the main stairway.  5

Figure 4.  Floor plan of the 3rd floor showing the location of the incident room and
notable features.  6

Figure 5.  Room 405 ceiling cavity after fire (Comando Provinciale Vigili del Fuoco
Roma presentation).  7

Figure 6.  Room 432 ceiling cavity after fire (Comando Provinciale Vigili del Fuoco
Roma presentation).  8

Figure 7.  Room 305 ceiling cavity after fire (Comando Provinciale Vigili del Fuoco
Roma presentation).  8

Figure 8.  Room 332 ceiling cavity after fire (Comando Provinciale Vigili del Fuoco
Roma presentation).  9

Figure 9.  Vertical cavity, April 2008 inspection.  10

Figure 10.  Circuit breaker panel on fifth floor of rooms, April 2008 inspection.  11

Figure 11.  Room 405 with a similar layout to room 305 (Comando Provinciale Vigili
del Fuoco Roma presentation).  12

Figure 12.  Desk, chair and wastebasket next to curtain and sliding glass door in room
305, April 2008 inspection.  Exponent notes that the basket was originally
on the right side of the table and the current occupant had moved it to the
left.  12

Figure 13.  Reception desk viewed from the security camera.  14

Figure 14.  LCD-6000 remote annunciators on the reception desk (arrow), April 2008
inspection.  20

Figure 15.  Fire alarm light on 3rd floor, April 2008 inspection.  21

Figure 16.  Layout of room 305 and corridors.  Yellow arrows point to smoke detectors.  26

Figure 17.  Features in room 305, including furniture, wastebasket, curtains, and vents.  26

Figure 18.  4-cm gap between arrows found in room 305 sliding glass door (Comando
Provinciale Vigili del Fuoco Roma presentation).  27

Ex⁻

**Privileged and Confidential:  Prepared at the Request of Counsel**

Figure 19.   Security camera image (left) of flames compared with FDS simulation result (right).  Flame is visible inside red box.   29

Figure 20.   Sequence of images as the door to room 305 opens, closes, and reopens at 5:17:50 a.m.  The images on the left are from video camera 9 and the simulation images are shown on the right from the same angle.   30

Figure 21.   Temperature at 90 cm off the floor in the middle of the bed.   33

Figure 22.   Radiative heat flux onto bed area.   34

Figure 23.   Ms. Castricone at the reception desk with beer in hand.  Corrected time shown in lower right corner.   36

Figure 24.   Image analysis used to determine the approximate size of the bottle.  The length of Ms. Castricone's head was determined from other images.   37

Figure 25.   Image enhancement of Ms. Castricone's beer bottle on reception desk.   37

Figure 26.   Ms. Castricone exhaling cigarette smoke while Ms. Bouldoukian makes a call to the U.S. from reception phone.  Corrected time shown in lower right corner.   38

Figure 27.   Ms. Bouldoukian smoking a cigarette.  Corrected time shown in lower right corner.   38

Figure 28.   View from room 305 balcony looking down at pool of water in front of the main entrance, April 2008 inspection.   41

Figure 29.   Composite image of third floor (top) and ground floor (bottom) video cameras. On the ground floor, Mr. Scarano is seen attending to the first illuminated LCD-6000 panel.   44

Figure 30.   Composite image of third floor (top) and ground floor (bottom) video cameras.  Mr. D'Arielli leaning over reception desk at second illuminated LCD-6000 panel.   45

Figure 31.   Composite image of third floor (top) and ground floor (bottom) video cameras.  Mr. Scarano and Mr. D'Arielli in front of LCD-6000 panel.  Door to room 305 opens (arrow) and smoke is visible exiting room.   47

Figure 32.   Room 305 during fire.  Flame visible inside room and smoke pouring into the hallway (flame denoted by red arrow).   48

Figure 33.   Smoke detectors (yellow arrows) outside room 305 in secondary corridor (left) and in main corridor in front of elevator (right).   49

Figure 34.   Composite image of third floor (top) and ground floor (bottom) video cameras.  Mr. D'Arielli exiting the elevator on the third floor (top left frame blue arrow); on the ground floor, Mr. Scarano is attending to the illuminated LCD-6000 panel.   49



**Privileged and Confidential:  Prepared at the Request of Counsel**

Figure 35.   Composite image of third floor (top) and ground floor (bottom) video cameras.  Mr. D'Arielli visible in front of rooms 307/308 on the third floor (top right frame as seen in camera 12 yellow arrow); on the ground floor, Mr. Scarano is attending to the illuminated LCD-6000 panel.   50

Figure 36.   Schematic of fifth floor noting location of the Busque and Lowry rooms as well as the location of video cameras and pull stations.   53

Figure 37.   Composite image of fifth floor video cameras.  Mr. and Mrs. Lowry are exiting their room 513.  Mr. Busque is walking to the south end of the main corridor.  Images correspond to cameras 3, 4, 2, 1, starting at top left image and moving in the clockwise direction.   54

Figure 38.   Circuit breaker for room fans on the fifth floor.   69

Figure 39.   Mr. Scarano retrieving binder (arrow).   71

Figure 40.   Evacuation plan (arrow) in room 316 after the fire (Comando Provinciale Vigili del Fuoco Roma presentation).   72

Figure A1.   Areas included in the computational domain.   A-9

Figure A2.   Smoke detector locations.   A-10

Figure A3.   Top view of the computational mesh blocks.   A-11

Figure A4.   Fire and smoke spread 30 seconds after flaming combustion for cases of Table 4.   A-12

Figure A5.   Fire and smoke spread 45 seconds after flaming combustion for cases of Table 4.   A-13

Figure A6.   Fire and smoke spread 60 seconds after flaming combustion for cases of Table 4.   A-14

Figure A7.   Fire and smoke spread 75 seconds after flaming combustion for cases of Table 4.   A-15

Figure A8.   Fire and smoke spread 90 seconds after flaming combustion for cases of Table 4.   A-16

Figure A9.   Fire and smoke spread 120 seconds after flaming combustion for cases of Table 4.   A-17

Figure A10.   Fire and smoke spread 180 seconds after flaming combustion for cases of Table 4.   A-18

Figure A11.   Temperature slice located in the middle of the bed for the initial stages of the fire at 15, 30, 45, and 60 seconds.   A-19

Figure A12.   Fire and smoke layer buildup at 15, 30, 45, and 60 seconds.   A-20

Figure A13.   Fire and smoke layer buildup at 90, 120, 150, and 180 seconds.   A-21

**Privileged and Confidential:  Prepared at the Request of Counsel**

Figure A14.   Thermocouple tree and layer zoning devices.                    A-22

Figure A15.   Temperature layer zoning.                                       A-23

Figure A16.   Temperatures from thermocouple tree above bed.                 A-24



**Privileged and Confidential:  Prepared at the Request of Counsel**

# List of Tables

<u>Page</u>

Table 1.    Video cameras and corresponding floors in hotel examined by Exponent    16

Table 2.    Security video synchronization analysis    18

Table 3.    Badge system temporal alignment.    19

Table 4     Comparison of four selected computational cases    29

Table 5.    Smoke detectors activation sequence (Simulation 4)    32

Table 6.    Sequence of events observed by the reception desk security video camera 6
            between 1:26 a.m. and 1:49 a.m. the day of the fire    39

Table 7.    Sequence of events observed on the ground and third guest floors between
            3:30 a.m. and 5:07 a.m. the day of the fire    42

Table 8.    Sequence of events observed throughout the hotel between 5:08 a.m. and
            5:35 a.m. the day of the fire    55

Table A1.   Comparison of smoke detector activation times for Simulation 4 for various
            obscuration levels    A-5



Privileged and Confidential:  Prepared at the Request of Counsel

# Executive Summary

Exponent Failure Analysis Associates, Inc. ("Exponent") was retained by Robinson & Cole, LLP to conduct an engineering investigation of the May 1, 2004 fire at the Grand Hotel Parco dei Principi in Rome, Italy.  They informed Exponent that, for the purposes of our analysis, we should assume that, under Italian Law, the hotel was required to meet the appropriate Italian Life, Health and Safety codes.  The provisions of common United States codes (including the National Fire Protection Association fire codes or the Uniform Mechanical and Building codes) did not apply.  Accordingly, an Italian expert has been retained to provide opinions regarding Italian code requirements for the hotel at the time of the fire.  Exponent was asked to establish the sequence of events before and during the initial stages of the fire and to determine the origin and cause of the fire.

Exponent has reviewed an extensive set of documents that were provided to us, including expert reports, deposition testimony, hotel security videotapes and technical drawings of various hotel subsystems, including the fire alarm system and the electrical system.  We inspected the subject hotel in April 2008 and interviewed various employees and contractors, documented room 305, and examined the fire alarm and guest notification systems.  Exponent also analyzed and time-corrected the security camera data to create a timeline of relevant events before and during the fire, and obtained and tested a newer version of the fire alarm control panel to better understand the sequence of events.

Based on eyewitness accounts, security camera footage, and the results from smoke and fire propagation computer simulations, Exponent has concluded that the subject fire started due to carelessly discarded smoking materials in room 305.



**Privileged and Confidential:  Prepared at the Request of Counsel**

# Compensation, Publications and Prior Testimony

Exponent is compensated at the rate of $490 per hour for Mr. Reza's time for the preparation of this opinion and testimony.  A list of Mr. Reza's publications and prior testimony is included as an appendix to this report.


Ali Reza, P.E.
Corporate Vice President
and Principal Engineer



**Privileged and Confidential:  Prepared at the Request of Counsel**

# 1.    Introduction

Exponent Failure Analysis Associates, Inc. ("Exponent") was retained by Robinson & Cole, LLP to conduct an engineering investigation of the May 1, 2004 fire at the Grand Hotel Parco dei Principi in Rome, Italy.  Specifically, Exponent was asked to establish the sequence of events before and during the initial stages of the fire and to determine the origin and cause of the fire.

The subject fire started during the early morning of May 1, 2004 in room 305 on the third floor of the hotel.  At that time, the room was occupied by two American women, Ms. Rachel Castricone and Ms. Tracy Bouldoukian, who were part of a Harvey Industries tour group in Italy.  During the night before the fire, Ms. Castricone and Ms. Bouldoukian had socialized with members of their tour group in the bar area on the ground floor.  Both women were observed drinking and smoking before leaving the hotel at approximately 1:50 a.m. to go to a dance club.  The group returned at approximately 3:30 a.m., and Ms. Castricone and Ms. Bouldoukian went up to their room with Mr. Matthew Fiderio, another American tourist in their travel group.  Shortly thereafter, Ms. Castricone and Mr. Fiderio returned to the bar area on the ground floor while Ms. Bouldoukian called the United States from her room.  At approximately 4:45 a.m., Ms. Castricone and Mr. Fiderio returned to room 305 and went out on the balcony to smoke cigarettes.  Mr. Fiderio recalled tossing his cigarette butt off the balcony and remembered that Ms. Castricone extinguished her cigarette in an ashtray, but he was not sure whether she left the ashtray on the balcony or brought it back into her room.  Mr. Fiderio left room 305 just before 5 a.m.

Approximately 7 minutes later, the hotel receptionist received a request for a wake-up call from room 305.  About 1 minute later, a smoke alarm alert was triggered at the alarm panel at the reception desk.  A second alarm was triggered a few minutes later while the receptionist had stepped away from the front desk.  Upon returning and examining the fire alarm remote control panel at the front desk, the receptionist sent the night porter to the third floor.  The porter verified that there was a fire on the third floor and the receptionist called the fire department, which arrived at the scene at approximately 5:37 a.m., approximately 13 minutes after they were first called.



**Privileged and Confidential:  Prepared at the Request of Counsel**

While the fire was limited to the third floor, there was extensive smoke and water damage to the structure.  Three guests on the fifth floor died during the incident.  Mr. and Mrs. Busque (in room 532) were found dead in their bathroom.[1]  Mr. Lowry fell while attempting to descend from the balcony of the fifth floor from room 513.

Robinson & Cole informed Exponent that, for the purposes of our analysis, we should assume that, under Italian Law, the hotel was required to meet the appropriate Italian Life, Health and Safety codes.  The provisions of common United States codes (including the National Fire Protection Association fire codes or the Uniform Mechanical and Building Codes) did not apply.  Accordingly, Exponent has relied upon a concurrently filed expert report by Insurance Engineering Services, S.r.l. (the Vaccaroni report) for their interpretation and analysis of Italian requirements.

Exponent reviewed an extensive set of documents that were provided to us, including expert reports, deposition testimony, hotel security videotapes, and technical drawings and schematics of various hotel subsystems, including the fire alarm system and the electrical system.  Exponent inspected the subject hotel in April 2008 to interview various employees and contractors, document room 305, and better understand the fire alarm and guest notification system.  We analyzed the security camera data and created a timeline of relevant events before and during the fire.  We also contacted the manufacturer of the fire alarm control panel and operated a newer and simplified panel to better understand the sequence of events.  Based on eyewitness accounts, security camera footage, and the results from smoke and fire propagation computer simulations using the Fire Dynamics Simulation (FDS) software developed by the National Institute of Standards and Technology (NIST), we have concluded that the fire started due to carelessly discarded smoking materials in room 305.

---

[1]   Statement of O. Saturnino, Chief Inspector of Police, May 3, 2004 (Bates 0001175-176); testimony of Franco Erginni, Criminal Proceeding 14886/07 against Rachel Lynn Castricone, hearing of 14/11/2008, Court of Rome VIII Monocratic Division.

**Privileged and Confidential:  Prepared at the Request of Counsel**

## 2.   Hotel Parco dei Principi

### Building layout

The subject hotel was located at 5 Via Gerolamo Frescobaldi in Rome, Italy and was bounded by Via G. Frescobaldi on the north (the front elevation)[2], Via Saverio Mercadante on the east (the east or left elevation), Via Pietro Raimondi on the west (the west or right elevation), and Via G.B. Pergolisi on the south (the rear elevation), as shown in Figure 1.  The primary guest entrance was located off the front elevation on Via Gerolamo Frescobaldi.  The main reception desk was located at the end of the lobby behind the bank of revolving doors and two side doors used by the guests to exit and enter the premises.



Figure 1.        Aerial image of Parco dei Principi Hotel.

---

[2]   Magnetic north is shown in Figure 1.  For purposes of discussion, Via Gerolamo Frescobaldi is designated as North.



**Privileged and Confidential:  Prepared at the Request of Counsel**

The hotel consisted of eleven floors, including three underground levels, seven guest floors, and the ground floor where the main entrance lobby, hotel bar and restaurant were located.  The ground floor had a larger footprint than the guest floors, and included offices, service rooms and public toilets.  A large garden and swimming pool area was incorporated in front of the west elevation. Three side-by-side elevators adjacent to the reception desk provided access to the guest floors.  Two separate stairways were located next to the guest elevators.  One was used regularly and accessed via a set of double doors; the second was accessed by a sliding pocket door and used primarily in the event of an evacuation.  There were also two service elevators, one behind the guest elevators and one behind the sliding pocket door (Figure 2, Figure 3).



Figure 2.      Main stairway (double door) on guest floor with alternate stairway on the right side of the photograph.

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 3.        Three guest elevators to the left of the main stairway.

Guest floors consisted of two 2.45 m high corridors, a 54 m long main corridor running north-south, which included the elevators, and a secondary 19 m long east-west corridor forming a "T" at the north end of the main corridor.  The fire originated in room 305, at the intersection of these two corridors on the third guest floor.  Figure 4 is a schematic floor plan of a guest floor that highlights the location of the elevators, stairways, and fire alarm pull stations.  There were a total of 183 rooms, with up to 350 beds.[3]

---

[3]    Economic damages assessment expert retained by the hotel (Bates PL008262).  Also see Technical Report of
       Fire Prevention, Hotel Parco dei Principi, May 27, 1996 (Bates 00906-00927).

E$x$

LA32609.000.A0T0 0509 AR01

Privileged and Confidential: Prepared at the Request of Counsel

6



Figure 4.    Floor plan of the 3rd floor showing the location of the incident room and notable features.

**Privileged and Confidential:  Prepared at the Request of Counsel**

The corridors on each floor incorporated false ceilings that concealed a 60 cm (approximately) high contiguous crawl space containing common utilities.[4]  The hallway and bathroom of each room also had a 70 cm (approximate) crawl space that incorporated ventilation ducts (including the bathroom exhaust) and served as the return air plenum (Figure 5 through Figure 8).  The supplementary cooling/heating units for the make-up air were mounted in this space.  All floors were connected via vertical shafts (Figure 9) that serviced two rooms on each floor (i.e., approximately 16 shafts per floor).  This vertical shaft, which included water, sewage and bathroom fan exhaust pipes, was located between the bathrooms and accessed via a locked doorway in the corridor.  Exponent understands that the shafts for the sixth and seventh floors were offset from the shafts on floors 1-5.[5]



Figure 5.      Room 405 ceiling cavity after fire (Comando Provinciale Vigili del Fuoco Roma presentation).

---

[4]    Public Prosecutors indicated that the crawl space in the corridors and the rooms was approximately 70 cm. However, Exponent determined that the false ceiling in the rooms was slightly lower than the false ceiling in the corridors.

[5]    Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004, p. 20.

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 6.        Room 432 ceiling cavity after fire (Comando Provinciale Vigili del Fuoco
                Roma presentation).



Figure 7.        Room 305 ceiling cavity after fire (Comando Provinciale Vigili del Fuoco
                Roma presentation).

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 8.        Room 332 ceiling cavity after fire (Comando Provinciale Vigili del Fuoco
              Roma presentation).

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 9.        Vertical cavity, April 2008 inspection.

The primary electrical service to the hotel consisted of a 400 kVA three-phase tie-in from the utility.  The guest floors were powered by 380 Vac phase-to-phase (220 Vac phase-to-neutral) via four 25 mm cables from the primary service.  On the third floor, the cables terminated in a switchboard, approximately 10 meters from room 305.[6]  Groups of three rooms on each floor were protected by a single Merlin Gerin breaker that allowed two phases to the rooms (Figure 10).  These two-phase breakers were rated for 400 Vac, with an operational current rating of 25 A and a time characteristic "C" (instantaneous trip at 5 times the operational current rating).  The two phases were used in each set of rooms to provide single phase versus neutral voltage of 220 Vac for the outlets and other electrical loads.  Each double occupancy room in the hotel was protected individually by a 10 A circuit breaker with 30 mA ground fault circuit interrupter capability located high near the entrance doorway to the room (each single occupancy had a 6 A circuit breaker mounted in the same location).[7]  Exponent has confirmed that the circuit breaker installed in room 305 during our inspection was a 10 A circuit breaker with 10 mA ground fault circuit interrupter.

---

[6]   Electrical closet in corridor of emergency stairway. Hotel floor plan S/E8 – "Pianta Piano Terzo Impianti Electrico E Speciale".

[7]   Based on interviews with hotel employees.



**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 10.     Circuit breaker panel on fifth floor of rooms, April 2008 inspection.

## Room 305

Room 305 was a typical double room, incorporating a main bedroom (approximately 180 sq ft),
balcony (approximately 43 sq ft), bathroom (approximately 55 sq ft), and small hallway
(approximately 44 sq ft).[8]  A wood door connected the room to the floor corridor, while another
door separated the room hallway from the bedroom.  The bathroom on the right, off the hallway,
also had a separate door.  The balcony was located on the wall opposite the hallway and was
connected to the main room via a sliding glass door (Figure 11).  This room was furnished with
a double bed (or two single beds pushed together), two bedside tables, an armchair, a tea table, a
writing desk and chair (with a metal wastepaper basket immediately next to it), as shown in
Figure 12, a refrigerator in a wooden cabinet, a television on top of the refrigerator cabinet and a
built-in closet.  Access to the patio was via a sliding glass door on the far wall, between the desk

---

[8]     Based on Exponent measurements.



**Privileged and Confidential:  Prepared at the Request of Counsel**

and the arm chair.  A heavy blackout curtain and a thinner, sheer curtain were mounted inside the room, over the sliding glass door.



Figure 11.    Room 405 with a similar layout to room 305 (Comando Provinciale Vigili del Fuoco Roma presentation).



Figure 12.    Desk, chair and wastebasket next to curtain and sliding glass door in room 305, April 2008 inspection.  Exponent notes that the basket was originally on the right side of the table and the current occupant had moved it to the left.

**Privileged and Confidential:  Prepared at the Request of Counsel**

## Reception desk and hotel management equipment

The reception desk faced the main entrance revolving door on the ground floor.  A number of hotel management systems were located at the counter.  Figure 13 is an annotated view of the reception desk as viewed from the reception security camera.  At the time of the fire, the desk had six phones that could dial to an external number.  The reception area phones were designated 824 and 829, the two black telephones to the right of the LCD-6000 fire alarm annunciators on the center of the desk were designated 839 and 818, and the two-line white telephone at the corner of the desk nearest the elevator banks was designated ATT2 and ATT3.  The badge system computer that logged entry into guest rooms was located between the phones designated as 839 and 818.  The garage camera monitor and telephone was mounted just below counter level, below telephone 818.  The hotel computer and switchboard computer were next to the white ATT2 telephone.  The main fire alarm control panel was mounted just behind the reception desk, and the alarm bells and telephone for the elevator were mounted on the wall directly across.  At the time of the fire, the television monitors that displayed video from the security cameras were installed in a separate utility room behind the reception area.  However, these had been moved to immediately behind the reception desk before our April 2008 inspection.



**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 13.        Reception desk viewed from the security camera.



**Privileged and Confidential:  Prepared at the Request of Counsel**

# 3.    Investigation and Analysis

## Security camera analysis

Exponent has analyzed the hotel security camera system to track events on the morning of the
fire.  A closed-circuit video surveillance system installed and managed by Control-Security
Sistemi di Sicurezza S.r.l. was in operation within the hotel during the fire.[9]  The system
consisted of grayscale CCD video cameras connected to one of four AHDR Ademco digital
video recorders.  Each camera recorded approximately 1.5 frames per second.[10]  Monitors to
view the video cameras were mounted in a utility room behind the reception desk.  While it was
possible to view any current video camera image on a full screen, it was not possible to review
previously recorded footage.  Full access to the data stored on the video recorders required
access to the video camera control room located in the sub-basement (2nd underground level).
Exponent understands that the Rome police department originally obtained video that spanned
approximately 5 days before the fire.[11]  However, they apparently saved records only from the
morning of the fire.  Exponent was provided with a set of CDs that included raw footage from
3:00 a.m. (camera time) the morning of the fire and onwards; the video from the reception
camera starts at 1:00 a.m. on the morning of the fire.  Camera numbers corresponding to the
various Ademco units were determined by reviewing the public prosecutor expert's report and
confirmed by personal conversations with a representative of Control Security S.r.l.[12]

Each guest floor was equipped with four video cameras.[13]  Three of the four cameras monitored
the main (north-south) corridor that provided access to the elevators and stairways, and the
fourth monitored the secondary (east-west) corridor connecting guest rooms on the north side of
the building.  Guest room 305 can be viewed by three of the four cameras:  camera 9, mounted
south of the elevators and looking north; camera 10, mounted at the very south end of the north-
south main corridor and looking north; and camera 12, mounted at the west end of the east-west

---

9    Record of impounding effected in relation to DeCandia, M. and Gizzi, D. Salario Parioli Police Station, May 1
     2004 (Bates 000190).

10   Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004, p. 23.

11   Conversations with Mr. DeCandia, Control Security, S.r.l., April 2008.

12   Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004, pp. 25-27.

13   Exponent understands that floor 7 had only three cameras.



Privileged and Confidential:  Prepared at the Request of Counsel

corridor and looking east.  Figure 4 is a simplified floor plan that highlights the location of the video cameras on the third guest floor.  The cameras on the third and fifth floors provided relevant information that established the events of the fire and allowed us to reconstruct the movement of hotel staff and guests.

Several video cameras were also located on the common floors of the building.  In particular, video from the reception desk camera (camera 6) and the elevator camera (camera 5) were relevant to understand the sequence of events on the ground floor.  Other cameras were either turned off, there was insufficient ambient light such that they recorded no useful information (e.g., the bar camera), or they provided no relevant information regarding the sequence of events during the morning of the fire because they were installed at a location where there was no activity.  Video cameras and the associated Ademco video recorders analyzed by Exponent are listed in Table 1.

**Table 1.   Video cameras and corresponding floors in hotel examined by Exponent[14]**

| Floor | Cameras | Ademco |
|-------|---------|--------|
| Ground | 5, 6 | 1 |
| First | 4 | 2 |
| Second | 6, 7, 8 | 2 |
| Third | 9, 10, 11, 12 | 2 |
| Fourth | 13 | 2 |
| Fifth | 1, 2, 3, 4 | 4 |
| Sixth | 5, 6, 7, 8 | 4 |
| Seventh | 9 | 4 |

## Temporal alignment of security camera footage and phone records

Each Ademco video recorder had a unique time stamp, not linked with any externally traceable reference.  Accordingly, in order to reconcile the events before and during the fire, it was necessary to align the time stamps on the Ademco video recorders with a reference time (henceforth denoted as "real" or "corrected" time).  A complete alignment of the video system

---

[14]   Exponent examined other available video camera data, but the cameras were in areas not critical to understanding the events during the subject fire.

**Privileged and Confidential:  Prepared at the Request of Counsel**

was performed by first relating Ademco 1 to an externally traceable event (front desk calls to fire department) and then aligning the remaining Ademco recorders by tracking elevator movement in the videos and relying upon experiments by the public prosecutor experts (and verified by hotel experts) that measured the actual transit time when taking an elevator from the ground floor to the third floor and from the ground floor to the fifth floor.

The reception desk video (camera 6), which is connected to Ademco 1, and the phone records and fire department call transcripts were used to anchor the hotel video system to an external time reference.  Mr. Scarano made two phone calls to the fire department, the durations of which are listed on the hotel phone records.[15]  The first phone call, made from phone 818, was 1 minute and 43 seconds long.  The fire department call logs indicate that Mr. Scarano put down the phone briefly during the first call to fetch a document.  A second, 35-second phone call to the fire department from phone ATT2 was made approximately 5 minutes after the start of the first call.  For the purposes of this reconstruction, Exponent used the time stamp when the first telephone call was received by the Rome Fire Department to denote the real time, and all other times have therefore been corrected to this reference.  Based on our review of the security camera videos and the analysis presented in the public prosecutor report, Mr. Scarano first called the fire department at 5:24:02 a.m. (corrected time), and the Ademco 1 camera time is 7 minutes and 20 seconds behind.[16,17]  The hotel telephone records were approximately 2 minutes ahead of corrected time (the hotel phone records only log the time in hours and minutes).

The third floor camera time (Ademco 2) was aligned with the ground floor (Ademco 1) camera time by tracking hotel guest movements and experimentally measuring elevator transit times between floors (Table 2).[18]  Ms. Castricone and Mr. Fiderio entered the ground floor elevator (camera 5) at 3:24:34 a.m. camera time.  The light above their elevator illuminates seconds before they are observed to exit on the third floor at 3:29:49 a.m. (camera 9).  The time required for the elevator to travel between the ground and third guest floor was measured by the public

---

[15]   Hotel telephone records, April 30-May 1, 2004.

[16]   Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004, pp. 25-27, 69.

[17]   The Fire Department Operator indicates that the time is 5:25 during the call.  Transcript of telephone calls at the operations room of the emergency number 115 on May 1, 2004. (Bates 000373).

[18]   Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004, pp. 25-27. (Also experimentally verified by the hotel).



**Privileged and Confidential:  Prepared at the Request of Counsel**

prosecutor experts and verified by Mr. Vaccaroni to take 11 seconds.  Assuming it took approximately 4 seconds for the elevator doors to open and the occupants to exit, Ademco 2 was determined to be 5 minutes ahead of Ademco 1, and 2 minutes and 20 seconds late with respect to real time.

The public prosecutor experts aligned the fifth floor camera time (Ademco 4) with real time in a similar manner, by tracking the movements of a guest who used the elevator on the night before the fire.  They determined that Ademco 4 was 2 minutes and 50 seconds late with respect to real time.[19]  While the footage they apparently relied upon is not available to Exponent, we have no reason to disagree with their proposed time correction.

**Table 2.    Security video synchronization analysis**

|  | Time (mm:ss) |
| --- | --- |
| Ground floor camera time lags real time | 7:20 |
| Ground floor camera time lags behind 3rd floor camera time | 5:00 |
| 3rd floor camera time lags real time | 2:20 |
| 5th floor camera time lags real time | 2:50 |

Exponent has decoded the videos from the embedded player and overlaid the above time corrections on them.  Appendix B includes a DVD with copies of the corrected videos for the ground floor, third floor and fifth floor cameras.

## Badge system

A VideoVox badge system was used to access the hotel rooms.  Each guest and employee was issued a card that could open specific doors.  The system would log the date and time of each entry into a specific room.  While the data from the badge system was not saved, a screen shot of the badge system computer showing entries and exits to selected rooms was recovered after the fire.[20]

---

[19]   Ibid.
[20]   Badge system screen shots acquired during Exponent's April 2008 site inspection.



**Privileged and Confidential:  Prepared at the Request of Counsel**

Available data was used to track the motion of the occupants when the security videos were not useful because of smoke obstruction.  This was particularly relevant to track the motion of Mr. and Mrs. Busque in room 532 when the video cameras were obscured by smoke.  Based on the time correction to the security video on Ademco 2 (described above) and visible entries and exits in room 305, Exponent determined that the badge control system is 5 minutes and 43 seconds ahead of real time.  Based on this, it is possible to determine when Mr. and/or Mrs. Busque entered room 532.

**Table 3.    Badge system temporal alignment.**

| Event | Badge system time (hh:mm:ss) | Camera time (hh:mm:ss) | Real time (hh:mm:ss) |
|-------|------------------------------|------------------------|----------------------|
| Room 305 entry | 03:38:19 | 03:30:15 | 03:32:35 |
| Room 305 entry | 04:48:37 | 04:40:34 | 04:42:54 |
| Room 532 entry | 05:34:01 | Obscured | 05:28:18 |
| Room 532 entry | 05:35:29 | Obscured | 05:29:46 |

Exponent notes that there are several errors in the public prosecutor expert report regarding the badge system temporal alignment with real time.  These appear to be primarily arithmetic errors when adding the synchronization time to the badge control system time.

# Fire alarm system

The hotel was equipped with a Notifier fire alarm system that consisted of a Notifier AM-6000 control panel mounted on a wall in a room behind the reception desk and at least one and possibly two LCD-6000 remote annunciators on the reception desk (Figure 13, Figure 14).[21] Notifier SDX-751EM optical smoke detectors were installed in guest rooms, hallways and other hotel areas, including the center of room 305.  Exponent understands that the hotel was not required to install smoke detectors in closed spaces such as ceiling cavities, elevator shafts and

---

[21]    The security video camera shows only one LCD-6000 panel on the reception desk.  However, at the time of our April 2008 inspection, there were two panels on the desk.

Ex

**Privileged and Confidential:  Prepared at the Request of Counsel**

the HVAC system at the time the fire occurred.[22]  Three fire alarm pull stations were located on

each guest floor, as well as in other locations in the building (Figure 4).



Figure 14.     LCD-6000 remote annunciators on the reception desk (arrow), April 2008
                      inspection.

Each guest floor was equipped with two fire alarm strobe light and bell combinations.[23]  One

was located at the intersection of the main (north-south) and secondary (east-west) corridor, the

second in the main corridor slightly south of the stairs.  Figure 4 shows the location of the alarm

lights of the fire alarm system.  Photos from Exponent's inspection of the alarm audio-visual

components within the corridors are shown in Figure 15.

---

22    Statement of Carla Milos, May 5, 2004, Central Office of the Criminal Police, The Department of the Interior
        (Bates 00364).  Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004,
        p. 24.  Also see Vaccaroni report.
23    Hotel floor plan A10 – "Pianta Piano Quinto Impianto Antincendio".



**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 15.       Fire alarm light on 3rd floor, April 2008 inspection.

The LCD-6000 remote annunciators are an extension of the AM-6000 control panel and report the same information.  The LCD screen on these annunciators displays the state of the system and will report any alarms or troubles and the location where they may occur.  They are equipped with a small red light-emitting diode (LED) that illuminates in the event of an alarm, a trouble LED (yellow), and a signal silence LED (if programmed) for external equipment.  The LCD-6000 allows the user to reset the control panel, acknowledge alarms, and silence control signals activated during an alarm.  The control panel is equipped with an internal memory that logs all events.  Exponent understands that the memory logs from the fire were lost when the fire department instructed the hotel employees to cut power to the system to silence the alarm on the morning after the fire.[24]  However, the fire alarm control logic and internal settings of the AM-6000 were recovered on a floppy disk after the fire and analyzed to predict the behavior of the system.[25]

The Notifier system can be customized in several ways, including a *verify detector* operation that allows a delay of up to 50 seconds (of continuous smoke) before a detector alarms, and a *tracking* operation that allows a detector or control module (connected to alarm lights, strobes,

---

[24]   Vaccaroni report and conversations with Mr. DeCandia, Control Security, S.r.l., April 2008.

[25]   Vaccaroni report.

**Privileged and Confidential:  Prepared at the Request of Counsel**

or other visual aids) to locally reset if the smoke source dissipates.[26]  The system can also be programmed to control the sensitivity of each detector by providing a number 1 through 9, with sensitivity increasing with number.  Different sensitivities can be set for night and day operation.  Exponent understands that the control panel sends out a signal to each detector and each detector replies by providing a signal that specifies how long it has seen smoke.  If the duration of the event at the detector is greater than the critical time prescribed by the sensitivity setting, the control panel issues an alarm.  If detector verification is enabled, the system waits for the prescribed amount of time to verify that the alarm condition persists before sending a signal to the LCD-6000 panel.  The system is customizable such that the user can select any combination of detectors or pull stations that should activate before a floor alarm is triggered.  The LCD display will also illuminate if a *trouble* is detected.  Troubles are technical faults within the fire alarm system and include issues such as faulty wiring, low power supply voltage, and improper communication with addressable devices.[27]

Explicit programming details of the system from when it was first installed were obtained by Mr. Vaccaroni during his 2009 inspections at the hotel when he worked with a technician from Notifier to review the AM-6000 programming.[28]  The operator had the option to *acknowledge* an alarm signal and then *reset* the panel by pushing various buttons on either the LCD-6000 panel on the reception desk or on the main AM- 6000 panel installed in a separate room behind the reception desk.  A floor alarm would trigger if a single alarming detector or pull station was not acknowledged in 5 minutes (10 minutes during the day, 8 a.m.-8 p.m.).  The floor alarm would activate immediately if two pull stations were triggered.  If any alarm was acknowledged but the panel was not reset, the buzzer at the LCD-6000 would be silenced but the floor alarm would still activate within 5 minutes.  The smoke detectors in the hotel were programmed with tracking enabled and a detector verification time of 10 seconds.

Information provided by the hotel has confirmed that the floor alarm would trigger if an alarming detector was not acknowledged within 5 minutes, but indicates that the floor alarm would trigger

---

[26]   Notifier AM-6000 Analog fire alarm control panel operating and programming manual, 10/1999, rev. C.2.

[27]   Ibid.

[28]   Vaccaroni report.  Mr. DeCandia has also previously confirmed to Exponent that the programming was not changed between 1999 and the time of the fire.

$Ex$

**Privileged and Confidential:  Prepared at the Request of Counsel**

2 minutes after a combination of two detectors or pull stations on a given floor were activated.[29] The public prosecutor experts have confirmed this programming logic, except they state that, if two detectors on a floor activated, the floor alarm would sound after a 1-minute delay.[30]

Exponent obtained a Notifier AM-1000 system (which we understand is a simplified version of the Notifier AM-6000 system, but responds to a smoke detector alarm in an identical manner), and the hotel provided us with exemplar Notifier SDX-751EM smoke detectors from their inventory to analyze the control panel operation.  We have also reviewed the installation and programming instructions for the Notifier AM-6000 and LCD-6000 panel.  We have confirmed that:

- If the AM-6000 or LCD-6000 panel buttons are pressed, the screen will remain illuminated yellow for 30 seconds following the last touch.

- If the system alarms:

    o The AM-6000 and LCD-6000 screens will illuminate and remain on for 30 seconds (if untouched);

    o The small red LED alarm light will blink on the LCD-6000;

    o The internal buzzer on the AM-6000 and LCD-6000 will sound;

    o The system will monitor for additional events for all detectors except those which have alarmed.

- If an alarm is acknowledged (by pushing a button on the AM-600 or LCD-600 panel):

    o The small red LED alarm light on the LCD-6000 will remain on;

    o The LCD-6000 internal buzzer will silence;

    o The system will monitor for additional events for all detectors except those which have alarmed.

---

[29]   Undated document describing fire alarm system in automatic operation provided to Exponent by Parco dei Principi staff in April 2008 (translated by Exponent).

[30]   Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004, p. 24.

**Privileged and Confidential:  Prepared at the Request of Counsel**

- If the system is reset (by pushing a button on the AM-600 or LCD-600 panel):

    o   All alarms are cleared and the system runs through its startup sequence;

    o   The red LED alarm light will turn off;

    o   All detectors monitor for events.

Exponent understands that, with the detector tracking option enabled, it is possible that both the detector and LCD-6000 could have reset automatically if a sporadic smoke source (such as cigarette smoke) triggered a smoke detector and then dissipated.[31]

Given the resolution of the grayscale security camera video, it is not possible to view the LED lights.  Therefore, for the purpose of our analysis, alarm events had to be extrapolated from the time when the LCD-6000 screen lights up.

## Detailed fire and smoke modeling

The fire and smoke propagation in room 305 and the adjacent areas was modeled using the Fire Dynamics Simulator (FDS) computer program that has been developed by the National Institute of Standards and Technology (NIST) of the United States Department of Commerce, in cooperation with VTT Technical Research Centre of Finland.[32]  FDS is a computational fluid dynamics (CFD) model of fire-driven fluid flow.  Consistent with the requirements of ASTM E 1355, *Standard Guide for Evaluating the Predictive Capability of Deterministic Fire Models*, this program has been extensively verified for numerical accuracy, validated against experimental fires, and is now considered a standard engineering tool to conduct fire and smoke simulations.[33] Smokeview is the companion visualization program that can be used to display the output of FDS.  The program allows the user to specify room size and fuel load, the size of the initial fire, and smoke detector characteristics.  Exponent constructed a model of room 305 and an immediately adjacent section of the third floor corridor to establish the time required to reach flashover from the moment flaming combustion started in room 305 and to determine the time

---

[31]  Vaccaroni report.

[32]  http://www.fire.nist.gov/fds/

[33]  http://www.fire.nist.gov/fds/verification_validation.html



**Privileged and Confidential:  Prepared at the Request of Counsel**

required for the smoke detectors in the hallway to alarm after the door to room 305 opens.  This analysis corroborates observations made during the fire to determine the sequence of events.

Several simulations were conducted as part of our analysis.  In each case, a fire was initiated in the wastebasket positioned next to the window curtain.[34]  The heat output of the wastebasket was prescribed based on a range of established heat release rates in the literature.[35]  As the fire progressed in the room, the door to room 305 was opened such that the smoke escaping into the corridor was visually consistent with smoke observed from the third floor video camera.  The door was opened, closed, and then re-opened in a sequence matching the security camera record of what actually happened as Ms. Bouldoukian and Ms. Castricone exited their room.

Dimensions of room 305 and the common corridors were determined from technical drawings and measurements made during our site inspection (Figure 16).  Optical smoke detectors were included in the simulations and placed in the corridor and room to reflect the pre-fire condition.  The obscuration needed to trip the optical smoke detectors was set at a value of 1%/ft, the default value prescribed by FDS and within the prescribed UL 286 obscuration upper and lower limits of 10%/ft and 0.5%/ft, respectively.[36]  Exponent also conducted simulations with obscuration levels at the upper and lower limits to bound the time required to trip the detector (see Appendix A, Table A1).  The layout of the room (Figure 17) and furniture materials were established from our April 2008 site inspection, pictures of room 405 (Figure 11, Figure 12) immediately following the fire, and material conformity certificates.[37, 38]  The energy content of the curtains and other room furniture was determined from data reported in a hotel related technical report[39] and compared with data in the literature and FDS materials library.

---

[34]  The hotel has confirmed that the wastepaper baskets in all rooms were typically placed under the right side of the desk, near the sliding glass door.

[35]  SFPE Handbook of Fire Protection Engineering, 2002 ed.

[36]  Underwriter Laboratories Standard 286, 9/2006.

[37]  Comando Provinciale Vigili del Fuoco Roma presentation.

[38]  Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004, Section 16.

[39]  Architect Claudio Bernardini Technical Report, December 10, 1982 (Bates 000951-000953).

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 16.     Layout of room 305 and corridors.  Yellow arrows point to smoke detectors.



Figure 17.     Features in room 305, including furniture, wastebasket, curtains, and vents.

Certain estimates and assumptions were made pertaining to the position of the doors in the room

during the fire.  Both the bathroom and bedroom doors connecting to the room hallway were

**Privileged and Confidential:  Prepared at the Request of Counsel**

assumed open.  Review of the post-fire scene photographs indicates that the sliding balcony glass door was partially open and had a 4-cm gap (Figure 18).  Smoke was free to enter the vents in the bathroom and above the bedroom door.  Details of Exponent's implementation of FDS are included in Appendix A.



Figure 18.      4-cm gap between arrows found in room 305 sliding glass door (Comando Provinciale Vigili del Fuoco Roma presentation).

# FDS results

Exponent created more than 45 different mesh input configurations and ran more than 35 simulations to understand fire growth and smoke generation rates after the onset of flaming combustion and to investigate the effects of various FDS parameters, including computational mesh resolution, materials heat release rates, geometric dimensions, etc.  Four simulations that allowed us to define the problem boundaries are presented here.  Details about other simulations and general methodology are presented in Appendix A.

In our computational models, the sliding glass door was left open with a 4-cm gap, consistent with the observations recorded by the public prosecutor experts.  Exponent notes that the glass door remained intact during the incipient phase of the fire, and the glass was observed to shatter

**Privileged and Confidential:  Prepared at the Request of Counsel**

as guests began exiting the hotel lobby.[40]  The curtain heat release rate was varied since the precise spacing of the curtains and the degree to which they were bunched together were unknown.  However, the heat release rates used for the analysis are consistent with values established in the literature.[41]  The initial smoldering phase of the fire was not modeled because there is insufficient information regarding the ignition source and the amount of combustible material (paper, tissue, clothing, etc.) near the point of origin.  The input parameters for the model were adjusted such that, when the door of room 305 opens, the smoke and fire seen in the security footage cameras match what is predicted by the FDS simulation.  The results from our simulations provide a bound for how long Ms. Castricone and Ms. Bouldoukian could have remained in their room after flaming combustion had begun.

Table 4 summarizes the effect of heat release rate variations in the four simulations mentioned above.  We compared many cases with the door opening at different times, allowing different quantities of smoke to accumulate behind the door before being released into the corridor.  For all the simulations summarized in Table 4, the door opens for the first time after 60 seconds of flaming combustion, stays open for 9 seconds, closes for 2 seconds, then opens again and remains in the open position until the end of the simulation at 180 seconds after flaming combustion.  Simulations 1 through 3 either result in too fast or too slow fire and smoke evolution in the room and hallway.  Simulation 4 most accurately reflects the observations on the security camera footage during the fire.  For Simulation 1, the Heat Release Rate (HRR) for both the wastepaper basket and the curtain were relatively low and the smoke and fire developed slowly with respect to the video camera data.  Smoke reached the front door at approximately 60 seconds, at which point the door was allowed to open.  Simulation 2 was similar to Simulation 1, but the wastepaper basket HRR was doubled.  This resulted in thicker smoke developing more quickly, but the fire did not develop quickly enough to be clearly visible from the door when opened, and time to flashover was inconsistent with the timeline of the fire.  Simulation 3 was similar to Simulation 2, except that the curtain HRR was almost tripled.  This resulted in a fire that was too rapid.  Simulation 4 used a curtain HRR of 200 kW/m$^2$ and produced a result very close to what was seen from the video camera.

---

40   Deposition of Erik Jarnryd, February 26, 2009, p. 32.

41   SFPE Handbook of Fire Protection Engineering, 2002 ed.



**Privileged and Confidential:  Prepared at the Request of Counsel**

**Table 4     Comparison of four selected computational cases**

| Case | Wastepaper Basket Top Burner Surface (kW/m$^2$) | Wastepaper Basket HRR (kW) | Curtain HRR (kW/m$^2$) |
|------|------|------|------|
| 1 | 1250 | 50 | 100 |
| 2 | 2500 | 100 | 100 |
| 3 | 2500 | 100 | 300 |
| 4 | 2500 | 100 | 200 |

Flames in both the simulation and the video camera data are observed when the inside of room 305 is visible (Figure 19).  Figure 20 shows a time sequence of smoke propagating in the corridors when the door to room 305 opens.  The simulation results are shown alongside the video camera footage at the same times with respect to the door opening (the corridor lights visible in the video were not modeled).  The time required for the smoke to propagate and the smoke density were matched by the FDS simulation.  The results indicate that Ms. Castricone and Ms. Bouldoukian were likely in the room for approximately 60 seconds after the onset of flaming combustion.  After the door of room 305 was opened, smoke propagated into the hallway and triggered the nearby smoke detectors.  The side-by-side security camera and FDS simulation video is included in Appendix C.  Table 5 summarizes the activation sequence of the smoke detectors, as predicted by our FDS simulation, as a function of their location.



Figure 19.     Security camera image (left) of flames compared with FDS simulation result (right).  Flame is visible inside red box.

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 20.    Sequence of images as the door to room 305 opens, closes, and reopens at 5:17:50 a.m.  The images on the left are from video camera 9 and the simulation images are shown on the right from the same angle.



**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 20. (cont.)  Sequence of images as the door to room 305 opens, closes, and reopens at 5:17:50 a.m.  The images on the left are from video camera 9 and the simulation images are shown on the right from the same angle.

**Privileged and Confidential:  Prepared at the Request of Counsel**

Table 5.   Smoke detectors activation sequence (Simulation 4)

| Device | Time after initial fire (seconds) | Time after/before door opens (seconds) | Corrected time |
|---|---|---|---|
| Room SD 1%/ft | 5.8 | -54.2 | 5:16:56 AM |
| Outside door SD 1%/ft | 64.1 | 4.1 | 5:17:54 AM |
| East corridor SD 1%/ft | 70.7 | 10.7 | 5:18:01 AM |
| West corridor SD 1%/ft | 74.5 | 14.5 | 5:18:05 AM |
| Elevator SD 1%/ft | 77.2 | 17.2 | 5:18:07 AM |

The detector in room 305 detects smoke from a flaming wastebasket within 6 seconds (the time to alarm will depend on the detector verify setting as discussed above).  After the room door opens, it takes 4 seconds for the nearest hallway detector to detect smoke, followed by the east corridor detector 7 seconds later, then the west corridor detector 4 seconds later, and finally the south corridor detector 3 seconds later.

Given that both Ms. Bouldoukian and Ms. Castricone had no serious thermal or smoke inhalation injuries, Exponent has concluded that they exited the room (for the final time) before flashover occurred.  The temperature and the radiation heat transfer at the top surface of the bed in room 305 were calculated to determine how long the occupants could have survived in the room with no thermal injuries.  Figure 21 and Figure 22 plot the temperature versus time and radiation heat transfer versus time at the surface of the bed, respectively.  Human "skin can be damaged when it reaches a temperature of 54 Celsius".[42]  Radiation heat flux is another measure used to predict human tolerance to heat.  "Radiant heat at this level [2.5 kW/m$^2$] and above causes skin pain followed by burns within a few seconds".[43]  Our results confirm that the occupants would have suffered significant thermal injuries had they remained inside the room for more than approximately 2.5 minutes after the onset of flaming combustion.

---

[42]  NFPA 921, Guide for Fire and Explosion Investigations, National Fire Protection Association, 2008, Section 23.7.2.4.1.

[43]  SFPE Handbook of Fire Protection Engineering, 2002 ed., p. 2-129.

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 21.    Temperature at 90 cm off the floor in the middle of the bed.



**Privileged and Confidential: Prepared at the Request of Counsel**



Figure 22.    Radiative heat flux onto bed area.



**Privileged and Confidential:  Prepared at the Request of Counsel**

# 4.    Sequence of Events on Incident Date

## Timeline – Actions of guests before fire

The raw security camera footage provided to Exponent was embedded within a custom Ademco software video player and therefore could not be edited as provided.  Exponent decoded and extracted the security videos from the Ademco player and overlaid the above-described time corrections on the footage (Appendix B, DVD of Video Camera Analysis).  Based on an analysis of the corrected video, it is possible to reconstruct certain events during the early morning prior to the subject fire.  For consistency, all times are reported and discussed in corrected time.

Based on the footage from the ground floor reception camera, Ms. Castricone and Ms. Bouldoukian socialized with various people at the reception desk and in the bar area between 1:26 a.m. and 1:55 a.m. on the morning of the fire (Table 6).  The group of Harvey guests was ordering drinks at the bar and organizing an outing to a club.[44]  Ms. Castricone and Ms. Bouldoukian were first observed to walk past the reception desk from left to right at 1:26 a.m.  At this time, Ms. Castricone was holding a bottle in her right hand.  About 11 minutes later, they walked from right to left back towards the bar area; Ms. Bouldoukian was holding a long-stemmed flower in her right hand.  At 1:38 a.m., Ms. Castricone approached the reception desk from the bar area with a bottle in her left hand and began a discussion with the receptionist, Mr. Scarano.  She placed the beverage on the reception desk counter (Figure 23) and was joined by another female guest and, eventually, Mr. D'Arielli (the night porter).  Exponent has analyzed the size and shape of the bottle and determined that it is consistent with the proportions of a beer bottle (Figure 24, Figure 25).  The images also indicate that there were two labels on the bottle, typical of certain beers.  Ms. Castricone's conversation with Mr. Scarano lasted for approximately 2 minutes, at which point the second female guest left by ducking underneath the reception desk counter and Ms. Castricone returned to the bar area with her drink and a piece of paper in hand.  At 1:48 a.m., Ms. Castricone returned to the reception desk and began a discussion with Mr. Scarano (Mr. D'Arielli was also present).  Several guests joined Ms. Castricone before Ms. Bouldoukian

---

[44]    Videotaped deposition of Rachel Castricone, February 18, 2009, pp. 25-27.



**Privileged and Confidential:  Prepared at the Request of Counsel**

approached the reception desk at 1:49 a.m., gave a thumbs-up to another guest, immediately picked up phone 839 (Figure 26) and began dialing.  She dialed a number, appeared to have misdialed, hung up the phone, and immediately dialed again.  During her second attempt, Mr. Scarano noticed she was on the phone, looked down at the phone display, took the phone back by first grasping the cord, and hung it up.  At the same time, Ms. Castricone was smoking a cigarette at the reception desk (Figure 26) and talking intermittently with Mr. Scarano and other guests.  Ms. Castricone also grabbed a book off of the reception desk in front of Mr. Scarano and started flipping through the pages.  At 1:51 a.m., Ms. Bouldoukian was observed smoking a cigarette (Figure 27).  The group of guests continued their discussion at the reception desk and, at 1:52 a.m., made their way out the revolving door.  After exiting, Ms. Bouldoukian re-entered through the revolving door, appeared to walk toward the bar area, and then re-exited through the revolving door.  Exponent understands that this group took a taxi to a local dance club at this time.



Figure 23.   Ms. Castricone at the reception desk with beer in hand.  Corrected time shown in lower right corner.

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 24.    Image analysis used to determine the approximate size of the bottle.  The length of Ms. Castricone's head was determined from other images.



Figure 25.    Image enhancement of Ms. Castricone's beer bottle on reception desk.

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 26.      Ms. Castricone exhaling cigarette smoke while Ms. Bouldoukian makes a call to the U.S. from reception phone.  Corrected time shown in lower right corner.



Figure 27.      Ms. Bouldoukian smoking a cigarette.  Corrected time shown in lower right corner.

Exponent notes that, in his deposition, Mr. Scarano indicated that Ms. Bouldoukian and Ms. Castricone were quite loud and "arrogant" to him on the morning of the fire and threatened to get him into trouble.  He recalls that Ms. Bouldoukian tried to call the United States from the

**Privileged and Confidential:  Prepared at the Request of Counsel**

hotel reception phone before he stopped her by pulling the phone away from her.[45]  Ms. Bouldoukian has indicated that she used the telephone to call either her parents' room or Ms. Castricone's parents' room.[46]  Examination of the phone records indicates that Mr. Scarano is correct on this matter; Ms Bouldoukian attempted to call a Boston number (617 area code) from phone 839 (Figure 26) at the time indicated on the video.[47]  Consistent with our time correction that the phone logs are approximately 2 minutes ahead of real time, this attempted call was logged on phone 839 at 1:51 am.

**Table 6.   Sequence of events observed by the reception desk security video camera 6 between 1:26 a.m. and 1:49 a.m. the day of the fire**

| Corrected time | Camera time | Event |
|---|---|---|
| 1:26:53 | 1:19:33 | Ms. Castricone (w/ drink in hand) and Ms. Bouldoukian walk past front desk left to right |
| 1:34:16 | 1:26:56 | Mr. Fiderio walks past front desk right to left |
| 1:37:32 | 1:30:12 | Ms. Castricone and Ms. Bouldoukian (holding a long-stemmed flower) walk past front desk right to left |
| 1:38:05 | 1:30:45 | Ms. Castricone (w/ drink in hand) talks to Mr. Scarano |
| 1:40:05 | 1:32:45 | Ms. Castricone (w/ drink in hand) leaves to the left |
| 1:48:35 | 1:41:15 | Ms. Castricone enters from left and talks to Mr. Scarano |
| 1:49:26 | 1:42:06 | Ms. Bouldoukian enters from left and joins group discussion w/ Mr. Scarano |
| 1:49:32 | 1:42:12 | Ms. Bouldoukian picks up phone |
| 1:49:39 | 1:42:19 | Cigarette visible in Ms. Castricone's left hand |
| 1:49:44 | 1:42:24 | Ms. Castricone exhales cigarette smoke upward |
| 1:49:49 | 1:42:29 | Ms. Castricone grabs a book off Mr. Scarano's desk |
| 1:50:10 | 1:42:50 | Mr. Scarano takes back phone from Ms. Bouldoukian and hangs it up |
| 1:50:55 | 1:43:35 | Ms. Castricone w/ cigarette visible in right hand and exhales smoke upward |
| 1:51:22 | 1:44:02 | Ms. Bouldoukian smoking a cigarette |
| 1:51:26 | 1:44:06 | Ms. Bouldoukian exhales cigarette smoke |
| 1:52:14 | 1:44:54 | Cigarette apparently visible in Ms. Bouldoukian's right hand |
| 1:52:26 | 1:45:06 | Ms. Castricone exits hotel through revolving door |
| 1:53:05 | 1:45:45 | Ms. Bouldoukian exits hotel through revolving door |
| 1:53:45 | 1:46:25 | Ms. Bouldoukian enters hotel through revolving door |
| 1:54:16 | 1:46:56 | Ms. Bouldoukian exits hotel through revolving door |

---

[45]   Interpreted videotaped deposition of Maurizio Scarano, March 23, 2009, p. 31.

[46]   Videotaped deposition of Tracey Bouldoukian, March 12, 2009, p. 214.

[47]   Telephone records.



**Privileged and Confidential:  Prepared at the Request of Counsel**

Ms. Castricone, Ms. Bouldoukian and the rest of the group returned from the club at approximately 3:30 a.m. (Table 7).  They entered through the revolving door and proceeded momentarily to the bar area.  A man in the group was observed to be holding up a sign and attracted the entire group over toward the elevators.  At 3:31 a.m., Ms. Bouldoukian entered the left elevator, as viewed from the ground floor camera 5, with five other guests.  Ms. Castricone and Mr. Fiderio entered the elevator on the right shortly after.  Before entering the elevator, Ms. Castricone took the sign left by the man on the ashtray in front of the elevator and raised it above her head; somewhat replicating the man's prior actions.  In his deposition, Mr. Scarano indicated that Ms. Castricone and Ms. Bouldoukian were very loud after they returned from the club, and he recalls that somebody pressed the alarm button in the elevator while the guests were going back up to their rooms.[48]  The security camera video shows that, at 3:32 a.m., Ms. Bouldoukian exited the elevator on the third guest floor and waited momentarily for Ms. Castricone and Mr. Fiderio before entering room 305.  Within the first 2 minutes in the room, the phone was used to call area code 617 in the Boston area.  This is the same number that Ms. Bouldoukian was dialing at the reception desk earlier in the evening.  The phone records indicate three failed attempts from room 305 followed by two attempts by the ATT2 reception area phone.  Video on the ground floor indicates that, at 3:34 a.m. and 3:35 a.m., Mr. Scarano was attempting to dial the number, presumably on behalf of Ms. Bouldoukian.  At 3:35 a.m., Ms. Castricone and Mr. Fiderio exited room 305 and returned to the bar area on the ground floor, where they remained for approximately 55 minutes.  Ms. Castricone appeared to be holding two bottles of beer and/or champagne in her left arm that she took from the mini fridge.[49]  During this time, Ms. Bouldoukian completed a 20-minute call to the 617 area code phone number, followed by a 5-minute call to a phone number with a 781 Boston area code.  At approximately 4:41 a.m., Ms. Castricone and Mr. Fiderio returned to room 305.  Ms. Castricone was now wearing Mr. Fiderio's long-sleeved shirt.  Exponent understands that, after they entered room 305 at 4:43 a.m., they went to the balcony and smoked cigarettes.[50]  Mr. Fiderio tossed his cigarette butt off the balcony (Figure 28) and recalls Ms. Castricone using an ashtray to discard her cigarette butt, and thought she might have brought the ashtray and pack of cigarettes back inside the room.  Ms Castricone

---

[48]   Interpreted videotaped deposition of Maurizio Scarano, March 23, 2009, p. 52.
[49]   Deposition of Matthew Fiderio, March 24, 2008, p. 141; videotaped deposition of Rachel Castricone, February 18, 2009, p. 45.
[50]   Deposition of Matthew Fiderio, March 24, 2008, p. 37; videotaped deposition of Rachel Castricone, February 18, 2009, pp. 51-58.



**Privileged and Confidential:  Prepared at the Request of Counsel**

thinks she left the ashtray on the balcony.[51,52]  At 4:55 a.m., Mr. Fiderio exited room 305 and took the stairway to return to his room.  Mr. Scarano stated that the occupants of room 305 requested a wake-up call immediately before he observed the indicator for room 305 on the synoptic panel light up for the first time.  The video record indicates that, at 4:59 a.m., Mr. Scarano answered a telephone call on ATT2; at 5:07 a.m., he answered a second call on phone 839.  Based on his review of his actions immediately after answering this call, he has indicated that he is sure that the 5:07 a.m. call was the wake-up call requested by room 305.[53]



Figure 28.     View from room 305 balcony looking down at pool of water in front of the
main entrance, April 2008 inspection.

[51]   Deposition of Matthew Fiderio, March 24, 2008, pp. 38-39; videotaped deposition of Rachel Castricone, February 18, 2009, p. 53.

[52]   Ms. Castricone has also indicated that she and  Ms. Bouldoukian had smoked on the balcony before dinner on April 30, 2004; videotaped deposition of Rachel Castricone, February 18, 2009, pp. 21, 57.  Ms Bouldoukian has denied ever having a cigarette in room 305 or the balcony; videotaped deposition of Tracey Bouldoukian, March 12, 2009, p. 107.

[53]   Transcribed Summary of Testimony by Scarano, Maurizio to the Rome Police Department, May 4, 2004 (Bates 00186-00187); interpreted videotaped deposition of Maurizio Scarano, March 23, 2009.

**Privileged and Confidential:  Prepared at the Request of Counsel**

**Table 7.    Sequence of events observed on the ground and third guest floors between 3:30 a.m. and 5:07 a.m. the day of the fire**

| Corrected time | Camera time | Floor | Event |
|---|---|---|---|
| 3:30:20 | 3:23:00 | Gnd | Ms. Bouldoukian, Ms. Castricone and Mr. Fiderio enter revolving door |
| 3:30:36 | 3:23:16 | Gnd | All exit to the left |
| 3:30:56 | 3:23:36 | Gnd | Ms. Bouldoukian enters from the left and leaves on the right toward the elevator |
| 3:31:04 | 3:23:44 | Gnd | Ms. Castricone and Mr. Fiderio enter from the left and go towards the elevator |
| 3:31:14 | 3:23:54 | Gnd | Ms. Bouldoukian enters elevator on the left |
| 3:31:46 | 3:24:26 | Gnd | Ms. Castricone and Mr. Fiderio enter elevator on the right |
| 3:32:10 | 3:29:50 | 3 | Ms. Bouldoukian exits elevator |
| 3:32:16 | 3:29:56 | 3 | Ms. Castricone and Mr. Fiderio exit elevator |
| 3:32:39 | 3:30:19 | 3 | Ms. Bouldoukian, Ms. Castricone and Mr. Fiderio enter room 305 |
| 3:34:20 | 3:27:00 | Gnd | Mr. Scarano makes phone call on ATT2 |
| 3:35:15 | 3:27:55 | Gnd | Mr. Scarano makes phone call on ATT2 |
| 3:35:49 | 3:33:29 | 3 | Ms. Castricone and Mr. Fiderio exit room 305 |
| 3:36:08 | 3:33:48 | 3 | Ms. Castricone (holding 2 bottles in her left arm) and Mr. Fiderio enter center elevator |
| 3:36:22 | 3:29:02 | Gnd | Ms. Castricone and Mr. Fiderio exit elevator |
| 3:36:30 | 3:29:10 | Gnd | Ms. Castricone and Mr. Fiderio enter from the right and walk past Mr. Scarano's desk (Mr. Fiderio wearing long-sleeved shirt) |
| 3:36:40 | 3:29:20 | Gnd | Mr. Scarano turns head (twice) and watches Ms. Castricone and Mr. Fiderio |
| 4:41:52 | 4:34:32 | Gnd | Ms. Castricone and Mr. Fiderio enter from the left and go towards the elevator (Ms. Castricone now wearing Mr. Fiderio's long-sleeved shirt) (Mr. Scarano tracking their movement) |
| 4:42:08 | 4:34:48 | Gnd | Ms. Castricone and Mr. Fiderio enter elevator on the left |
| 4:42:37 | 4:40:17 | 3 | Ms. Castricone and Mr. Fiderio exit elevator |
| 4:42:55 | 4:40:35 | 3 | Ms. Castricone and Mr. Fiderio enter room 305 |
| 4:55:03 | 4:52:43 | 3 | Mr. Fiderio leaves room 305 |
| 4:59:12 | 4:51:52 | Gnd | Mr. Scarano picks up white phone |
| 5:07:27 | 5:00:07 | Gnd | Wake up call from room 305. Mr. Scarano picks up black phone (left) |

# Timeline – During fire

Exponent has tracked the actions of hotel guests and staff during the fire, monitored observable signals from the fire alarm remote annunciator and optical strobe lights on the guest floors, and the propagation of smoke and fire from room 305 and throughout the hotel.  Particular attention



**Privileged and Confidential:  Prepared at the Request of Counsel**

was placed on the actions of Mr. Scarano and Mr. D'Arielli, and the events that occurred as viewed from the security cameras on the third floor.

The LCD on the remote annunciator illuminated at 5:08:46 a.m., approximately 1 minute after Mr. Scarano received a wake-up call request from room 305 (Table 8).  This is the first observable event on the fire alarm panel (Figure 29).  Given that Mr. Scarano was helping Mr. D'Arielli in front of the reception desk and was not looking at the LCD-6000, the video suggests that the internal buzzer sounded, drawing his immediate attention.  Within approximately 10 seconds after this first alarm, Mr. Scarano reached the annunciator and began to review it.  He continued to examine the LCD-6000 panel for approximately 1 minute, during which time he had a discussion with Mr. D'Arielli, who leaned over the counter to look at the panel.  In his deposition, Mr. Scarano indicated that he reset the fire alarm control panel at this time.[54] Exponent notes that, based on information about the alarm panel programming provided in the Vaccaroni report, an alarm indication that is triggered on the panel by a sporadic smoke source (such as smoking) can also reset automatically once the source has cleared.  In either event, the alarm did not immediately reactivate after it was reset (or reset itself), which confirms that the smoke source in room 305 was not continuous.  Accordingly, Exponent opines that this event was likely due to smoke in room 305, either from a smoldering fire or because one of the occupants was smoking a cigarette.  After the panel had reset, Mr. Scarano worked on the hotel computer and switchboard for approximately 1 minute before leaving the reception area at 5:12 a.m.  He can be seen walking in front of the guest elevators towards the men's restroom.

---

[54]   Interpreted videotaped deposition of Maurizio Scarano, March 23, 2009, p. 70.



**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 29.    Composite image of third floor (top) and ground floor (bottom) video cameras.
On the ground floor, Mr. Scarano is seen attending to the first illuminated LCD-6000 panel.


At 5:12:59 a.m., the LCD on the remote annunciator illuminated for a second time.  Within 5

seconds, Mr. D'Arielli stopped cleaning the floor and leaned over the counter to look at the

panel, which indicates that the internal buzzer had also activated (Figure 30).  Consistent with

our experimental observations on the simplified AM-1000 system, the LCD light turned off

after 30 seconds.  Mr. D'Arielli examined the panel on two more occasions between 5:13 a.m.

and before he exited the reception area at 5:17 a.m., and communicated with Mr. Scarano who

was just returning to the reception area.  At this point, both men proceeded directly to the LCD-

6000 panel.

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 30.    Composite image of third floor (top) and ground floor (bottom) video cameras.
Mr. D'Arielli leaning over reception desk at second illuminated LCD-6000 panel.

Exponent has determined that, because the door to room 305 had not yet opened and no smoke was visible in the hallway, the 5:12:59 a.m. event was also triggered by the smoke detector in room 305.  Other smoke detectors on the third guest floor could not have activated by this time. When the alarm triggered, the LCD-6000 display illuminated and went off after 30 seconds, but the internal buzzer likely remained on for 4 minutes until Mr. Scarano returned to the reception area.  In his deposition, Mr. D'Arielli did not provide any information regarding the alarm buzzer between 5:13 a.m. and 5:17 a.m., and the security camera video confirms that he did not touch the LCD-6000 panel during this period.  As discussed above, the system was programmed to activate the floor alarm within 5 minutes (according to the Vaccaroni report) and, consistent with this programming, no floor alarm indication was observed on the third floor following the first and second alarm.  Based on the results of our literature review on cigarette fires (described in the fire causation section below) and our FDS simulations, Exponent concludes that the second panel



**Privileged and Confidential:  Prepared at the Request of Counsel**

indicator alarm was due to smoldering combustion in room 305.  The second alarm from the room 305 detector also confirms that either Mr. Scarano reset the system after the 5:08 a.m. alarm or the system reset itself, as described in the Vaccaroni report, because the smoke source was sporadic.  If the system had not been reset, the smoke detector within the room could not have sent another signal at 5:12:59 a.m.

At 5:17:28 a.m., immediately after Mr. Scarano returned to the reception desk, he stood in front of the LCD-6000 panel with Mr. D'Arielli and examined it for a period of time.  While the view of the panel is obscured from 5:17:28 a.m. through 5:18:19 a.m., the screen light was observed illuminated at 5:18:19 a.m. for a few seconds when Mr. Scarano and Mr. D'Arielli moved away from the panel.  It is likely that at least one (and possibly several) smoke detectors activated during this time, immediately after the occupants opened the door to room 305 (for example, our FDS results indicate that the corridor detector would have detected smoke within approximately 4 seconds after the room door was opened).  The panel light went off at 5:18:23 a.m.[55]

At 5:17:50 a.m., the door to room 305 opened for approximately 9 seconds, closed for approximately 2 seconds, and then opened for a second time.  As the two women exited the room, Ms. Castricone was observed to crouch down, leaning against the wall in the hallway facing the fire in room 305 (Figure 32).  During this time, video camera number 9 provides a direct view inside the room.  A bright flame was observed toward the back (northwest) corner of the room and a significant amount of smoke entered the hallway (Figure 19, Figure 32).  Ms. Bouldoukian appeared to hesitate, knocked on the door of room 306, and then re-entered room 305.[56]  Ms. Castricone followed her back into the room at 5:18:19 a.m.  They were both still inside at 5:18:26 a.m. when smoke obstructed the visibility of the cameras.

---

[55]  It is also possible that this panel light is associated with either Mr. Scarano or Mr. D'Arielli touching one of the panel buttons.

[56]  Ms. Bouldoukian has testified that she went back into her room with her parents to get her pants from the floor next to her bed; she was in the room for 10 seconds.  Videotaped deposition of Tracey Bouldoukian, March 12, 2009, pp. 132, 134.

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 31.    Composite image of third floor (top) and ground floor (bottom) video cameras.
Mr. Scarano and Mr. D'Arielli in front of LCD-6000 panel.  Door to room 305
opens (arrow) and smoke is visible exiting room.

Based on this sequence of events and fire and smoke growth rates established from the FDS

results, flaming combustion could have started in room 305 as little as 1 minute before the door

was first opened at 5:17:50 a.m.  FDS also predicts that any occupants inside the room would

have suffered burn injuries within approximately 2.5 minutes from the onset of flaming

combustion.  The video shows that the girls reentered the room and were inside when the smoke

completely obstructed the view from the security cameras at 5:18:26 a.m. (i.e., flaming

combustion started at approximately 5:16 a.m.).  Given the level of uncertainty typically

associated with computer modeling, the level of agreement between these independent

approaches is very consistent and confirms that the flaming combustion in room 305 started

between 5:16 and 5:17 a.m.  Our FDS simulations and review of the video data also indicate that

the smoke detector in the corridor immediately in front of room 305 could have activated within



**Privileged and Confidential:  Prepared at the Request of Counsel**

4 seconds after the door was opened at 5:17:50 a.m., and additional corridor detectors would
have activated within approximately 15 seconds (Figure 33, Table 5).



Figure 32.    Room 305 during fire.  Flame visible inside room and smoke pouring into
the hallway (flame denoted by red arrow).

Consistent with this analysis, and after recognizing that another third floor detector had now
activated, Mr. Scarano instructed Mr. D'Arielli to go check the third floor at 5:18:18 a.m.
Apparently, he also acknowledged the alarms or reset the panel such that the floor alarm was not
triggered.  Mr. D'Arielli took the center elevator and can be seen exiting on the third floor at
5:18:53 a.m. (Figure 34).  He immediately re-entered the elevator by 5:18:56 a.m. and
descended to the lobby.  During this time, the LCD-6000 screen again illuminated at
5:18:48 a.m., most likely because the smoke triggered additional smoke detectors in the third
floor hallway.  This is consistent with smoke propagation throughout the third floor hallway as
observed from the video cameras.

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 33.    Smoke detectors (yellow arrows) outside room 305 in secondary corridor (left) and in main corridor in front of elevator (right).



Figure 34.    Composite image of third floor (top) and ground floor (bottom) video cameras. Mr. D'Arielli exiting the elevator on the third floor (top left frame blue arrow); on the ground floor, Mr. Scarano is attending to the illuminated LCD-6000 panel.

**Privileged and Confidential:  Prepared at the Request of Counsel**

Mr. Scarano was still examining the LCD-6000 alarm panel when Mr. D'Arielli returned to the
reception area from the third floor at 5:19:04 a.m.  They had a rapid conversation, after which
Mr. D'Arielli returned to the third guest floor via the elevator.  At 5:20:24 a.m., he appears in
the hallway with a flashlight in front of rooms 307 and 308 (Figure 35).  This time is consistent
with Mr. D'Arielli arriving at the third floor after he had reported the fire to Mr. Scarano.  By
5:20:40 a.m., the cameras on the third floor were completely obscured by smoke.



Figure 35.    Composite image of third floor (top) and ground floor (bottom) video cameras.
Mr. D'Arielli visible in front of rooms 307/308 on the third floor (top right frame
as seen in camera 12 yellow arrow); on the ground floor, Mr. Scarano is
attending to the illuminated LCD-6000 panel.

After Mr. D'Arielli confirmed the fire, Mr. Scarano made a call from telephone ATT2 on the
reception desk at 5:19:18 a.m.  In his deposition, he claimed that he called the fire department
number, but Exponent notes that this call does not appear in the hotel phone logs.  Mr. Scarano
also retrieved and consulted a folder, which Exponent understands to be the emergency plan,

**Privileged and Confidential:  Prepared at the Request of Counsel**

during this time (Figure 39).  At 5:21:37 a.m., he received a call on ATT2, likely from a guest in the hotel.  Guests evacuating from the third floor first arrived at the ground floor at 5:21:57 a.m. and assembled loosely in the reception area.  Ms. Castricone arrived there at 5:22:26 a.m., immediately went to the reception desk, and covered her head with her arms.  At 5:22:39 a.m., Mr. Scarano turned on the room lights in the reception area.  Exponent notes that, after this time, it is no longer possible to determine when the LCD-6000 panel lights turn on or off because the room lights are too bright for the camera to resolve the display.

At 5:24:02 a.m., Mr. Scarano called the 115 fire department telephone number from phone 818. According to the security camera video, this call lasted for 1 minute and 46 seconds, which is consistent with fire department records that the first call to them was 1 minute and 43 seconds long.[57]  The phone records and video footage both indicate that, during this call, Mr. Scarano put down the phone to locate a phone number requested by the emergency operator.[58]  Mr. Scarano called the fire department a second time from phone ATT2 at 5:29:52 a.m.[59]

Many third floor guests have claimed that they did not hear any alarms as they evacuated their rooms, and security camera views from the third floor confirm that the floor alarm mounted just outside room 305 had not activated before the smoke obscured the view from this camera at approximately 5:18:45.  Accordingly, it appears that Mr. Scarano acknowledged multiple detectors and likely reset the alarm when he pushed the LCD-6000 panel buttons starting at 5:17:28 a.m., as seen in the security camera video (Table 8).  In his deposition, Mr. Scarano confirmed that he reset (or acknowledged) the smoke detectors at least once and possibly more, and has also acknowledged that he did not activate the general alarm, which is accessed by turning a manual key in the AM-6000 fire alarm control panel behind the reception desk.  The security cameras do confirm that the floor alarms for the rest of the floors were activated during the incident, as described in Table 8.

---

[57]   Recording and transcript of first call to the Rome Fire Department.  Attachment to the police report, June 24, 2004, Central Office of the Criminal Police, The Department of the Interior (Bates 00373).

[58]   Transcript of telephone calls at the operations room of the emergency number 115 on May 1, 2004. (Bates 000373).

[59]   The time between both fire department phone calls on the video camera is also consistent with the phone records.

**Privileged and Confidential:  Prepared at the Request of Counsel**

Exponent understands that the alarm system had been regularly inspected and verified every 6 months by Project Service S.r.l. (who originally installed the system).  The alarms and certain detectors on the third and fifth floors were tested during the last inspection before the fire on January 21, 2004.[60]  The public prosecutor experts were provided an opportunity to test the alarm system after it was repaired and reprogrammed with the original instructions, and concluded that the alarms were in fact working correctly.[61]

## 5th floor

The first indication of smoke in the fifth guest floor hallway was at 5:19:50 a.m. when smoke was observed from the gaps of the room 505 door on cameras 2 and 3 (Figure 36).  The door to room 505 opened at 5:22:13 a.m. and the door to room 506 opened immediately thereafter.  A man in his underwear, apparently occupying room 506, activated the pull station beside the emergency exit at 5:23:08 a.m.  He then activated a second pull station at the southwest end of the main hallway (next to room 520) at 5:23:52 a.m.  Consistent with the system programming, the fifth floor fire alarm flashing light activated immediately after the second pull station was pulled, at 5:23:55 a.m.

---

[60]   Control Security Sistemi Di Sicurezza S.r.l. Impianto Rivelazione Incendi, M. DeCandia.  Additional details are provided in the Vaccaroni report.

[61]   Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004, pp. 22, 24. Additional details of the public prosecutor tests are also provided in the Vaccaroni report.

**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 36.    Schematic of fifth floor noting location of the Busque and Lowry rooms as well as the location of video cameras and pull stations.

At 5:26:27 a.m., either Mr. or Mrs. Busque was observed to open the door to their room (532) and exit into the hallway.  They returned to their room and closed the door within a few seconds.  After approximately 1 minute, Mr. Busque was seen at the southwest end of the main hallway on video camera 4 (Figure 37).  According to the badge system records, either Mr. or Mrs. Busque returned to their room at 5:28:18 a.m.  A second badge entry to room 532 is logged at 5:29:46 a.m.  The amount of smoke in the hallway precludes visual observations from the video cameras at these times.

Mr. and Mrs. Lowry exited their room (513) at 5:27:47 a.m. and proceeded into the main stairway (Figure 37).  They turned around and went back into the hallway before returning to their room.



**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 37.    Composite image of fifth floor video cameras.  Mr. and Mrs. Lowry are exiting their room 513.  Mr. Busque is walking to the south end of the main corridor. Images correspond to cameras 3, 4, 2, 1, starting at top left image and moving in the clockwise direction.

**Privileged and Confidential:  Prepared at the Request of Counsel**

**Table 8.    Sequence of events observed throughout the hotel between 5:08 a.m. and 5:35 a.m. the day of the fire**

| Corrected time | Camera time | Floor | Event |
|---|---|---|---|
| 5:08:46 | 5:01:26 | Gnd | Panel light on LCD-6000 turns on |
| 5:08:55 | 5:01:35 | Gnd | Mr. Scarano studies synoptic display |
| 5:09:21 | 5:02:01 | Gnd | Mr. D'Arielli leans over and looks at synoptic display |
| 5:10:26 | 5:03:06 | Gnd | Panel light on LCD-6000 turns off |
| 5:12:46 | 5:05:26 | Gnd | Mr. Scarano leaves the reception area |
| 5:12:59 | 5:05:39 | Gnd | Panel light on LCD-6000 turns on |
| 5:13:02 | 5:05:42 | Gnd | Mr. D'Arielli leans over desk and looks, continues mopping floor |
| 5:13:28 | 5:06:08 | Gnd | Panel light on LCD-6000 turns off |
| 5:13:52 | 5:06:32 | Gnd | Mr. D'Arielli comes behind reception desk, looks at LCD-6000, leaves |
| 5:14:13 | 5:06:53 | Gnd | Mr. D'Arielli leaves reception desk and continues cleaning floor |
| 5:16:44 | 5:09:24 | Gnd | Mr. D'Arielli comes behind reception desk, looks at LCD-6000, leaves |
| 5:16:49 | 5:09:29 | Gnd | Unidentified guest enters left elevator |
| 5:17:28 | 5:10:08 | Gnd | Mr. Scarano & Mr. D'Arielli return to reception, look at LCD-6000 |
| 5:17:50 | 5:15:30 | 3 | Door to rm 305 opens, fire visible, smoke entering hallway |
| 5:17:59 | 5:15:39 | 3 | Door to rm 305 closes |
| 5:18:01 | 5:15:41 | 3 | Door to rm 305 opens, girls exit, fire visible, smoke entering hallway |
| 5:18:19 | 5:10:59 | Gnd | Panel light visible on LCD-6000 (panel obscured by Mr. Scarano from 5:17:28) |
| 5:18:19 | 5:15:59 | 3 | Ms. Castricone and Ms. Bouldoukian re-enter room 305 |
| 5:18:23 | 5:11:03 | Gnd | Panel light on LCD-6000 turns off; Mr. Scarano and Mr. D'Arielli leave the reception desk |
| 5:18:26 | 5:16:20 | 3 | Smoke obscures view to room 305 |
| 5:18:27 | 5:11:07 | Gnd | Mr. D'Arielli enters center elevator to check 3rd floor |
| 5:18:48 | 5:11:28 | Gnd | Panel light on LCD-6000 turns on |
| 5:18:53 | 5:11:33 | Gnd | Mr. Scarano returns to LCD-6000 |
| 5:18:54 | 5:16:34 | 3 | Mr. D'Arielli exits elevator and re-enters |
| 5:19:04 | 5:11:44 | Gnd | Mr. D'Arielli at elevator on ground floor and communicates with Mr. Scarano |
| 5:19:17 | 5:11:57 | Gnd | Mr. D'Arielli re-enters elevator and leaves lobby |
| 5:19:18 | 5:11:58 | Gnd | Mr. Scarano returns to reception, makes phone call (white phone ATT2) |
| 5:20:16 | 5:12:56 | Gnd | End of phone call, Mr. Scarano returns to LCD-6000 |
| 5:20:25 | 5:18:05 | 3 | Mr. D'Arielli visible at west end of hallway in front of room 307/308 |
| 5:20:46 | 5:13:26 | Gnd | Mr. Scarano leaves the reception area |
| 5:21:00 | 5:13:40 | Gnd | Panel light on LCD-6000 turns off |
| 5:21:37 | 5:14:17 | Gnd | Mr. Scarano returns to reception and answers white phone, looks through a booklet |
| 5:21:56 | 5:14:36 | Gnd | Guests begin coming into lobby from the right, ultimately exit through front door |
| 5:22:07 | 5:14:47 | Gnd | Mr. Scarano puts down white phone |
| 5:22:13 | | 5 | Door to rm 505 opens, smoke enters hallway |
| 5:22:14 | 5:14:54 | Gnd | Mr. Scarano looking through a booklet |



**Privileged and Confidential:  Prepared at the Request of Counsel**

| | | | |
|---|---|---|---|
| 5:22:26 | 5:15:06 | Gnd | Ms. Castricone at reception desk |
| 5:22:34 | 5:15:14 | Gnd | Mr. Scarano turns on reception area lights |
| 5:23:08 | 5:20:18 | 5 | Man in underwear at fire alarm pull station next to emergency stairs |
| 5:23:52 | 5:21:02 | 5 | Man in underwear activates fire alarm pull station at south end of hallway |
| 5:23:55 | 5:21:05 | 5 | Flashing fire alarm light |
| 5:24:02 | 5:16:42 | Gnd | Mr. Scarano makes first call to the fire department (818 black phone) |
| 5:24:10 | 5:16:50 | Gnd | Mr. Scarano touches keypad of white phone and places the receiver on the desk |
| 5:26:12 | 5:18:52 | Gnd | Mr. Scarano makes or receives call on white phone |
| 5:26:27 | 5:23:37 | 5 | Mr. or Mrs. Busque open room 532, exit room, re-enter, and close door |
| 5:26:54 | 5:19:34 | Gnd | Mr. Scarano hangs up white phone |
| 5:26:56 | 5:19:36 | Gnd | Mr. Scarano picks up white phone |
| 5:27:18 | 5:19:58 | Gnd | Guest uses black phone |
| 5:27:40 | 5:24:50 | 6 | Flashing fire alarm light |
| 5:27:47 | | 5 | Mr. and Mrs. Lowry exit room 513 and proceed to main stairway |
| 5:27:48 | 5:24:58 | 5 | Mr. Busque at south end of hallway |
| 5:27:50 | 5:20:30 | Gnd | Mr. Scarano hangs up white phone |
| 5:28:00 | 5:20:40 | Gnd | Mr. Scarano touches LCD-6000 |
| 5:28:16 | | 5 | Mr. and Mrs. Lowry enter room 513 |
| 5:28:17 | 5:20:57 | Gnd | Mr. Scarano picks up white phone ATT2 |
| 5:28:18 | 5:25:28 | 5 | Mr. or Mrs. Busque open room 532 door (badge records) |
| 5:28:20 | 5:26:00 | 4 | Flashing fire alarm light |
| 5:28:23 | 5:21:03 | Gnd | Guest hangs up black phone 818 |
| 5:28:43 | 5:21:23 | Gnd | Mr. Scarano hangs up white phone ATT2 |
| 5:29:03 | 5:21:43 | Gnd | Guest speaks to Mr. Scarano, points upward, Mr. Scarano makes phone call on white phone ATT2 |
| 5:29:17 | 5:21:57 | Gnd | Mr. Scarano hangs up white phone ATT2 |
| 5:29:20 | 5:22:00 | Gnd | Mr. Scarano picks up white phone ATT2 |
| 5:29:30 | 5:22:10 | Gnd | Mr. Scarano hangs up white phone ATT2 |
| 5:29:31 | 5:27:11 | 2 | Flashing fire alarm light |
| 5:29:46 | | 5 | Mr. or Mrs. Busque opens room 532 door (badge records) |
| 5:29:47 | 5:22:27 | Gnd | Mr. Scarano makes phone call on white phone ATT2 |
| 5:29:52 | 5:22:32 | Gnd | M. Scarano 2nd call to the fire department (white phone ATT2) |
| 5:30:00 | 5:22:40 | Gnd | Mr. D'Arielli communicates with Mr. Scarano (while on phone ATT2) |
| 5:30:25 | 5:23:05 | Gnd | Mr. D'Arielli goes out front door |
| 5:30:36 | 5:23:16 | Gnd | Mr. Scarano hangs up white phone ATT2 |
| 5:30:46 | 5:27:56 | 7 | Flashing fire alarm light |
| 5:35:09 | 5:32:49 | 1 | Flashing fire alarm light |



**Privileged and Confidential:  Prepared at the Request of Counsel**

# 5.    Fire Origin and Cause

Exponent has conducted an independent assessment of the fire ignition and spread investigations carried out by various entities retained on this matter.  We have reviewed the report and attachments from the Rome Police Forensics Service (Police report), the November 2004 report by the experts retained by the public prosecutor (Public Prosecutor report), and the reports filed by experts retained by the attorneys for Ms. Rachel Castricone (Castricone expert and Castricone electrical expert), Ms. Tracey Bouldoukian (Bouldoukian expert) and the hotel employees originally charged by the public prosecutor (Hotel expert, Hotel toxicologist).  A summary of their opinions relevant to this analysis is provided below.

## Public Prosecutor expert report

Based on their review of the security video and their assessment of fire damage patterns to various hotel rooms, the Public Prosecutor experts concluded that the fire started in room 305 and propagated along the third floor hallway to room 332.  The bulk of the fire damage was confined to only these two rooms and the third floor hallway that connected them.  However, there was extensive smoke damage on several floors because smoke from room 305 penetrated into rooms 405 and 505 directly overhead.  There was also significant smoke and heat exposure from the flames that vented from the patio area after rooms 305 and 332 had flashed over.

The Public Prosecutor experts concluded that the third floor security camera video clearly establishes that, at approximately 5:18 (corrected time), immediately after Ms. Castricone and Ms. Bouldoukian first left their room, an incipient fire is visible between the mini refrigerator and the sliding glass patio door.[62]  Based on their analysis of the video, this is the only location in the hotel where fire (or smoke) was visible at that time.  The smoke and fire propagated into the third floor hallway because Ms. Castricone and Ms. Bouldoukian left their room door open.  Room 332 subsequently burned due to a chimney effect, because the occupants of that room had also left the patio door, as well as the main door, open during the evacuation.

---

[62]    Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004, p. 34.

**Privileged and Confidential:  Prepared at the Request of Counsel**

The Public Prosecutor experts concluded that the fire was likely first ignited at 5:08:46 (corrected time), approximately coincident with when the first alarm signal appeared at the synoptic panel on the reception desk.  The fire had transitioned to flaming combustion by 5:17:51 when the girls opened the door to room 305 for the first time.  Given the (approximately) 9-minute time difference between these events, they concluded that the incident likely started as a smoldering ignition, which transitioned to flaming combustion just before the room door was opened.  They ruled out accelerants because the fire would have grown much more rapidly had these been used.  They also ruled out electrical causes because the copper circuits in the areas not directly affected by the fire did not exhibit discoloration that would suggest internal overheating, there was no observable damage to the electric panel on the third floor, and the electrical system and wiring for the hotel was compliant with European Standards and had passed recent inspections.  They also opined that an electrical fire would likely have developed much more quickly than the 9 minutes that elapsed between the first alarm and the time Ms. Castricone and Ms. Bouldoukian evacuated the room.

Based on eyewitness accounts that both occupants were occasional smokers and Ms. Castricone apparently discarded smoking materials in the wastebasket in her room, and their own tests wherein lit cigarette butts deposited in exemplar wastepaper baskets caused smoldering ignition for between 4-8 minutes, they concluded that the fire likely occurred due to a slow ignition mechanism, consistent with carelessly discarded smoking materials.  A series of fire tests on exemplar furniture and furnishings provided fire growth and spread timelines consistent with the observed events.

## Castricone experts

Ms. Castricone's attorneys in Italy retained two different experts to address causation.  Mr. Monti opined that the ignition experiments conducted by the prosecution experts established that a discarded cigarette butt could not have started the fire because four separate attempts to ignite combustibles in an exemplar wastepaper basket (with up to two cigarette butts) only caused smoldering ignition (i.e., there was smoke without any evident flaming combustion).  He also cited literature that purports to claim that discarded smoking materials frequently cannot start a fire and concluded that the television as well as an unidentified electrical fault could not



**Privileged and Confidential:  Prepared at the Request of Counsel**

be ruled out.[63]  Specifically, Mr. Monti claimed that, since the rooms were protected by circuit breakers that had a rated current of 6 A, breaking capacity of 4.5 KA and differential threshold of 30 mA, a faulty component, localized short-circuit, electric arc, false contact or localized overheating due to insulation loss that drew less than the rated amount of energy could be a credible "slow trigger" type ignition source.  He further stated that, on the night of June 24, another fire occurred in the hotel due to a short circuit in one of the air-conditioning units on the second floor.  However, even though this incident caused a lot of smoke, the fire department controlled the fire very quickly and there were no injuries.

Professor Parise also provided an independent report in which he concluded that a damaged cable or conductor that caused a non-ground fault could cause resistive heating or intermittent (pulsating) arc-related heating sufficient to ignite a fire in surrounding combustibles.[64]  In the event such a fault existed in the subject room, the existing protection circuit might not be triggered and ignition could occur after a sufficient period of time.

## Bouldoukian expert

Ms. Bouldoukian's expert, Professor Falcone, cited Italian fire statistics that show that the cause of approximately 53% of fires in Italian hotels and other public venues remained undetermined (1990-2001).[65]  Based on his evaluation of the fire timeline, wherein the first alarm was recorded at the reception desk at 5:08:46 (corrected time) and the two occupants of room 305 exited the room at 5:17:51 (corrected time), he concludes that the fire could not have started in the wastepaper basket in room 305 because the occupants would have been overcome by smoke had the fire started at this location.  He noted that the smoke detector did not immediately detect the continued presence of smoke after it was re-armed and, therefore, concluded that the first alarm was triggered due to a fire in the false ceiling above the room hallway, likely due to an electrical malfunction.  Under his hypothesis, the smoke detector inside the room was intermittently exposed to smoke, and therefore did not re-alarm immediately after it was reset.

---

[63]   Monti, A.S., Expert Evidence Report for Castricone, Rachel Lynn, March 6, 2006, section 3.

[64]   Parise, G., Fire Concerning the Hotel Parco dei Principi That Took Place on May 1, 2004.  Independent Opinion. January 16, 2006, p. 3.

[65]   Falcone, D., Expert Opinion Concerning the Fire That Developed on 01.05.2004 at the Hotel Parco dei Principi of Rome. March 7, 2006, p. 3.

**Privileged and Confidential:  Prepared at the Request of Counsel**

He also opined that, since the prosecution experts failed to demonstrate that flaming ignition could occur in their wastepaper basket tests, the root cause could not be a smoldering fire that started in the wastepaper basket.

## Hotel experts

Based on available eyewitness interviews, the hotel experts concluded that Ms. Castricone discarded smoking materials somewhere in room 305.  The smoldering fire transitioned into flaming combustion and ultimately propagated into the hallway outside after the door was opened and to the upper floors through the outside landing.[66]  They ruled out an electrical cause because no one in room 305 reported any smoldering or pungent smells, consistent with electrical resistive heating or smoldering caused by intermittent arcing.  They criticized the public prosecutor experts for excluding accelerants without a formal laboratory-based chemical analysis of the fire debris.  While this opinion was based in part on field measurement results from the fire department, no calibration records or description regarding how and where the equipment was used was provided.  The hotel experts concluded that, since the public prosecutors' own flashover tests demonstrated that a flammable liquid was necessary to reliably propagate a fire, the presence of an accelerating substance could not be conclusively ruled out.

The security video demonstrates that Ms. Castricone and Ms. Bouldoukian briefly re-entered room 305 between 5:18:20 and 5:18:26 after they first exited it at 5:17:51.  The toxicological expert retained by the hotel relied on the temperature-time profile from the flashover tests conducted by the public prosecutor experts to conclude that flaming combustion in room 305 first occurred between 5:14:55 and 5:15:25.[67]

## Compliance with NFPA 921, Guide for Fire and Explosion Investigations

The National Fire Protection Association *Guide for Fire and Explosion Investigations* (NFPA 921) was developed to improve and provide consistency to the fire investigation process and to

---

[66]  Marinelli, S., Tiezzi, I., & Bardazza, M.  Expert Evidence on Behalf of Roberto Naldi, Giuseppina Carla Milos and Antonietta Bartoletti, March 14, 2006, pp. 33-37.
[67]  Gandini, C., Expert Witness Toxicology Report, p. 53.

**Privileged and Confidential:  Prepared at the Request of Counsel**

allow regulatory authorities and risk managers to better understand how and why fires occur and take appropriate steps to prevent future occurrences.

NFPA 921 establishes guidelines and a recommended practice for the safe and systematic investigation or analysis of fire and explosion incidents that yields effective fire investigation and origin and cause analysis results.[68]  The guide stresses that the compilation of factual data as well as the subsequent analysis should be accomplished objectively and truthfully, and the fire investigator should approach every incident with no preconceived determination as to the source of the fire.  The basic methodology of a correct fire investigation comprises several steps that should be accomplished in a systematic manner that is consistent with accepted scientific and engineering practices.[69]  NFPA 921 clearly instructs that the determination of a single point of origin should be made unless the evidence is inconclusive.[70]  If a single point of origin cannot be identified, the investigator should identify all plausible origin sources, with the supporting evidence for each option.

Since the fire was investigated as a criminal matter by the Rome Police Department, the fire scene was made available only to the police and public prosecutor investigators.  The remaining experts were provided with documents from the criminal investigation and wrote rebuttal reports after being provided an opportunity to inspect the hotel (during or after the repairs).  Based on our analysis of the portions of reports relevant to the ignition and spread of the fire from experts for various parties, all experts generally agree on the fire spread mechanism.  However, there is significant disagreement on the ignition mechanism and when the fire first started.  Exponent has concluded that, while the public prosecutor experts generally followed the guidelines of NFPA 921, they did not provide sufficient basis for ultimately concluding that smoking-related materials ignited the fire and for eliminating all electrical causes.

---

[68]   NFPA 921, 1995, Section 1-2.
[69]   Ibid., Section 2-3.
[70]   Ibid., Section 11-1.

Eₓ

**Privileged and Confidential:  Prepared at the Request of Counsel**

# Exponent opinions on causation

The public prosecution experts as well as the experts for the hotel have concluded that the May 1, 2004 fire was caused by carelessly discarded smoking materials, while the causation experts hired by the attorneys for Ms. Castricone and Ms. Bouldoukian have concluded that there was an unidentified electrical cause.  Based on our review and analysis, Exponent has concluded that all electrical causes can be conclusively ruled out.  There appear to be no other credible ignition sources and, therefore, by a process of elimination that is consistent with NFPA 921, we have concluded that carelessly discarded smoking materials caused the subject fire.

## Causation via smoking materials

Hotel employees have stated that they recall Ms. Castricone and Ms. Bouldoukian smoking in the lobby the evening before the fire.[71]  Both individuals are seen smoking in the lobby, Ms. Castricone at 1:49:44 a.m. and Ms. Bouldoukian at 1:51:26 a.m.  Mr. Fiderio and Ms. Castricone have also confirmed that they both smoked on the balcony of room 305 after they returned from the lobby at 4:42:55 a.m.[72, 73]  Mr. Fiderio recalls throwing his cigarette out of the balcony and remembers that Ms. Castricone extinguished her cigarette in the ashtray.  He thinks that she might have brought the ashtray back into her room and was not carrying it when he hugged her as he left the room at 4:55:03 a.m.[74]

Literature indicates that lighted tobacco is the leading cause of fire deaths in every country that keeps fire cause statistics.  For example, in 2003, the United States reported 25,600 smoking-material structure fires that caused 760 fatalities, 1520 injuries and $481 million dollars in direct property damage.[75]  Approximately 14% of these fires were first ignited in rubbish, trash or waste.  While the statistics do not provide sufficient detail to determine whether the specific circumstances of these fires involved inadequate or poorly placed ashtrays or inappropriate disposal of burning cigarettes or ashes, most of these incidents were attributed to human error in

---

[71]  Interpreted video deposition of Antonello D'Arielli, March 9, 2009, p. 44.

[72]  Deposition of Matthew Fiderio, March 24, 2008, p. 37.

[73]  Videotaped deposition of Rachel Castricone, February 18, 2009, pp. 51-58.

[74]  Transcript of witness statement, Matthew Fiderio, May 1, 2004 (translation); Statement of Matthew Fiderio, February 18, 2005.

[75]  Hall, J.R., The Smoking-Material Problem, National Fire Protection Association, August 2006.



**Privileged and Confidential:  Prepared at the Request of Counsel**

control or disposal of smoking-material.  The literature also indicates that most victims of
smoking-material fires were either asleep or slowed by alcohol or other disability prior to the fire.

A compilation of selected fatal fire incidents by the National Fire Protection Association confirms
that lit cigarettes routinely cause fires when dropped on papers or other light combustibles, or
when the contents of an ashtray are improperly disposed of in a wastepaper basket.[76]  For
example, in 2000, a man from the State of Missouri died in a cigarette fire after his son emptied
the contents of an ashtray into a trash can before leaving the house; the fire spread to nearby
furniture.  In 1997, a man from the State of Maine and his two young children died in a fire that
started after cigarette ashes were dumped into a kitchen trash bag and, in 2006, a man from the
State of South Carolina died when a fire started after an ashtray was emptied into a wastebasket in
his living room.  In 1992, ten occupants of the Nu-Way Housing Development Center, a Detroit
foster care facility for adults, perished in a fire that was ignited due to smoking materials
discarded in a wastepaper basket that contained combustible materials.[77]  Additional incidents
where fires occurred after cigarettes were improperly disposed of in trash containers are
documented in the *Firewatch* section of many issues of the NFPA journal.[78]

Based on a United States Consumer Product Safety Commission (CPSC) study of residential
fires, cigarettes are a credible ignition source if they contact an ignitable fuel source, which has
been separately shown to include trash and paper items.[79]  Measurements have confirmed that
the combustion zone within a cigarette ranges between 600-650°C, well above the temperature
necessary to ignite paper or light combustibles.  Experimental investigations confirm that
discarded cigarettes can initiate trash or paper fires in a wastepaper basket, and the time to reach
flaming combustion ranges between 8 and 40 minutes, with an average time of approximately
17 minutes.[80]  Investigators have also concluded that cigarette-initiated trash fires can often be
difficult to reproduce, and there is a higher probability of transitioning to flaming combustion if

---

[76]  Flynn, J.D., Selected Fatal Fire Incidents Involving Cigarettes, National Fire Protection Association, September 2008.

[77]  Isner, M.S., 10 Die in Detroit Board and Care Facility, NFPA Journal, January/February 1993.

[78]  See, for example, Firewatch, NFPA Journal, September/October 2007.

[79]  Harwood et al., Cigarette Fire Incident Study, Vol 4 of Final Report, Fire Safe Cigarette Act of 1990, Consumer Product Safety Commission.

[80]  Babrauskas, V., Ignition Handbook, 2003.



**Privileged and Confidential:  Prepared at the Request of Counsel**

the trash container is placed in an area of draft (i.e., next to an open window or door).[81] Transition of smoldering combustion to flaming combustion is also much more likely and occurs in the majority of the cases if a single layer of cloth (e.g., a bed sheet or cotton clothing) covers the smoldering cigarette.

The timeline of the subject incident supports a discarded cigarette as the ignition source of the subject fire.  If Ms. Castricone inadvertently dropped a smoldering cigarette on light combustibles (e.g., into a wastepaper basket that contained light combustibles) or onto clothing on the floor just before Mr. Fiderio left the room at 4:55:03 a.m., the timing of the girls exiting the room at 5:17:50 a.m. is consistent with the a smoldering fire transitioning to flaming combustion.[82,83] Mr. Scarano testified that he received a wake-up call request from the room at 5:07:27 a.m. and, therefore, reset the system after he acknowledged the first alarm at 5:08:46 a.m. because he concluded it was likely caused by smoking.[84]  It is very significant that, once reset, the alarm did not retrigger itself immediately (the synoptic display turned off at 5:10:26 a.m. after the system had reset itself), confirming that the smoke source was intermittent.  Hotel employees have consistently indicated that the smoke detectors in the rooms were frequently triggered if guests smoked in the room.[85]  Accordingly, it is also possible that either Ms Bouldoukian or Ms. Castricone smoked in the room immediately after the wake-up call request and smoking materials were improperly disposed of at this time.  However, both girls have denied smoking in the room.[86, 87]  The second alarm at 5:12:59 a.m. was triggered due to a continuous smoke source caused by smoldering combustion in or around the wastepaper basket or on the floor in room 305.

The toxicological expert for the hotel has concluded that flaming combustion started no more than 2.5 or 3 minutes before the girls left the room (for the first time), at approximately 5:15 a.m.

81   Cigarette Fire in Paper Trash, Fire Findings, 6:1, (1-3), Winter 1998.

82   Door to room 305 opens at 5:17:50 a.m. and flaming combustion observed.  Room flashes over 2-3 minutes after onset of flaming combustion.  As discussed earlier, smoldering transitions to flaming combustion at approximately 5:16 a.m.

83   Mr. Fiderio has testified that he recalls that there was clothing and baggage on the floor of room 305 near the sliding glass door. Deposition of Matthew Fiderio, March 24, 2008, pp. 159-160; Transcript of witness statement, Matthew Fiderio, May 1, 2004 (translation).

84   Interpreted videotaped deposition of Maurizio Scarano, March 23, 2009, pp. 69-71.

85   See for example, interpreted videotaped depositions of Arnaldo DeRiso, March 24, 2009, and Gennaro Procino, February 11, 2009.

86   Videotaped deposition of Rachel Castricone, February 18, 2009, pp. 239, 257.

87   Videotaped deposition of Tracey Bouldoukian, March 12, 2009, p. 124.



**Privileged and Confidential:  Prepared at the Request of Counsel**

As discussed above, our FDS analysis confirms that the onset of flaming combustion occurred between 5:16 a.m. and 5:17 a.m., which is consistent with the medical opinion.  The incident timeline is also consistent with experimentally observed average times for a discarded cigarette to transition to flaming combustion (if it was discarded either just before Mr. Fiderio exited the room at 4:55:03 a.m. or immediately after the first alarm at 5:08:46 a.m.).

The literature also explains why the public prosecutors failed to reproduce flaming combustion in their tests.  Their tests were only conducted with tissue paper, writing paper or newspaper, and there is no indication that other more reliably ignitable material (e.g., cotton balls or fabric) were tested.  There are also no details about whether an appropriate draft (e.g., from the partially open room door) was present.  Only four tests were conducted, and the literature confirms that many more tests are typically required to bracket the conditions necessary to create flaming combustion.  While discarding a cigarette into a wastebasket does not guarantee flaming combustion on each occurrence, it can certainly occur and cannot be eliminated as a potential cause.

## Electrical causation ruled out

Experts retained by the attorneys for Ms. Castricone and Ms. Bouldoukian have postulated that a short circuit, intermittent arcing or a resistance heating mechanism could have started the fire without triggering overcurrent ground fault protection on each floor.  Although the experts retained by the defendant have claimed an electrical cause for the fire, they have provided no evidence to support their hypothesis.  Exponent notes that NFPA 921 states, "Before a fire can properly be determined to have been caused by electricity, the source of electrical heat must be identified."[88]  No evidence of an electrical fault has been identified and, based on their investigation, the public prosecution experts have explicitly ruled out an electrical cause.

*Short circuit.*  Exponent notes that the subject room was one of three rooms connected to a single 25 A circuit breaker installed in the third floor switchboard, approximately 10 m from room 305 (Figure 10).  The Castricone electrical expert has opined that the distance to the breaker would impose significant impedance, which might have explained why the breaker did not trip in the early stages of the fire.  Exponent does not agree with this opinion.  According to

---

[88]  NFPA 921, 2004 ed., Section 8.9.1.4.

**Privileged and Confidential:  Prepared at the Request of Counsel**

NFPA 921, the impedance for a single 14 AWG wire over this distance is approximately 0.1 Ohms and, therefore, the resistance from the breaker to the hotel room was negligible.[89] Exponent opines that the breaker would have tripped very quickly in response to a sustained short circuit.  Based on the electrical floor diagrams, the electrical outlets and light fixtures in the bedroom, bathroom and hallway were connected through a 10 A circuit breaker/ground fault interrupter in the room.[90]  Accordingly, any fault that drew less 10 A or had a 10 mA leak to ground would trip these overcurrent protection devices and prevent overheating of the conductors.[91]  In fact, multiple hotel guests from the Harvey party have complained that the room breakers were too sensitive and required frequent resetting.[92]  Exponent has concluded that, given the installed overcurrent and ground fault protection, a sustained short circuit could not have occurred in the hotel room without tripping these devices.

*Intermittent arcing.*  Electrical arcing can cause ignition if it contacts light combustibles for a sustained period.  A mechanically damaged power cord can cause arcing if the line voltage conductor contacts the neutral conductor through damaged insulation, such that the 10 mA ground fault protection is not triggered.  However, once an arc occurs, it typically vaporizes the conductors supplying current to the arc, causing them to separate and, therefore, terminate the arc. "The surge of current melts the metals at the point of contact and causes a brief parting arc as a gap develops between the metal pieces.  *The arc quenches immediately*..."[93] (emphasis added). Arcing that lasts for sufficient time to ignite combustibles (between 0.35 to 1.43 seconds at currents near 5 A to ignite cotton)[94] can only occur if a cyclic mechanical disturbance that causes the two conductors to repeatedly come into contact and then be separated before the 10 A overcurrent protection circuit is triggered is imposed on the power cord.  In most cases, installed protective devices open (i.e., turn off the circuit) in a fraction of a second and prevent repetition of the event.[95]  An undisturbed power cord will not spontaneously initiate an arc even if it is mechanically damaged.  If arcing does occur, clear evidence in the form of melted "beads" will

---

[89]  NFPA 921, 2004 ed., Figure 8.2.2.8.

[90]  Electrical schematics for Hotel Parco dei Principi, Room types G&F, May 1996.  Room 305 was a Type G room.

[91]  NFPA 921, 2004 ed., Section 8.2.8.3.

[92]  See for example, deposition of Michael A. Pitre, March 16, 2009, pp. 13-14.

[93]  NFPA 921. 2004 ed., Section 8.9.4.4.2.

[94]  Shea, J., "Comparing 240 Vrms to 120 Vrms Series Arcing Faults in Residential Wire," Proceedings of the 54th IEEE Holm Conference on Electrical Contacts, Orlando, FL, Oct. 27-29, 2008, pp. 218-224.

[95]  NFPA 921, 2004 ed., Section 8.9.5.1.



**Privileged and Confidential:  Prepared at the Request of Counsel**

be visible on the copper conductors.[96]  Multiple beads are often observed on energized power cords damaged by fire because the insulating properties of the cord have been damaged, thereby allowing arcing through char before protective devices de-energize the cord.  No evidence of beads on the electrical power cords in the room of ignition was observed by the public prosecutor experts or police investigators.  The arcing event itself also causes a loud obvious snap that will startle those nearby.  The auditory volume of the snap is proportional to the power dissipated in the arc,[97] which is higher for a system running off of 240 V compared to 120 V.[98]

An electrical arcing fault of this type can be ruled out as the cause of the subject fire for multiple reasons.  Ms. Castricone and Ms. Bouldoukian have both testified that they recall no electrical problems in the room prior to the fire and have not reported any event that might have damaged a power cord during their stay.  Ms Castricone has indicated that the refrigerator and wall lights were working, while Ms. Bouldoukian recalls that all lights worked in the room.[99,100]  Both have also reported that they were asleep at the time the fire began and, therefore, there was no source of a cyclic physical disturbance of a mechanically damaged power cord to repeatedly initiate arcing.  If arcing had occurred, the occupants would likely be startled and roused by the loud snap created by any arcing much before the onset of smoldering combustion.  In addition, no positive evidence of melted beads on the power cords in room 305 was identified by the public prosecutor experts.  Exponent has concluded that an intermittent arcing mechanism is not a credible ignition source for the subject fire.

*Resistive heating.*  A resistive electrical connection can cause heating that slowly generates char damage to the insulation surrounding the connection.  An arcing through char event can occur once the charred material bridges the insulation between line and neutral conductors.  The arcing event shares the same characteristics as the intermittent arcing discussed above and can be ruled out as root cause of the subject fire for the reasons described above.  In addition, the heating and charring of the insulation that takes place in the days or weeks leading up to the arcing event

---

[96]   NFPA 921, 2004 ed., Sections 8.10.2 - 8.10.4.

[97]   Neal, T. and Parry, R., "Shrapnel, Pressure, and Noise," IEEE Industry Applications Magazine, vol. 11, no. 3, 2005, pp. 49-53.

[98]   Shea, J., "Comparing 240 Vrms to 120 Vrms Series Arcing Faults in Residential Wire," Proceedings of the 54th IEEE Holm Conference on Electrical Contacts, Orlando, FL, Oct. 27-29, 2008, pp. 218-224.

[99]   Videotaped deposition of Tracey Bouldoukian, March 12, 2009, p. 103.

[100]  Videotaped deposition of Rachel Castricone, February 18, 2009, p. 202.



**Privileged and Confidential:  Prepared at the Request of Counsel**

creates an obvious and unpleasant odor of hot insulation, such that it is easily noticeable in a small room.[101],[102]  No such odor was reported by the occupants of room 305 or the housekeeping personnel in the days or weeks leading up to the fire.  Exponent has concluded that resistive heating as root cause of the subject fire is not a credible ignition source for the subject fire.

*The June 24 event*.  On June 24, 2004, a "smart speed controller" for the supplemental air handling unit mounted within the plenum above the hall of room 209 on the second floor failed, causing smoke and activating the fire alarm.[103]  Although the fire department responded, the hotel controlled the incident before they arrived.  Hotel employees have reported that the failed controller produced thick, acrid, black smoke that exited the plenum through the room grill.  Mr. DeRiso, who was sent to the room by the receptionist, indicated that no flames were visible, but they used an extinguisher anyway.  Mr. D'Arielli, who accompanied Mr. DeRiso, stated that there was a very small flame that was extinguished in 3 seconds.  Hotel employees also stated that the electrical circuits in the room and on the second floor tripped due to this incident.[104],[105],[106] Exponent understands that the second floor had been water-damaged during the suppression activities associated with the May 1 fire, and the subject controller may therefore have been damaged, precipitating a subsequent failure.  In his deposition, a principal of ICEM (which owns the hotel) testified that the company that repaired the fault confirmed that the failure occurred because the electrical wires had been water-damaged.  He also stated that, after the May 1 fire, the hotel had been warned that, due to water damage, there could be a greater risk of electrical short circuits in the rooms on the lower floors and they had therefore increased the level of staffing at the reception desk.[107]  During our April 2008 inspection, we verified that the room HVAC systems were protected at each floor (Figure 38).

---

[101]   CPSC Guide to Home Wiring Hazards, U.S. Consumer Product Safety Commission, Washington, D.C.

[102]   Cadick, J., Capelli-Schellpfeffer, M., and Neitzel, D., Electrical Safety Handbook, McGraw-Hill, 2000.

[103]   Report from the Rome Fire Department (Incident 13629). June 28, 2004.

[104]   Deposition of Gennaro Procino, February 11, 2009, p. 42.

[105]   Deposition of Antonello D'Arielli, March 9, 2009, pp. 44-46.

[106]   Deposition of Arnaldo DeRiso, March 24, 2009, pp. 15-23.

[107]   Interpreted videotaped Rule 30(b)(6) deposition of ICEM, S.P.A. by its designee, Roberto Naldi, March 30, 2009, pp. 164-166.



**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 38.        Circuit breaker for room fans on the fifth floor.


Ms. Castricone's experts have claimed that this June 24 incident suggests the earlier May 1 fire was also electrical in nature, and Ms. Bouldoukian's expert has concluded that the subject fire started in the false ceiling above room 305.  However, there are significant differences between the two incidents.  The June 2004 electrical failure in the controller apparently caused the circuit breakers to trip immediately, whereas these breakers did not trip during the incipient phases of the May fire, as demonstrated by the security camera and corridor lights, which remained on. There were no active electrical devices in the area of origin of room 305 that could have failed in a manner similar to the smart speed controller.  Based on the view inside room 305 immediately after the door opened, the hallway ceiling appeared intact and the fire was in the far back corner, near the writing desk/sliding door area.  Given the size of the visible fire, it is not possible that the origin was in the false ceiling above the hallway because the occupants would not have been able to traverse through this region to exit the room, neither would they have been able to briefly re-enter it as Ms. Bouldoukian has indicated she did.

**Privileged and Confidential:  Prepared at the Request of Counsel**

# 6.    Codes Compliance

Exponent understands that the United States court has opined that Italian law applies for determining the appropriate standard of care in this matter.  A separate expert report from an Italian codes expert addresses allegations of Life Safety Codes violations and alleged improper fire response procedures by hotel personnel.[108]  Nevertheless, for completeness, it is useful to summarize what the hotel experts have concluded in this matter.

In addition to Ms. Castricone and Ms. Bouldoukian, three hotel employees, including Mr. Naldi, the *de facto* director, and Ms. Milos, the hotel manager and head of the emergency team, were cited during the subsequent criminal investigation.[109]  The Public Prosecutor experts opined that there were significant deficiencies in the manner and time in which hotel personnel responded to the fire and that the hotel did not meet certain requirements of a 1994 Ministerial Decree regarding fire and smoke barriers, including fire walls and self-closing doors, appropriate fire escape routes, and safety exits and firefighting water (sprinkler) systems.  However, they also concluded that, under Italian law, most provisions of the 1994 Ministerial Decree did not apply because, as an existing business, Parco dei Principi was granted a grandfathered exemption and, therefore, was only required to comply with the older regulations in Law 406 (1980) and Law 818 (1984).

The public prosecutors claimed that there were three violations of Law 406 (1980) / 818 (1984) and the applicable provisions of the 1994 Ministerial decree.  The hotel did not have the required provisional fire certificate (NOP certificate) that allowed them to operate as an existing business, the employees were not appropriately trained to respond to a fire, and, in any case, the emergency plan was not readily available to them and the rooms did not have an emergency evacuation plan displayed on the walls.

Exponent understands that the hotel has rebutted each of these points during the criminal trial.  Specifically, the hotel demonstrated that it had applied for a NOP certificate in 1993 and also responded to a fire department request for additional documentation in 1997.  Under Italian law

---

[108]    See concurrently filed report by Insurance Engineering Services, S.r.l. (the Vaccaroni report).

[109]    Exponent understands that the criminal verdicts against the hotel employees have been vacated under appeal, and Italian prosecutors have not indicated whether they will re-file criminal charges.

**Privileged and Confidential:  Prepared at the Request of Counsel**

(818, Article 2), the NOP certificate is considered as having been issued *de facto* and without objections if the fire department does not respond with additional requirements within 120 days of document submission.  The fire department did not respond to the hotel after its 1997 document submission and, therefore, the hotel concluded that it had received NOP certification. The hotel had trained more than 20 employees before the fire and had also developed a safety plan.  While neither Mr. Scarano nor Mr. D'Arielli were formally trained, Mr. Scarano has indicated he had been instructed on fire emergency procedures by hotel staff.[110]  Exponent understands there was no explicit requirement that a trained employee had to be present on the premises at all times.  Security videotape of the reception desk confirms that the safety plan and emergency contact numbers were filed in a binder, readily available to the hotel employees, and Mr. Scarano has stated that he referred to this binder when he called the fire department (Figure 39).  In his deposition, Mr. Cuppoletti testified that all emergency evacuation plans were posted in all rooms well before the May 2004 fire and has produced invoices from 2001 and 2003 which confirm that the hotel paid for at least 140 framed copies of the plan.[111]  Photographs taken immediately after the fire also confirm that emergency evacuation plans were posted in the hotel rooms (Figure 40).



Figure 39.        Mr. Scarano retrieving binder (arrow).

---

[110]    Interpreted videotaped deposition of Maurizio Scarano, March 23, 2009, pp. 14-15.

[111]    Deposition of Matteo Cuppoletti, p. 49, and Exhibit 2 to the deposition. February 10, 2009.



**Privileged and Confidential:  Prepared at the Request of Counsel**



Figure 40.    Evacuation plan (arrow) in room 316 after the fire (Comando Provinciale
              Vigili del Fuoco Roma presentation).

**Privileged and Confidential:  Prepared at the Request of Counsel**

# 7.    Conclusions

Based on our investigation, Exponent has concluded that:

- The fire that occurred at approximately 5:17 a.m. on May 1, 2004 originated in the northwest corner of room 305.

- The cause of the fire was carelessly discarded smoking materials in or around the wastebasket or on the floor of room 305.  All other ignition sources and, specifically, all electrical causes can be ruled out.

- Ms. Castricone likely discarded her cigarette in her room after she had smoked on the balcony with Mr. Fiderio before the fire.

- Smoldering existed for several minutes before flaming combustion was established in room 305, approximately 1 minute before the occupants opened the door.

- The smoke detector in room 305 first triggered an alarm at the LCD panel at 5:08:46 a.m., due to an intermittent smoke source.  Mr. Scarano reset the panel after this alarm.

- The second alarm at 5:12:59 a.m. was caused by a continuous smoke source from smoldering combustion in room 305.  Mr. Scarano was not at the reception desk at this time.  Mr. D'Arielli alerted Mr. Scarano about the alarm when he was returning to the reception area at 5:17:20 a.m.

- Upon returning to the reception desk at 5:17:28 a.m., Mr. Scarano examined the fire panel and sent Mr. D'Arielli up to the third floor to confirm whether or not there was a fire after he determined that a second smoke detector on the floor had activated.

- As the occupants of room 305 exited at 5:17:50 a.m., additional smoke detectors were triggered as smoke escaped into the corridor.  Some of these alarms are visible on the security camera video because they activated the screen display on the LCD-6000 panel. However, the panel display cannot be used to determine whether an alarm had activated after the light in the reception area was turned on at 5:22 a.m.



**Privileged and Confidential:  Prepared at the Request of Counsel**

- Mr. Scarano made two calls to the fire department, the first at 5:24:02 a.m. and the second about 6 minutes later.

- Analysis of the fire development in room 305 determined that any occupants within the room would have suffered burn injuries approximately 2.5 minutes after the onset of flaming combustion.  This indicates that the earliest that flaming combustion started inside the room was approximately 5:16 a.m.

- Floor level fire alarms were activated on all guest floors.  However, the floor alarm on the third floor was likely delayed because Mr. Scarano reset the alarm system during the incipient stages of the fire.

Exponent reserves the right to modify these conclusions as additional information becomes available.

