# Exhibit EE
# to the Pencu Affidavit



*Failure Analysis Associates*

**Privileged and Confidential: Prepared at the Request of Counsel**

**Engineering Investigation of the Parco dei Principi Hotel Fire**

**Rebuttal Report**

Exponent®

**Privileged and Confidential: Prepared at the Request of Counsel**

# Engineering Investigation of the Parco dei Principi Hotel Fire

# Rebuttal Report

Prepared for

John E. Tener, Esq.
Robinson & Cole, LLP

Prepared by

Ali Reza, P.E.
Daren Slee, B.S.E.E., P.E., CRE
Exponent Failure Analysis Associates, Inc.
5401 McConnell Ave
Los Angeles, CA 90066

August 2009

© Exponent, Inc.

Doc. no.  LA32609.000 A0T0 0809 AR02

**Privileged and Confidential: Prepared at the Request of Counsel**

# Contents

|  | Page |
|---|---|
| **List of Figures** | iii |
| **Rebuttal Opinions** | 1 |
|    Compensation, Publications and Prior Testimony | 15 |

Appendix A    CV and prior testimony, Ali Reza, P.E.
Appendix B    CV and prior testimony, Daren Slee, B.S.E.E., P.E., CRE



**Privileged and Confidential:  Prepared at the Request of Counsel**

## List of Figures

|  |  | Page |
|---|---|---|
| Figure 1. | Sequence of images of the door to room 305 opening at 4:55 a.m.  Image (a) shows a reflection (arrow) with the door closed.  Image (b) shows the reflection translating to the left as the door is opening.  Image (c) shows that the reflection vanishes when the door is open only a couple of inches.  A door frame reflection is visible and stationary. | 4 |
| Figure 2. | Images of room 305 from security camera 9.  (a) Mr. Fiderio leaving at 4:55:19 a.m.  Light in the hallway is on.  Room is dark behind.  (b) Same image as (a) with location of fire highlighted in red.  (c) View of fire in room at 5:18:11 a.m.  Note that the door is completely open and foyer light is off in image (c) and only partly open with foyer light on in images (a) and (b). | 5 |
| Figure 3. | Room 305 ceiling cavity.  (a) Space above the foyer and bathroom with piece of unburned and unstained wood (arrow).  (b) Void space between studs in the bedroom is completely exposed.  (Comando Provinciale Vigili del Fuoco Roma presentation) | 6 |



**Privileged and Confidential: Prepared at the Request of Counsel**

# Rebuttal Opinions

Subsequent to Exponent's May 27, 2009 report on the above referenced matter,[1] various defendants retained Dr. William E. Gale,[2] Mr. John D. Malcolm,[3] and Mr. Wayne E. Miller[4] (jointly referred to as defense experts in this report) to provide opinions regarding the origin and cause of the subject fire. At the request of Robinson & Cole, LLP, Exponent has reviewed their reports and prepared this rebuttal report. Exponent reiterates the opinions presented in our original report and offers the following additional opinions.

As we explained in our original report, immediately after the May 1st fire at the Hotel Parco dei Principi, the Italian authorities opened a criminal inquiry and the police and fire department conducted an investigation under procedures accepted in Rome, Italy. On the basis of their preliminary investigation, the case was referred to the Public Prosecutor's office. The presiding judge assigned to the criminal matter appointed an independent set of experts (comprised of fire investigators and mechanical and electrical engineers) to "ascertain the circumstances that led to the fire at issue".[5] These experts were unanimous that the origin of the fire was in the northeast corner of the room and was caused by smoking-related materials. They explicitly ruled out an electrical cause based on a number of factors, which included observations that all internal wiring was compliant with European standards and did not identify that there were any indications of arcing.[6] The Italian court subsequently accepted this report and ruled that the findings were based on an objective, logical and coherent fire investigation.[7] The court also noted that certain counsel retained by the accused (including counsel for Ms. Castricone and Ms. Bouldoukian) did not directly rebut the technical elements of the Public Prosecutor experts

---

[1]   Exponent expert report, "Engineering Investigation of the Parco dei Principi Hotel Fire", May 27, 2009.
[2]   Bundy, Gale & Shields, LLC Expert report, "Grand Hotel Parco dei Principi Fire Investigation", July 1, 2009.
[3]   J.D. Malcolm Forensic Electrical and Fire Consultant Expert report, "The May 1, 2004 Fire suffered by the Hotel Parco dei Principi, Rome, Italy", June 29, 2009.
[4]   Wright Group Inc. Expert report, June 26, 2009, WGI file #56398.
[5]   Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004, p. 4.
[6]   Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004, p. 67.
[7]   July 2007 decision by Judge Maria Luisa Paolicelli, Criminal Proceeding Number 20263/04.



**Privileged and Confidential: Prepared at the Request of Counsel**

or fire department; counsel instead attempted to demonstrate that the investigation was biased because one of the Public Prosecutor experts was also a member of the Rome Fire Department.[8]

All three defense experts in this civil action have concluded that the origin and cause of the May 1st fire is undetermined because evidence from the fire is not available for their inspection and therefore, they cannot eliminate other potential ignition causes . The defense experts also claimed that the investigation by the Italian experts and authorities failed to meet an appropriate standard for a scientific investigation.  While the defense experts have identified specific instances wherein they each claim that the Italian investigators did not follow the guidelines provided in NFPA 921 *Guide to Fire and Explosion Investigations* (the Guide), it is significant that they have not explicitly identified how the Italian investigators violated Italian law or failed to meet appropriate guidelines for conducting their investigation in Italy.  In fact*,* based on Judge Paolicelli's ruling, the Public Prosecutor report and findings comply with Italian criteria for an objective, logical and coherent technical analysis.

Exponent was informed that, under Italian law, we could not have access to any evidence that had been retained by the police or fire departments and were also prohibited from interviewing or questioning the Public Prosecutor experts.  Accordingly, we could only review publically available information from the Rome police and fire departments, documents provided by the hotel, and reports from the Public Prosecutor experts, as well as experts retained by counsel for Ms. Castricone, Ms. Bouldoukian and the hotel during our investigation.  While there was general agreement among all Italian experts on the fire spread mechanism, we noted that there was disagreement on where the fire started (the origin) and how it started (the cause).

The investigation conducted by the Public Prosecutor experts appears to be consistent with the scientific method.[9]  They determined that the area of origin was in the northeast corner of room 305.  Based on a review of the third floor security camera videotape that shows the incipient stages of the fire, available photographs, our understanding of the propagation of smoke, the layout of the room, and distribution of combustible materials, Exponent concurs that the area of

---

[8] July 2007 decision by Judge Maria Luisa Paolicelli, Criminal Proceeding Number 20263/04 B.
[9] NFPA 921, 2008 ed., Sections 4.2, 4.3.

**Privileged and Confidential: Prepared at the Request of Counsel**

origin of the fire was in the northeast corner of room 305, near floor level and near the desk and the sliding door. Our analysis is consistent with NFPA 921 guidelines, wherein "in some instances, a single item, such as … a video recording may be the basis for a determination of origin".[10] Testimony from Mr. D'Arielli, Ms. Castricone, and Ms. Bouldoukian stating that they saw fire or smoke in the back corner of the room, with the desk near the balcony, also supports this analysis.

Defense experts have stated that no eyewitness saw flames in room 305 during the incipient stages of the fire. In his statement to the Rome police, Mr. D'Arielli stated that the " room was completely full of smoke and I noticed flames behind the bedroom where there should have been a writing desk".[11] Both Ms. Castricone and Ms. Bouldoukian indicated that, while they did not see flames, they saw smoke coming from the balcony.[12] All three witnesses therefore describe the area of origin in the back corner of the room, consistent with the video recording.

Mr. Malcolm opined that it is more likely than not that the fire occurred in the ceiling area above and outside of room 305. Mr. Miller also proposed a possible void space fire, and all three defense experts ultimately concluded that the area of origin could not be determined. Defense experts appear to have done little or no technical analysis to substantiate their claim that the large, persistent, bright spot visible on the surveillance videotape at 5:18:13 a.m. in room 305 is a reflection from an unidentified light. Exponent and the Public Prosecutor experts have independently determined that this light is from the incipient fire. Exponent submits that ignoring or failing to provide a meaningful rebuttal or explanation for the flame observed in the security camera video suggests that any opinion that the origin is undetermined is an (imperfect) tautology.

Exponent conducted a line of sight analysis to evaluate the light seen in room 305 when the door was open between 5:18:06 a.m. and 5:18:16 a.m. We have concluded that the light visible in the northeast corner of the room is from an open flame and is not an artifact created by reflection or from a light that shone in from the outside. For reflections of a light to be visible on the camera,

---

[10] NFPA 921 2008 ed., Section 17.2.1.2.
[11] Police interview of Antonello D'Arielli, Bates # 000183.
[12] Police interviews of Ms. Castricone and Ms. Bouldoukian, Bates # 000177 – 000180; videotaped deposition of Tracey Bouldoukian, March 12, 2009, p. 92.

**Privileged and Confidential:  Prepared at the Request of Counsel**

the angle between the light source and reflecting surface must be roughly equal to the angle between the camera and reflecting surface.  For example, a light reflection is visible from the hall light on the door to room 305 when it is closed (Figure 1).  As the door opens, the location of the reflection on the door translates to the left.  The reflection quickly disappears when the door opens more than a few inches.  The principles of light reflection also apply in the vertical direction.  Notice that, in Figure 1, the light reflection is at the top of the door.  This is because the camera is mounted on the ceiling in the hallway.  If the camera were lowered down to the floor, the location of the reflection would shift downward to preserve the angles of incident and reflected light.  Reflections from the front door, inner hallway door and glass patio door are ruled out because of the location of light source in the hallway.  A reflection will also appear smaller for reflecting surfaces located farther away.  Accordingly, the light observed inside room 305 at 5:18:13 a.m. cannot be an artifact created by the hallway light because it is larger than the reflection observed on the door.  Reflections off the cabinet with the TV and mini fridge are also ruled out as they could only be observed from a camera located on the floor.



Figure 1.   Sequence of images of the door to room 305 opening at 4:55 a.m.  Image (a) shows a reflection (arrow) with the door closed.  Image (b) shows the reflection translating to the left as the door is opening.  Image (c) shows that the reflection vanishes when the door is open only a couple of inches.  A door frame reflection is visible and stationary.

The security video data (and witness accounts) confirms that, that the lights in the room were off when Ms. Castricone and Ms. Bouldoukian woke up during the fire.[13]  Therefore, reflections from lamps or other room lights have been ruled out.  Light coming from outside on the balcony

---

[13]   Videotaped deposition of Rachel Castricone, February 18, 2009, p. 62.

**Privileged and Confidential: Prepared at the Request of Counsel**

was also ruled out for a number of reasons. Video footage inside room 305 when Mr. Fiderio left at 4:55:19 a.m. revealed that no light was coming from the back of the room (Figure 2a), which was completely dark. The video images in Figure 2a and Figure 2c have been overlaid and show that the location of the fire was completely in the dark area (Figure 2b). A reflection from the doorknob is not possible because it is not aligned with the location of the bright spot and was not observed to cause a reflection from the hallway lights.[14] Since Ms. Castricone has indicated that she did not manipulate the drapes before she went to bed, the position of the drapes and the sliding door would have remained the same from when Mr. Fiderio left room 305.[15] The size and shape of the balcony also precluded any light from the external lights mounted outside the hotel from entering the room in such a manner as to create a bright spot on the camera. Mr. Malcolm's suggestion that the light was reflected off the increasing smoke[16] in the room is also not credible. It is clear from the video footage that the thick smoke layer at 5:18:12 a.m. was above the bright spot.



Figure 2.   Images of room 305 from security camera 9. (a) Mr. Fiderio leaving at 4:55:19 a.m. Light in the hallway is on. Room is dark behind. (b) Same image as (a) with location of fire highlighted in red. (c) View of fire in room at 5:18:11 a.m. Note that the door is completely open and foyer light is off in image (c) and only partly open with foyer light on in images (a) and (b).

Photographic evidence of the ceiling cavity above the bathroom and foyer in room 305 fails to support a theory that the fire originated at this location. The ceiling was substantially intact in

---

[14]   Third floor security camera 9, 4:40:44 a.m. - 4:40:49 a.m. (camera time).

[15]   Videotaped deposition of Rachel Castricone, February 18, 2009, pp. 61-63.

[16]   J.D. Malcolm Forensic Electrical and Fire Consultant Expert report, June 29, 2009, "The May 1, 2004 Fire suffered by the Hotel Parco dei Principi, Rome, Italy", p. 13.

**Privileged and Confidential:  Prepared at the Request of Counsel**

this area, with evidence that wood remained unburned (Figure 3) and a relatively small amount of charring.  In comparison, the stud space in the bedroom of room 305 was completely exposed after the fire, and the wood in the living space of room 305 showed extensive evidence of char.  If the fire had originated near the ventilation unit in the ceiling cavity, as proposed by defense experts, more extensive damage would have occurred in the immediate vicinity and the fire would have broken through the bathroom and foyer ceiling and dropped debris down into the space below.  Photocopies of photographs of this area taken by the police department[17] immediately after the fire confirm that the ceiling of the room 305 foyer remained substantially intact.  Documents provided by the hotel confirm that the false ceiling at this location consisted of a composite (chipboard) panel.[18]  Our inspection confirmed that a composite panel material was used again when the damage was repaired,



Figure 3.   Room 305 ceiling cavity.  (a) Space above the foyer and bathroom with piece of unburned and unstained wood (arrow).  (b) Void space between studs in the bedroom is completely exposed.  (Comando Provinciale Vigili del Fuoco Roma presentation)

While the Public Prosecutor experts and fire department provide sufficient details on why they concluded that the origin of the fire was in the northeast corner of room 305, Exponent agrees that they did not provide sufficient details on why they ruled out an electrical cause and how they concluded that improperly discarded smoking materials ignited the subject fire.  The defense experts have opined that strict application of NFPA 921 would therefore suggest that the cause of the fire should be also be classified as undetermined.

---

[17]   Department of the Interior Criminal Police Central Directorate, Bates # 000677 – 000701.
[18]   Declaration of conformity # 1311 for fireproof chipboard panel, Bates # 000496.

**Privileged and Confidential:  Prepared at the Request of Counsel**

NFPA 921 clearly states that, while the Guide is designed to produce a systematic framework for an effective fire and explosion investigation analysis, deviations from these procedures are not necessarily wrong or inferior, but need to be justified.[19]  The Guide also acknowledges that public sector agencies have jurisdiction for investigating an incident, and therefore are governed by their jurisdictional, legislative, and statutory authority, laws, regulations, rules and policies.[20]  Further, the Guide acknowledges that legal considerations impact every phase of a fire investigation, that the material in the Guide only pertains to law in the United States, and that recognition of applicable legal requirements and considerations will help to ensure the reliability and admissibility of the investigator's records, data, and opinions.[21]  Due to the limitations imposed by the Italian legal system, Exponent has been unable to examine any of the retained evidence and has not been granted permission to interview any of the original investigators.  Exponent recognizes that whether the findings by the independent Italian experts can be accepted as evidence in this matter is ultimately a legal question.  Exponent also agrees that an electrical cause cannot be conclusively ruled out without accepting observations by the Rome Fire Department and the Public Prosecutor experts.  These investigators did not report evidence of a malfunction in any of the appliances and reported no indication of arcing on the electrical conductors in room 305.  However, based on an independent analysis in which we considered only the information that was available to us, we have concluded that an electrical fault can be ruled out as a probable cause.[22]

Exponent's analysis is based on the NFPA 921 methodology.[23]  Section 19.2.1 identifies four distinct classifications for fires:  Accidental cause, Natural cause, Incendiary cause, and Undetermined cause (if one of the former three causes cannot be determined to an acceptable level of certainty).  Exponent has ruled out natural causes as there were no earthquakes, high winds, lightning or other uncontrollable phenomena the night of the fire.[24]  Incendiary causes were also ruled out based on witness testimony, sequence of events during the fire, and testing

---

[19]  NFPA 921, 2008 ed., Section 1.3.

[20]  NFPA 921, 2008 ed., Section 27.1.1.1.

[21]  NFPA 921, 2008 ed., Section 11.1.

[22]  An electrical cause can be conclusively ruled out if the observations made by the Rome Fire Department and the Public Prosecutor experts are accepted to be correct.

[23]  NFPA 921, 2008 ed., Sections 18, 19.

[24]  Weather data, Bates # 000577 – 000592.

LA32609.000 A0T0 0809 AR02                                 7



**Privileged and Confidential:  Prepared at the Request of Counsel**

from the Public Prosecution experts' investigation.  Based on the area of origin determined by the Public Prosecutor experts and fire department (and independently confirmed by our analysis of the security camera video and available photographs), an accidental cause is credible.  The area of origin had combustible material on the floor or in the wastebasket, and witnesses have indicated that smoking materials might have been discarded in the room.[25]  Accordingly, improperly discarded smoking materials are a credible cause and cannot be eliminated.  In our original report, we analyzed whether an electrical cause, including a short circuit, intermittent arcing or a resistive heating mechanism, could have started the fire, and concluded that these mechanisms were not credible.  What follows are supplemental opinions on why this fire was not likely caused by an electrical failure.

*Hotel Wiring.*  Each room was equipped with several electrical protection devices, including a 25 A circuit breaker (connected to three rooms), a 10 A circuit breaker (in the double rooms, a 6 A breaker was installed in single rooms), and a 10 mA ground fault circuit interrupter (GFCI).  The circuit breakers and GFCI protect against short circuits between line and neutral, as well as line and ground**.**

An electrical short alone is not sufficient to cause a fire.  In order for a fire to start, the short has to continue for a sufficient time to produce enough heat before a combustible material is ignited.  The circuit breakers and GFCIs installed in the hotel network were designed to detect a short within any of the rooms and disconnect those rooms from power before significant heating could occur.  These protective devices, which typically operate within a large safety margin, were designed to disconnect within a fraction of a second.  An additional circuit breaker, rated at 10 A, was installed in each room to eliminate the possibility of circuit breaker failure or an under protected circuit.  This redundancy precluded the possibility of a single point of failure in the protection circuitry.

Resistive heating of the wiring in the walls is also an unlikely cause, as discussed in our previous report.  When electrical heating occurs, the insulation surrounding the conductors

---

[25] Police interview of Mr. Fiderio (Bates # 000182), "The room was dark and full of open luggage and the whole room was a mess"; Deposition of Matthew Fiderio, March 24, 2008, p. 158, "There was stuff on the floor in the path from the balcony to the door, clothes or some kind of baggage".

**Privileged and Confidential: Prepared at the Request of Counsel**

slowly chars. This creates a strong smell that would have been noticeable for days leading up to the fire; however, hotel guests and staff reported no such odors. While an arc can occur through the charred material, an arc does not inherently cause a fire. In addition to the arc, ignitable material has to be in the immediate vicinity of the arc (touching or practically touching the sparking area), and a mechanical force needs to disturb the conductors in close proximity to each other to initiate repeated arcing. The circuit breakers and GFCI protect against this type of sustained arcing. In the event an arcing through char mechanism does occur, local temperatures sufficient to melt the conductor cause beading that can be readily observed after the fire. Exponent notes that the Public Prosecutor experts and the fire department investigators have not indicated that any arcing was observed on the conductors.[26]

Appendix D of Mr. Malcolm's report includes 15 affidavits from individuals (8 affidavits are not signed or dated and some even have the word draft on them) who reported breakers tripping, overheated or inoperable appliances, smoke and sparks coming from electrical outlets, inoperable lights, or lights flickering when operating a hair dryer. These alleged events are not suggestive of an overall electrical problem within the hotel. In fact, the assertion that the hotel had an overall electrical problem ignores the existing documents declaring the facility's compliance with state of the art[27] and the regular inspection of the hotel's electrical system.[28]

Mr. Malcolm concluded that "these separate electrical problems the night of the fire indicates that the cause of this fire is more likely than not was caused by an electrical failure in the hotel's electrical system". Exponent opines that a list of unrelated electrical issues that allegedly occurred in the hotel, mostly due to loads used in the rooms and breakers tripping (overprotecting), are insufficient basis to conclude the fire was likely caused by an electrical failure. Furthermore, there was no evidence of such issues in room 305. Circuit breakers can trip if people plug in appliances that require a large amount of energy, such as hair dryers into a protected circuit that is not rated for the current draw. Examples of circuit breakers tripping in the various hotel rooms only confirms the sensitivity of the protection circuitry. Overheated or

---

[26] Criminal proceedings hearing 2007-02-09, p. 38.

[27] "Declaration of Facility Compliance with State of the Art, Art. 9, Law No. 46, March 5, 1990" – Signed documents dated Nov. 28, 1997, Nov. 29, 1997, March 31, 1998.

[28] Grand Hotel Parco dei Principi Systems Inspection and Maintenance Record, Bates # 002624-002625.



**Privileged and Confidential:  Prepared at the Request of Counsel**

inoperable appliances do not necessarily indicate a problem with electrical wiring in the building, but more likely indicate a faulty appliance, especially in the case of appliances not designed to be used on the 220 VAC power distribution network (or dual voltage appliances that were not properly switched over to 220 VAC).  It is common to see sparks coming from a 220 VAC outlet when plugging in certain appliances, such as a hairdryer, especially if the appliance is already turned on as the user is plugging it into the socket.  Noises heard coming "from the walls" of a popular hotel in the middle of a populated area could have any number of explanations.  Neither Ms. Castricone nor Ms. Bouldoukian reported any electrical problems in their room prior to the fire.  Furthermore, none of the alleged incidents reported in the affidavits occurred in room 305 at the time the fire started.  Neither Ms. Castricone nor Ms. Bouldoukian reported using any hair dryers or other appliances immediately before the occurrence of the fire.  The majority of hotel guests were sleeping at the time of the fire and, therefore, it is reasonable to assume that the electrical system of the hotel had a small load at the time of the fire.

*Room appliances and electrical outlets.*  The appliances in the immediate vicinity included a mini-fridge, TV, and lamp.  Defense experts have claimed that these items were not retained by the Public Prosecutor or fire department and therefore cannot be ruled out.[29]  Exponent reiterates that the Public Prosecutor experts and fire department conducted independent investigations and concluded that these appliances did not start the fire.  While it is correct that NFPA 921 recommends that such evidence should be made available to all parties, the fire department investigators and the Public Prosecutor experts appear to have followed appropriate Italian guidelines in conducting this investigation, and Italian law precludes access to this evidence (including by Exponent).  However, just because the equipment is not available for inspection does not imply that, *ipso facto*, the original investigation was defective.  A more reasonable conclusion is that the Public Prosecutor experts and fire department examined the original scene, explicitly determined that the electrical system was in compliance with the standards of good practice as well as applicable laws,[30] and were correct in ruling out an electrical cause.  Exponent submits that, unless the defense can establish that the investigation conducted by the Italian investigators was defective, it is appropriate to include their findings as a basis for our

---

[29]  Mr. Malcolm Expert Report, p. 16; Mr. Miller Expert Report, p. 29; Dr. Gale Expert Report, pp. 17, 18.
[30]  Michelon, A. et al., Expert Evidence Report Ordered by Public Prosecutor, November 15, 2004.



**Privileged and Confidential:  Prepared at the Request of Counsel**

opinions. Notwithstanding the above, Exponent has conducted an independent review of available information and concluded that the appliances and electrical outlets in the room likely did not cause the fire.

The lamp in the corner of the room can be ruled out because video surveillance footage indicates that the lamp was off.  Protection from the breakers previously discussed was sufficient to protect against a short circuit in the energized power cord.  Intermittent arcing can be ruled out because there was no arcing noise reported and the breakers offer protection against intermittent arcing.  No evidence of arcing (melted conductors, beads) or other malfunctions was identified by the Public Prosecutor experts or the fire department.  Resistive heating can be ruled out because no smell of charring or heating insulation in room 305 was reported by the occupants or housecleaning staff in the days and hours leading up to the fire.

The television in room 305 is an unlikely cause because it was not being used when the fire started.  European televisions are designed to meet international standard IEC 60065, which specifically mandate measures to prevent them from becoming fire hazards.[31]  Exponent understands that all room televisions in the hotel were purchased after 1985.  The 1985 version of IEC 60065 contains provisions for heating under normal operating conditions and fault conditions, insulation requirements for power surges, reliability testing of components, specifications for external flexible cords, and other requirements and tests that are intended to prevent fires from occurring within the television.  There is also a requirement that the printed circuit board be made of flame -retardant material or encased in a metal enclosure to prevent the spread of a fire.[32]  The back cover of the television, as well as other parts of the enclosure that incorporate ventilation holes, are made out of slow-burning materials.  The television cord can be ruled out for the same reasons that the lamp cord was ruled out.  In addition, IEC 60065 mandates that flexible cords must have a protective earth ground and/or be doubly insulated. The cord is designed with a large gage wire such that excessive heating will not occur with currents below the breaker rating.  The 1985 version of IEC 60065 was amended in 1989 and again in 1992.  The sixth edition of IEC 60065 was published in 1998, followed by the seventh

---

[31] IEC 60065 - Audio, video and similar electronic apparatus – Safety requirements.
[32] The 1985 version of the IEC 60065 section 20.1 includes a flame test protocol for printed circuit boards, including a test in which the flame created during the test must extinguish itself in less than 10 seconds.



**Privileged and Confidential:  Prepared at the Request of Counsel**

edition of IEC 60065, published in 2001.  The versions subsequent to the 1985 version of IEC 60065 have maintained identical or more strict fire protection requirements.  Given the design standards applicable to the television, the fact that the unit was turned off at the time of the fire, the location of the fire, the conclusions of the Italian investigators who had access to the original fire scene, and witness testimony surrounding events leading up to and during the fire, the television can be ruled out as a probable ignition source of the subject fire.

European refrigerators are designed in compliance with IEC standards,[33] which mandate specific measures to prevent them from becoming fire hazards.  These standards include provisions for resistance to heat and fire, overload protection, electric circuitry, heating elements, electric strength, and insulation under normal operation as well as foreseeable abnormal operation.  There are also specific guidelines that pertain to refrigerators.[34]  Exponent understands that all room refrigerators in the hotel were purchased after 1980.  Standards regulating the safe design of household electrical appliances and refrigerators date back to the 1970s, and, while the specifics of the criteria and testing procedures have evolved, the general fire-related issues listed above have been consistently addressed.

The refrigerator cord can be ruled out as a probable ignition source for the same reasons as the lamp cord.  The circuit breakers previously discussed were sufficient to protect against a short circuit.  Intermittent arcing can be ruled out because there was no arcing noise reported and protection from the breakers offers protection against intermittent arcing.  No evidence of arcing (melted conductors, beads) or other malfunction was identified by the Public Prosecutor experts or the fire department.  Resistive heating can be ruled out because no smell of charring or heating insulation in room 305 was reported by the occupants or housecleaning staff in the days and hours leading up to the fire.  Given the design standards applicable to the mini refrigerator, the fact that the refrigerator was operating normally 1½ hours before the time of the fire, the conclusions of the Italian investigators who had access to the original fire scene, and witness testimony surrounding events leading up to and during the fire, the refrigerator can be ruled out as a probable ignition source.

---

[33]  IEC 60335-1 Safety of household and similar electrical appliances – Part 1:  General requirements.

[34]  IEC 60335-2-24 – Household and similar electrical appliances – Safety – Part 2-24:  Particular requirements for refrigerating appliances, ice-cream appliances and ice makers.



**Privileged and Confidential:  Prepared at the Request of Counsel**

The air conditioner is cited by the defense experts as a possible ignition source for the fire based on the June 24 event, which occurred after the fire.  Exponent has ruled out the air conditioner because it was not in the area of origin in room 305.  Defense experts have also failed to establish that sufficient combustible material to spread the fire was present around the air conditioner and have ignored photographs from the Rome police department that document that the area around this unit was relatively intact.  As stated in our previous report, there is a possible causal relationship between the May 1 fire and the June 24 event.  Water damage from the fire suppression may have damaged the controller for the air conditioner from the June 24 event, as it was located in the 2nd floor plenum, below the 3rd floor.[35]

Electrical outlets can also be ruled out because the breakers previously discussed provided sufficient protection against a short circuit.  No arcing noise was reported and no arcing evidence (melted conductors, beads) or other malfunction was identified by the Public Prosecutor experts or the fire department.  Resistive heating can be ruled out because no smell of charring or heating insulation in room 305 was reported by the occupants or housecleaning staff in the days and hours leading up to the fire.

With regard to smoking material, Dr. Gale suggests the possibility that fire-safe cigarettes might have been used.[36]  Discovery in this case has established that Ms Castricone and Ms. Bouldoukian were smoking American filtered cigarettes, possibly Marlboro Lights.[37]  No U.S. state (including Massachusetts) required the usage of fire-safe cigarettes until after the subject incident.[38]  Fire-safe cigarettes are likely to reach European markets by 2011 and, therefore, were not sold in Italy in 2004.[39]

The fire dynamics simulations carried out in our report were used to understand the propagation of smoke and to predict the amount of time until flashover conditions.  Defense experts have

---

[35] Interpreted videotaped Rule 30(b)(6) deposition of ICEM, S.P.A. by its designee, Roberto Naldi, March 30, 2009, pp. 164-166.

[36] Dr. Gale Expert report, p. 15.

[37] Deposition of Matthew Fiderio, March 24, 2008, p. 84; interpreted video deposition of Antonello D'Arielli, March 9, 2009, p. 44; videotaped deposition of Tracey Bouldoukian, March 12, 2009, p. 18.

[38] www.firesafecigarettes.org

[39] CEN European Committee for Standardization, "Self-extinguishing cigarettes on the way", August 2008.



**Privileged and Confidential:  Prepared at the Request of Counsel**

attempted to downplay the value of this analysis, using statements like "junk in, junk out"[40] or "cart before the horse",[41] and have made unsupported inferences regarding the number of runs we actually conducted without attempting to understand our numbering methodology.  Contrary to Dr. Gale's suggestion, Exponent did not arbitrarily changes FDS default settings for smoke production, and we reiterate that details on the variables we explored are provided in our original report.  The defense experts do not appear to understand why Exponent conducted the FDS simulations.  While we have insufficient information to model the smoldering phase of combustion, the simulations are only used to model flaming combustion (starting from when the flame is visible in the security video) and allow us to predict fire and smoke growth from that moment onward (for example, to determine the time that various smoke detectors would trip in the hallways).[42]  We reemphasize that smoldering combustion from improperly discarded smoking materials likely originated either in the wastebasket or directly on some of the personal items on the floor, as stated in our original report.

The opinions and conclusions in this report are based upon Exponent's current understanding in this matter, the materials reviewed, and the information available to us at this time.  We reserve the right, if necessary, to amend this report and our opinions, or author a supplemental report should additional materials become available.

---

[40] Mr. Malcolm Expert report, p. 9.

[41] Dr. Gale Expert report, p. 16.

[42] Mr. Miller Expert report, p. 26, also addresses this point.  He states "Models do well with fire growth … such as predicting when fire detectors would activate, approximate when flashover might occur…"

**Privileged and Confidential:  Prepared at the Request of Counsel**

## Compensation, Publications and Prior Testimony

Exponent is compensated at the rate of $490 per hour for Mr. Reza's time and $265 per hour for Mr. Slee's time for the preparation of this opinion and testimony.  Curricula vitae and lists of prior testimony by Mr. Reza and Mr. Slee are included as Appendix A and Appendix B to this report.

Ali Reza, P.E.  
Corporate Vice President  
and Principal Engineer

Daren Slee, B.S.E.E., P.E., CRE  
Senior Managing Engineer

