# Exhibit B
# to the Tener Affidavit

B-1

# ITALIAN CIVIL CODE

## ARTICLES §§ 2043 AND 2051

# STUDIO LEGALE ASSOCIATO

Via Lazzaro Palazzi, 6
20124 Milano, Italy
Telephone: (39) 02 20.56.93.11
Facsimile (39) 02 20.56.93.21
e-mail: studiolegale.ass@tiscalinet.it

Avv. Maria Luisa Pompole
*M.B.A. New York University*
*Research Fellow University of Ferrara*

June 29, 2009

EXPERT REPORT

OF

ATTORNEY MARIA LUISA POMPOLE

ON

INTERPRETATION AND APPLICATION OF

ITALIAN CIVIL CODE

ARTICLES §§ 2043 and 2051

I.    **Qualifications of Attorney and Research Fellow Maria Luisa Pompole**

I am member of the Milan BAR Association and Research Fellow to Professor Giovanni Grippo, Commercial Law, University of Law, Ferrara.

I am a graduate of the University of Law, Modena. I hold an M.B.A. Degree from New York University. I have an extensive litigation practice involving all aspects of Italian tort law. Legal Counsel for Arnoldo Mondadori Editore S.p.A. (Mediaset Group) the largest Italian publishing company. Defended and coordinated the defense of Arnoldo Mondadori Editore S.p.A. in up to forty civil liability claims per years, arising from the company's magazine publishing activity, related to defamation charges. Claims were placed in front of both Civil and Criminal Courts in Rome and Milan. Represented Raleigh USA (bicycle manufacturer) as defendant in numerous product liability claims, involving personal injuries of the claimants, in Italian Courts in Rome and Milan. Since 2001 I have colaborated with the Legal Department of United States' Southern European Task Force (SETAF) based in Vicenza, Italy assisting US citizens in front of Italian Courts in civil and criminal cases. Acted as legal advisor to Ania, Associazione Italiana fra le imprese Assicuratrici.

I conducted various seminars including:

1. "Legal Aspects in the Transfer of Securities", Bocconi University, Milan 1995;
2. "Italian Law Applicable to Insider Trading", Bocconi University, Milan 1995;
3. "Liabilities related to the use of Internet", Apimilano, Milan 1997;
4. "Investimenti Bilaterali fra Stati Uniti d'America e Triveneto", American Chamber of Commerce in Italy, Venezia 1998;
5. "Liabilities related to Millennium Bug", Associazione Industriali di Vicenza, Vicenza 2000;
6. "Elements of Italian law", US Consulate in Milan, Milan 2000;
7. "Product Liability a comparative analysis between Italian and US law", Assolombarda, Milan 2003.

I authored various articles including:

1. "Insider Trading Regulations in the U.S.: an Analysis from the standpoint of the Italian Legal System", Milan 1995;
2. "Sole Shareholder: Responsibilities ex Article 2362", Milan 1999;
3. "Liabilities related to the Millennium Bug", Milan 2000;
4. "Civil Liability under Italian Law", Milan, 2006.

I cooperated to "Diritto Commerciale", Monduzzi Editore, with Professor Giovanni Grippo.

## II.    BACKGROUND

I was retained by the law firm Gillespie & Associates in order to express an opinion on the interpretation of Italian Civil Code Articles §§ 2043 and 2051.

Gillespie & Associates represents Defendant Rachel Castricone in an action brought in front of the United States District Court of Massachusetts by Plaintiffs ICEM S.p.A. and Aurora Assicurazioni S.p.A. against Defendants Harvey Industries, Inc., Tracey Bouldoukian and Rachel Castricone arising from the fire that occurred at the Hotel Parco dei Principi in Rome Italy on May 1, 2004.

Plaintiffs have alleged causes of action against Harvey Industries, Inc. under Italian Civil Code Articles §§ 1588, 2043 and 2051. The Plaintiffs have alleged causes of action against Tracey Bouldoukian and Rachel Castricone under Italian Civil Code Articles §§ 2043 and 2051.

In order to prepare the present opinion I have reviewed the following documents and materials:

1) Italian Civil Code;
2) Attendance of the Italian Depositions;
3) Review of the Police and Fire Department of Rome Reports on May 1, 2004 fire at Hotel Parco dei Principi;
4) Reviewed Report Fire Department of Rome on June 25, 2004 fire at Hotel Parco dei Principi;
5) Review of the Fire Report of the June 25, 2004 fire at the Hotel Parco dei Principi;
6) Review of the Italian Prosecutor's Expert Report, dated November 17, 2004, on the

causes of the fire;

7) Reviewed summary of Depositions of Rachel Castricone, Matthew Fidiero, Tracey Bouldoukian and Maurizio Scarano;

8) Reviewed testimony transcripts including those of: Roberto Naldi, Antonello D'Arielli, Maurizio Scarano, Chief Inspector Oreste Saturnino, Substitute Inspector Franco Enginni, Police Officer Fulvio Lombi, Police Officer Eduardo Smiraglia, Police Officer Marcello D'Agostino, tennis players Massimo Sartori and Andreas Seppi;

9) Attended hearings in Court of Rome criminal proceedings n. 27388/05 Reg. Gen. GIP against defendants: Roberto Naldi, Antonietta Bartoletti and Giuseppina Carla Milos;

10) Reviewed Court of Rome Sentence n. 1714/07 of June 15, 2007 of conviction of Roberto Naldi, Antonietta Bartoletti and Giuseppina Carla Milos;

11) Conferences with Attorney Paul Gillespie;

12) Complaint, dated April 27, 2004;

13) Rachel Castricone's Answer and Jury Demand, dated August 27, 2007;

14) Answer of Harvey Industries, Inc. to Plaintiffs' Complaint and Cross-Claim against Rachel Castricone and Tracey Bouldoukian, dated September 12, 2007;

15) Answer of Tracey Bouldoukian to Plaintiffs' Complaint, dated September 21, 2007;

16) Plaintiffs' Motion for Appropriate Relief on the Application of Italian Law, dated July 28, 2008;

17) Tracey Bouldoukian's Opposition to Plaintiff's Motion for Appropriate Relief on the Application of Italian Law, dated August 7, 2008;

18) Harvey Industries, Inc.'s Opposition to Plaintiff's Motion for Appropriate Relief on the Application of Italian Law, dated August 29, 2008;

19) Limited Response of Defendant Rachel Castricone to Motion of the Plaintiffs ICEM S.p.A. and Aurora Assicurazioni S.p.A. for Appropriate Relief of the Application of Italian law, dated August 29, 2008;

20) Court's Electronic Order regarding the application of Italian Law, dated September 9, 2009;

21) Harvey Industries, Inc.'s Memorandum of Law in Support of Motion to Compel Interrogatory Answers, dated March 23, 2009;

22) Memorandum of Law in Support of Harvey Industries Inc.'s Motion to Compel Further and Better Rule 30(b)(6) Testimony from ICEM S.p.A. April 17, 2009;

I reserve the right to amend or supplement my opinion and conclusions.

## III.   ITALIAN CIVIL CODE

### A.   The general rule in Italian Tort Liability

Italian Civil Code Article § 2043 provides as follows:

> **"Compensation for unlawful acts**. Any fraudulent, malicious, or negligent act that causes an unjustified injury to another obliges the person who has committed the act to pay damages."

this sets the ordinary "civilian" principles of liability based on fault. The Article provides that the party found liable for negligent or intentional conduct shall compensate the injured party.

According to Article § 2043 the damage caused must be an "unjustified injury". The negligence is deemed implied in the violation of laws and may be integrated also by acting not in compliance with the average standard of care required in a given situation.

Article § 2043 maintains the burden of proof for proving the negligent or intentional conduct on the injured party. The injured party must also prove the damages as well as the cause effect *nexus* between the conduct and the damage. An action is deemed to have caused an event when without such action the event would not have taken place.

In the case where more than one person has contributed to the causation of the event the law of comparative negligence applies. The law of comparative negligence is governed by two Articles of the Civil Code, Article § 1227 and Article § 2055:

> Italian Civil Code Article § 1227 provides as follows:
>
> > "**Contributory negligence of the creditor.** If the creditor's negligence has contributed to cause the damage, the compensation is reduced according to the seriousness of the negligence and the extent of the consequenses arising from it [2056]."
> >
> > "Compensation is not due for damages that the creditor could have avoided by using ordinary diligence [1914, 2056]." and;
>
> Italian Civil Code Article § 2055 provides as follows:
>
> > "**Liability *in solido*.** If the act causing damage can be attributed to more than one person, all are liable *in solido* [1292] for the damages. The person who has compensated for damages has recourse against each of the others in proportion to the degree of fault of each and to the consequences arising therefrom."

> "In case of doubt, the degree of fault attributable to each is presumed to be equal."

With regard to the evaluation of the damage Article § 1223 applies:

Italian Civil Code Article § 1223 provides as follows:

> "**Measure of Damages.** The measure of damages arising from non-performance or delay shall include the loss sustained by the creditor and the lost profits [1905, 2056] insofar as they are a direct and immediate consequence of the non-performance or delay [1225, 1382, 1479, 2 paragraph, 1515, 1516, 1518, 1589, 1591, 1696, 1905, 2056]."

**B.      The exceptions to the general rule in Italian Tort Liability**

Italian Civil Code Article § 2051 provides as follows:

> "**Damage caused by things in custody.** Everyone is liable for injuries caused by things in his custody, unless he proves that the injuries were the result of a fortuitous event [1218, 1256, 2052]."

this establishes a presumption of liability on the custodian for the damages caused by the thing under his custody.  Such liability derives from the actual custodial relationship between the "thing" and the custodian.

Therefore an injured party wishing to assert Article 2051 must prove: i) first the custodial relationship between the thing and the defendant; and ii) secondly that the damage was produced by the thing under custody.

According to the general rule the injured party, in order to obtain damages recovery, must prove not only the damage, and that the damage was "caused" (*nexus*) by the subject from which he claims the damage, but also the fault of such subject.

However, for some cases the Italian Civil Code provides exceptions to this rule, for instance for damages *caused by things under one's guard* (2051), by *animals* (2052) and *by the fall of*

*ruinous buildings or structures* (2053).  The practical importance of these provisions lies on the fact that, where the cause is unknown or incapable of precise proof, liability falls on the defendant rather than on the plaintiff.

### 1)    Liability in case of leased thing

In case of lease, the liability for damages caused by the leased thing is placed either on the lessor or on the lessee depending on whether the thing that caused the damage was under the custody of one or the other.

It is generally held that the owner of the rented real estate (and even more so an hotel's owner), maintaining the legal control of the real estate (and therefore the custody of the wall structure as well as of the systems), is liable according to Article § 2051, for the damages caused to third parties by said structure and systems.  If the fire is proven to be caused by the electrical system then the lessor would be in custody and control of such events.

On the contrary the lessee is liable for the parts and accessories of the rented real estate of which he has full control with the power to directly intervene in order to avoid damages to third parties. *See Cass. Civ. [Supreme Court] 2004/20335*

### 2)    Liability where the lessee admits a third party to the use of the thing

The lease contract implies that the lessee is granted the use of the thing and becomes the custodian of the rented thing.  Where the lessee [*in the case in issue Harvey Industries, Inc.*] admits another subject in the rented space, Article § 1588, 2° paragraph, places on the lessee the liability, since such decision [*to admit a third party*] is related to his choice of how to use the rented good.  As a consequence, the injured party, in order to claim the contributing liability, together with that of the lessee, of the third party admitted to use the leased good, in compliance with Article § 2051, will have to prove that the latter was in a situation of autonomous control of the good. *See Cass. Civ. [Supreme Court] 2003/19185*

Italian Civil Code Article § 1588 provides as follows:

> **"Loss of and damage to leased thing.** The lessee is liable for
> loss of and damage (1592[2]) to the leased thing which occur
> during the lease, even if caused by fire (1611), unless he proves
> that such loss or damage was due to causes for which he is not
> responsible (1218 *ff.*, 1256 *ff.*, 2281)."

> "He is also liable for loss and damage caused by persons whom
> he has admitted, even temporarily, to the use or enjoyment of
> the thing (1594)."

It has been determined that the accessibility to the good does not *per se* imply the transfer of the custody. It is the Court that must evaluate in a specific case if the custodian, even allowing a third party to use the thing, has retained custody or not. *See Cass. Civ. [Supreme Court] 2003/1948*

### 3)    Liability of the owner in case of ruin of the building

Italian Civil Code Article § 2053 provides as follows:

> **"Collapse of buildings.** The owner of a building or other
> structure is liable for damages caused by its collapse, unless he
> proves that such damages were not caused by defective
> maintenance, or by a defect in construction."

Italian Civil Code Article § 2053 provides another exception to the general rule established by Italian Civil Code Article 2043 placing the liability on the owner of the building for damages caused by the ruin or distruction, even partial, of the building or other structure, regardless of the fact that the owner is present or not at the time of the fact. The notion of ruin or destruction has been interpreted in case-law quite extensively including events related to the structure or systems of the building including: explosion of water cables, automatic gate exiting the track, collapse of gates, breackage of cables.

In the case in issue, even if Plaintiffs prove the fire started in room 305, this could have been generated in the double ceiling of the room [*as happened just about two months later in June*

*25, 2004 fire at Hotel Parco dei Principi*] where all cables, including electrical and air conditioning cables were placed, and therefore be related to a system part of the structure of the building of which the owner is liable. In addition the fire spread so as interest the entire structure of the building, making clear that something in the structure of the building did not respond properly, at least the structure' materials non fire proof and the anti-fire system. In such case also Article § 2053 finds application.

Where the damage is caused by the ruin or destruction of a building or of related structures, liability is placed squarely upon the proprietor by Article § 2053 unless he can prove that the damage is not related to a lack of maintenance or a vice of construction.

Subjective liability for intentional or negligent conduct is regulated by Article § 2043. Articles §§ 2051 and 2053 provide an hypothesis of objective liability, based on the material cause effect *nexus* between the thing and the damage. In a situation where the premises are leased, the distribution of liability between lessor and lessee, in compliance with Article § 2051 is determined by the legal and actual control over it, with the consequence that the liability rests on one or the other depending on who had control on that particular part of the building [*from which the damage is derived*]. Such distinction does not operate in case of ruin of a building, including in such notion any destruction, even partial, of the building or accessory elements: in such case, in fact the special rule set forth at Article § 2053 provides the exclusive liability of the owner, even in the case he does not use directly the building. *See Cass. Civ. [Supreme Court] 2005/3385.*

Liability under Article § 2053 is based on the ownership of the building. The notion of "ruin of building" provided by Article § 2053 includes any disintegration, even limited, of structural elements of the building such as the break of cables of the water system. *See Cass. [Supreme Court] n. 2005/1666.*

The liability of the owner of a building for damages caused by the ruin arises only in cases of damages caused by structural elements of the building or damages caused by the dynamic action of the materials integrating the structure of the building. *See Cass. [Supreme Court]*

*1988/212.*

The owner of a rented building, maintaining the legal control and, therefore, the custody of the walls and systems structure, on which the lessee does not have any duty-power to intervene, is the exclusive responsible party, in compliance with article § 2053 (the only rule applicable for the concept of exception with respect to article § 2051), for the damages caused to third parties by such structures and systems, unless he proves that the ruin is not due to defect of maintenance or defect of construction. *See Cass. [Supreme Court] 2001/4737*

The presumption of liability of the owner of the building applies even if the injured party is the lessee (in the specific case the lessee reported substantial personal injuries following the fall of the door of the garage he had rented). *See Cass. [Supreme Court] 1988/6774*

### 4)   Contributing liability of the injured party

In any case the injured party may not recover those damages he could have avoided by using an ordinary degree of diligence.

In order to avoid liability the custodian must prove the fortuitous fact. The fortuitous fact can be integrated also by the fact of a third party or by the fact of the injured party himself. The fact of the third party may exclude the custodian's liability in case it intervenes, in the causation of the event, as an autonomous not foreseeable cause. Also the conduct of the injured party may exclude the liability of the custodian . In the event the liability of the custodian is not totally excluded by the conduct of the injured party, however, such consuct may come into consideration as having contributed to the damage in compliance with Article 1227, with consequential proportional reduction of the custodian' liability. *See Cass. Civ. [Supreme Court] n. 2008/11227.*

Even in case of liability of the custodian under § 2051, applies Article § 1227, consequently the recovery is not due for those damages that could have been avoided by the injured party

Avv. Maria Luisa Pompole

by using an ordinary degree of diligence. *See Cass. Civ. [Supreme Court] n. 2002/10641*

The liability for ruin of the building integrates an hypothesis of liability for presumed negligence , given that, once the injured party acting for the recovery of damages ex art. 2053 of the Civil Code, has proven the existence of the damage and the cause effect *nexus* with the state of ruin of the building, it is the owner of the building that has the burden to provide the specific proof that the ruin is not due to defect of maintenance or defect of construction. To be free from liability he may prove the fortuitous event, or a fact with autonomous casual effect not dependent on the owner, including the fact of the third party or even of the injured party (in the particular decision the Court has confirmed the liability of the hotel's owner for the damages occurred to a child, injured by the metallic gate of the hotel that went out of track). *See Cass. . [Supreme Court] 2009/2481*

## IV.   OPINION

I opine that in order to assert Article § 2043 against Rachel Castricone, the Plaintiffs ICEM S.p.A. and Aurora Assicurazioni S.p.A. must prove her intentional or negligent act, the damage, and the cause effect *nexus* between the act and the damage.

In order to assert Article § 2051 against Rachel Castricone, Plaintiffs ICEM S.p.A. and Aurora Assicurazioni S.p.A. must first prove that the fire was caused by a thing under the custody of the lessee Harvey Industries, Inc. In fact the lessor, even if he rents a portion of the building, maintains the custody of the structure and systems of the building, including electrical system, water system, air conditioning system, fire-prevention system.

In order to claim Rachel Castricone's contributory liability, with Harvey Industries, Inc.'s liability, Plaintiffs ICEM S.p.A. and Aurora Assicurazioni S.p.A., must prove that she was entrusted with an autonomous control on the room by the lessee Harvey Industries, Inc.

In any event, Plaintiffs ICEM S.p.A. and Aurora Assicurazioni S.p.A. shall not be entitled to damages that could be avoided by using an ordinary degree of diligence, which would indlude an ordinary amout of diligence in fire prevention, adequate training, warning, use of flamable materials and use of fire suppression equipment, and the like.

## V.   ADDITIONAL MATTERS

### 1)   Compensation

I have enclosed a copy of my curriculum vitae.  For the preparation of the present opinion I am charging Euro 250 per hour.

### 2)   Cases in Which I have served as an Expert

Arbitration proceeding filed in Geneva, Switzerland, in front of the WIPO Arbitration and Mediation Center, Geneva between the parties *Pomellato S.p.A./Richard Tonetti.*

Respectfully submitted,

Attorney Maria Luisa Pompole

Attachment A and B

B-2

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3

4     - - - - - - - - - - - - - - -x

5     ICEM S.P.A.

6     AURORA ASSICURAZIONI S.P.A.

7              Plaintiff

8     V.                        Civil Action No.

9     HARVEY INDUSTRIES, INC.,  1:07-CV-10819 RCL

10    RACHEL CASTRICONE,

11    TRACEY BOULDOUKIAN

12             Defendants

13    - - - - - - - - - - - - - - -x

14

15             DEPOSITION OF ALI REZA

16           Friday, October 16, 2009

17                  9:50 a.m.

18          Nutter McClennen & Fish, LLP

19             155 Seaport Boulevard

20            World Trade Center West

21             Boston, Massachusetts

22                - - - - - - -

23         Reporter:  Deborah Roth, RPR/CSR

24

1     Q.  Verify detector.

2          And why don't you tell us what that

3   is exactly.

4     A.  Okay.

5     Q.  I sense I'm going to settle in for the

6   long run.

7          Let me ask you this:  Is that once

8   you reset the Notifier, how long it will be

9   before it can be alarmed again or can respond

10  to smoke again?

11    A.  No.  No.  That's a separate setting.

12    Q.  Did you ask him that?

13    A.  That's not a setting.  That's the time

14  to reset the system.

15    Q.  Okay.  You know what, let's not get too

16  hung up on this Notifier right now, because we

17  would be here until midnight if I get --

18    A.  We could talk for a while about it.

19    Q.  It's a complex little machine; would

20  you agree with that?

21    A.  It was interesting to figure out how it

22  works.

23    Q.  And would you say that an understanding

24  of the Notifier is in some way critical to you

Page 137

1    fully formulating and giving your opinions in

2    this case?

3        A.   What I will say is that it was

4    necessary for me to understand the sequence of

5    lights on the LCD 6000, because in order to

6    determine whether or not there was an alarm or

7    not, understanding what those lights meant was

8    relevant.

9        Q.   And in order to gain that

10   understanding, you had to work with

11   Mr. Vaccaroni, is that right, asking

12   questions?

13       A.   The first thing that we did was we

14   talked to Notifier.  We called them.  I asked

15   Dan, Dr. Leiberman, to call them, and we got a

16   significant amount of information from that.

17            The second thing we did is we

18   actually bought an Exemplar, simplified, but

19   Exemplar system.

20            Once we understood the general

21   layout, as well as the general principles of

22   operation -- we actually bought some smoke

23   detectors also -- then it became necessary --

24   so to understand the sequence of the alarms,

Ali Reza                                                                          October 16, 2009

Page 138

```
 1    that information was actually complete.

 2              To interpret the hotel's actions and

 3    to determine what the alarms meant, it was

 4    necessary to confirm the detector verify and

 5    detector tracking settings.

 6    Q.  Okay.  So one of the things you did was

 7    you looked at the videotape of the camera.

 8              Do you remember, is it Camera 6

 9    that looks at the front desk on the ground

10    floor?

11              It doesn't matter?

12    A.  It's 5 or 6.

13    Q.  It's 5 or 6.

14              Okay.  So you did look at the video

15    camera and the videotape of what was

16    recorded --

17    A.  Yes.

18    Q.  -- with respect to the front desk --

19    A.  Yes.

20    Q.  -- of the hotel on the night in

21    question?

22    A.  Yes.

23    Q.  And you've given us a detailed written

24    account drawn from other sources as well and
```

Ali Reza                                                                                    October 16, 2009

Page 155

```
 1      A.  Yes.  He gets there in ten seconds.

 2      Q.  And eventually D'Arielli comes over

 3   with him and they have a little talk about it,

 4   if I remember correctly?

 5      A.  Yes.

 6      Q.  And they actually block our view for a

 7   little bit, I think, don't they?

 8      A.  Yes.

 9      Q.  And then Mr. Scarano, in some

10   fashion -- and he described doing this, I

11   believe -- he resets it?

12      A.  Yes.

13      Q.  Fair to say?

14      A.  Yes.

15      Q.  And you have -- you don't actually --

16   we don't know the moment when he resets it; is

17   it fair to say?

18      A.  Let me clarify this.  Mr. Scarano is

19   unclear whether he reset it or whether it

20   reset itself.  He has said that he reset it.

21   Part of the reason I had looked for the

22   settings on the tracking part of the detector

23   is the smoke alarm can actually reset itself

24   if the smoke source is intermittent.
```

1     Q.   Now, how do you know that?

2     A.   We -- I asked Dr. Leiberman to

3   understand what the tracking option is with

4   Notifier.  I tested a similar smoke detector

5   as the one that was in the hotel on my

6   Notifier panel.  I actually tested that.  The

7   only -- so I based on my conversations --

8   Exponent's conversations with Notifier, as

9   well as my tests on a simpler version of the

10  Notifier system, I was able to convince myself

11  that if the tracking option is enabled, the

12  smoke detector resets itself.

13          The only thing I did not know is

14  whether the tracking option was enabled in the

15  system installed at the Parco dei Principi,

16  and Mr. Aira had that information.

17          I obviously do not speak Italian.  I

18  first asked Mr. DeCandia to get that

19  information, and ultimately Mr. Vaccaroni got

20  it for me.

21    Q.   From whom?

22    A.   From Mr. Aira.

23          Now, it turns out -- and we spent a

24  lot of time trying to resolve whether the

1  smoke detector reset itself or Mr. Scarano

2  reset it, but ultimately, either he reset it

3  or it reset itself.

4         The most interesting aspect of this

5  analysis was that it did not come on again.

6    Q.  We'll get to that in a second, okay.

7    A.  Okay.  It did not come on again --

8    Q.  Do you remember what -- sorry.  Go

9  ahead.

10   A.  It did not come on again until 5:12:59,

11 or 5:13 approximately.

12   Q.  Did you determine when, in terms of

13 minutes and seconds, when the Notifier machine

14 was either reset or reset itself after this

15 initial --

16   A.  It's not -- it was not possible to do

17 that.

18   Q.  Right.

19   A.  All I can tell you is that the panel

20 light on the LCD 6000, which is the remote

21 enunciator, it turned off at 5:10:26.

22         Therefore, the last time somebody

23 touched a button was 30 seconds previously,

24 because the delay on the LCD light is 30

1   seconds.   Therefore, the latest Mr. Scarano

2   reset this machine was at 5:09:56.

3      Q.   Now, in order for you to be able to

4   reconstruct in the manner that you're

5   testifying about now, reconstruct events on

6   the morning of the fire by reviewing the

7   videotape, you needed to have a relatively

8   full and complete description of the workings

9   of the Notifier, correct?

10     A.   I needed to have a relatively full and

11  complete description of the workings of the

12  Notifier system, yes, sir.

13          And you had asked me a question, and

14  I neglected to give you one additional piece

15  of information.   I apologize and I will

16  supplement my answer.

17          Before I talked to Mr. Vaccaroni, I

18  also had talked Mr. DeCandia.   Mr. DeCandia --

19  I requested Mr. Tener to provide me access to

20  somebody who could give me some information

21  about the Notifier system.   Mr. Tener or the

22  hotel indicated that I should talk to

23  Mr. DeCandia.

24     Q.   As best you can recall, when was it

Ali Reza                                                                                    October 16, 2009

Page 159

 1   that you were seeking this information related

 2   to the Notifier?

 3       A.   I was at the hotel in April 2008, and

 4   one of my requests at that time was to meet

 5   with Mr. DeCandia, so that I could understand

 6   the Notifier system.

 7       Q.   When you visited the hotel, did you

 8   receive a demonstration of how the Notifier

 9   worked at the front desk?

10       A.   I went over and took a look at it.  The

11   annunciator panel was there, and the

12   receptionist who was there pushed a button for

13   me and showed me what would show up.  But the

14   hotel did not allow me to trigger detectors to

15   force an alarm.

16            So I did not get a demonstration of

17   how the Notifier responded in an alarm.  I was

18   not permitted by the hotel to reset the

19   system, test the smoke detectors, any of that.

20   So I did not get a true demonstration, but

21   somebody did push a button so that I could see

22   what the LCD panel looked like when it lit up.

23       Q.   The LCD panel being the light that

24   we're looking at here?