# Exhibit B
# to the Pencu Affidavit

# B-1

```
                                                    Page 1
 1            UNITED STATES DISTRICT COURT

 2        FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   - - - - - - - - - - - - - - -x

 5   ICEM S.P.A.

 6   AURORA ASSICURAZIONI S.P.A.

 7          Plaintiff

 8   V.                      Civil Action No.

 9   HARVEY INDUSTRIES, INC.,  1:07-CV-10819 RCL

10   RACHEL CASTRICONE,

11   TRACEY BOULDOUKIAN

12          Defendants

13   - - - - - - - - - - - - - -x

14

15            DEPOSITION OF ALI REZA

16          Friday, October 16, 2009

17                 9:50 a.m.

18        Nutter McClennen & Fish, LLP

19           155 Seaport Boulevard

20          World Trade Center West

21           Boston, Massachusetts

22              - - - - - - - -

23      Reporter:  Deborah Roth, RPR/CSR

24
```

1    experts.

2        Q.   You did?

3        A.   Yes, sir.

4        Q.   Okay.  And in what respect did you rely

5    upon them?

6        A.   The Rome Fire Department, when they did

7    their initial investigation, concluded very

8    quickly that there was no evidence that this

9    was an electrical fire -- that is the Rome

10   Fire Department -- and one challenge that I

11   had is what that really meant.

12            Because I have no independent

13   knowledge of -- I had no independent knowledge

14   of how Italian fire investigators conduct

15   their investigation, I asked an Italian expert

16   retained on this matter, Mr. Vaccaroni, what

17   that statement meant to him; and what

18   Mr. Vaccaroni indicated was that no evidence

19   of electrical fire to him indicated that they

20   did not find evidence of arcing in that room.

21       Q.   I'm sorry, I'm going stop you right

22   there.

23            They don't actually say they did

24   any arc searching or arc mapping at all in

1    their report?

2        A.   Correct.

3        Q.   So Mr. Vaccaroni told you that he

4    thinks what they meant was that they did an

5    arc mapping or arc search for arcing?

6        A.   Search for arcing.

7             Please understand that "arc mapping"

8    is a different term altogether.

9        Q.   Okay.  I just want to understand.

10            Mr. Vaccaroni told you that what

11   they meant was that they searched for arcing,

12   the prosecutor --

13       A.   What Mr. Vaccaroni told me is that in

14   his experience, when the Italian fire

15   department indicates that they found no

16   obvious evidence that this was an electrical

17   fire -- when the Rome Fire Department

18   indicated that there was no evidence of an

19   electrical fire, based on his knowledge of how

20   investigators in Italy conduct their

21   investigation, they would have made their

22   determination based on whether or not there

23   was arcing in the room or not.

24            In the United States, when we are

Ali Reza                                                                                    October 16, 2009

 1    faced with a similar situation, there is a

 2    mechanism by which -- by discovery or by

 3    request for clarification, you can get

 4    clarification on that.

 5              We did try and get clarification on

 6    this multiple times, but apparently the laws

 7    in Italy are that you, independent

 8    investigators, are prohibited from getting

 9    additional information from either the Rome

10    Fire Department or the public prosecutor

11    experts.

12    Q.  You do understand that Mr. Vaccaroni

13    was not present for any portion of this

14    particular investigation, correct?

15    A.  Correct.

16    Q.  You do understand that he himself has

17    never spoken to any of the six experts that

18    assessed in this investigation?

19    A.  That is correct.  And therefore -- and

20    I did not ask him whether he had spoken.  What

21    I wanted to know was, and it's different but

22    subtle, but I think bears repeating, what I

23    wanted to understand was under typical Italian

24    investigation methods, was arcing something

1    be a difficult process.

2        Q.  Okay.  Now, we got the thing reset,

3    either by itself or otherwise, and so I guess

4    what I need to know, because I think this

5    is -- I get the sense this is kind of

6    important to people -- is that when the alarm

7    first goes off at 5:08 in the morning, what,

8    in your view, was the cause of the alarm going

9    off?

10       A.  Right.  In my opinion, the reason this

11   alarm went off was because of intermittent

12   smoke that was present in the room, and there

13   are two mechanisms by which intermittent smoke

14   could be present.  One is that there was some

15   smoldering that was going on wherever the

16   cigarette butt had been discarded.  The second

17   is that somebody was actually smoking in the

18   room when the alarm was triggered.

19            I understand that Ms. Castricone and

20   Ms. Bouldoukian have both been asked and have

21   indicated that they were not smoking in the

22   room, but -- and then therefore, I have

23   indicated that I have concluded that this was

24   smoldering that was going on in the area where

Ali Reza                                                    October 16, 2009

Page 163

1    the cigarette was previously discarded at

2    4:55.

3           I think the point here is that

4    regardless of --

5    Q.   I missed that.

6           What was the part about 4:55?

7    A.   Mr. Fiderio left at approximately 4:55.

8    Q.   Okay.

9    A.   And there is an eyewitness account --

10   not eyewitness account, a police statement

11   that he thinks that Ms. Castricone brought the

12   ashtray back in the room.

13   Q.   Oh, okay.

14   A.   Okay?

15          Now, the most important -- from my

16   perspective, the most important point to my

17   investigation in this time is that we know

18   that there was another alarm at approximately

19   5:13 -- 5:12:59, 5:13 for the sake of

20   convenience, in Room 305.  There is only one

21   smoke detector in Room 305.  The way the smoke

22   detector in the Notifier system works is if a

23   smoke detector has detected smoke and has not

24   turned itself off, i.e., it has not been reset

1    or it has not reset itself, that's smoke

2    detector does not activate again.

3          So once a smoke detector is

4    activated, it remains activated, okay.

5          So we know that the smoke detector

6    in Room 305 turn off or was reset, and then we

7    know from Mr. Vaccaroni that it takes ten

8    seconds to reset, and therefore between

9    5:09:56 and 5:12:59, there was not sufficient

10   smoke in Room 305 to trigger that smoke

11   detector.

12         So we know there was enough smoke to

13   trigger it once at 5:08, we know there was

14   smoke again to trigger it again at 5:13, but

15   there wasn't enough smoke to trigger it

16   between 5:09:56 and 5:13, and that is very

17   significant because that is characteristic of

18   smoldering combustion, that you have

19   intermittent smoke.

20     Q.  Smoldering combustion in the sense that

21   whatever cigarette embers there were, whether

22   they were in the wastebasket or on clothes or

23   on a sheet, were smoldering in the room at

24   that point?

```
 1      A.  No, there is nothing in his deposition

 2   on who made that call.

 3      Q.  Okay.  I'm moving on now, sir, to

 4   Page 2, and at the bottom of Page 2, the last

 5   phrase is, "We have concluded that the fire

 6   started due to carelessly discarded smoking

 7   material in Room 305," correct?

 8      A.  Yes.

 9      Q.  And that is really the conclusion at

10   the beginning and at the end of your report?

11      A.  Yes.

12      Q.  Okay.  Who discarded the smoking

13   material, if you know?

14      A.  Right now, the only clear evidence that

15   I have where smoking materials might have been

16   discarded is when Ms. Castricone brought the

17   ashtray back into the room.  Mr. Fiderio has

18   indicated that he recalls that she might have

19   brought the ashtray back into the room, and he

20   does not recall that she had the ashtray in

21   her hand when he left the room.

22          If I accept that the smoldering

23   cigarette was discarded at that point, then it

24   would be Ms. Castricone.
```

1          The reason I'm hesitating here is if

2     the cigarette was not discarded at that time

3     period, I have no additional mechanism to

4     explain the 5:08 intermittent smoke alarm,

5     unless there was a second instance, an

6     additional instance of somebody smoking in the

7     room.  In other words, if somebody smoked in

8     the room between 5:07, the wake-up call, and

9     the 5:08 alarm, then all bets are off.

10          I'm aware that Ms. Bouldoukian and

11    Ms. Castricone have indicated that they did

12    not smoke in the room.  I'm also aware that a

13    cigarette butt being discarded at

14    approximately 4:55 explains the 5:08 alarm.

15    But if I exclude that cigarette butt, then I

16    do not know which person smoked in the room,

17    but I know that there was intermittent smoke.

18    Q.  At 5:08?

19    A.  At 5:08.

20    Q.  I'm going to take those two theories.

21    A.  Okay.

22    Q.  I'm going ask you the basis, okay.

23    A.  I think I just gave you my basis, but

24    you can --

1     Q.   I want to separate the two.

2     A.   Okay.

3     Q.   I want the basis for your opinion,

4    okay.

5     A.   Okay.

6     Q.   Well, first of all, this is what is

7    confusing me.  I would like to get your

8    opinion, to a reasonable degree of certainty,

9    because that's what I'm logically expecting

10   you're going to testify to at trial.

11    A.   Yes.

12    Q.   So now to a reasonable degree of

13   scientific certainty in your area of

14   expertise, I would like to know who discarded

15   the smoking material in Room 305.

16    A.   To a reasonable degree of scientific

17   certainty, it is Ms. Castricone.

18    Q.   Okay.  Not Ms. Bouldoukian?

19    A.   Correct.

20    Q.   To a reasonable degree of scientific

21   certainty?

22    A.   Correct.

23    Q.   Okay.  Now, to a reasonable degree of

24   scientific certainty, okay, when did this

**B-2**

ICEM
vs.
Harvey Industries

Antonello D'Arielli

Volume 1

March 9, 2009
pp. 1-121

**Jones Reporting**
C O M P A N Y

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Antonello D'Arielli

Volume:  I

Pages:  1-122

Exhibits:  1-10


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 07-cv-10819-RCL

- - - - - - - - - - - - - - - - - - - - - x

ICEM, S.P.A., AURORA ASSICURAZIONI, S.P.A.,

Plaintiffs,

v.

HARVEY INDUSTRIES, INC., RACHEL CASTRICONE,

TRACEY BOULDOUKIAN,

Defendants.

- - - - - - - - - - - - - - - - - - - - - x


INTERPRETED VIDEOTAPED DEPOSITION OF

ANTONELLO D'ARIELLI

Monday, March 9, 2009

10:18 a.m. to 3:57 p.m.

NUTTER, McCLENNEN & FISH

155 Seaport Boulevard

Boston, Massachusetts

Reporter:  Marianne R. Wharram, CSR/RPR

333083a5-ba8b-48fa-a934-869615ed3806

Page 44

1    A.   Yes.

2    Q.   And then you told us that you took 15 days

3    of leave as you had hurt your ribs?

4    A.   Yes.  I don't remember whether it was ten

5    or 15 days.  That was what the emergency service

6    prescribed.

7    Q.   By the way, did you notice -- to go back to

8    the night of the fire, either before the American

9    group went to the disco -- well, let me ask you

10   this.  Did you notice the dark haired American girl

11   smoking cigarettes?

12   A.   I didn't earlier, but I noticed that they

13   were smoking when I called the taxi, because they

14   offered me a cigarette.

15   Q.   And did you remember the type of cigarette

16   that the young lady was smoking?

17   A.   Maybe Marlboro Light, Light, Marlboro

18   Light.

19   Q.   Now, a few weeks later, in June of 2004,

20   was there another fire at the Parco dei Principie

21   Hotel?

22   A.   Fire, yes, we can call it a fire, but it

23   was very, very, small.  Yes, yes, a fire.

24   Q.   Fuoco.  Was it -- it was a fire, but not a

333083a5-ba8b-48fa-a934-869615ed3806

Antonello D'Arielli

Page 70

1    questions for you.  My first question, sir, is

2    you'll agree that your memory today is not as

3    accurate and good as it was immediately after the

4    fire, right?

5        A.  Correct.

6        Q.  Okay.  And you've previously testified that

7    all your testimony before the Italian courts were

8    truthful and accurate, right?

9        A.  Correct.

10       Q.  And that included your testimony before the

11   Italian court in September of 2008, correct?

12       A.  Correct.

13       Q.  And sir, your testimony was also accurate

14   and truthful the day of the fire on May 1st when

15   you gave your statement to the police, correct?

16       A.  I think so.

17       Q.  Okay.  You recall that after the fire you

18   were interviewed by numerous newspapers and

19   journalists, correct?

20       A.  Yes.  Alas, yes.

21       Q.  And your answers to the journalists'

22   questions were truthful and accurate, correct?

23            MR. BRAKE:  Objection.

24       A.  The answers I gave, yes.  The answers they

333083a5-ba8b-48fa-a934-869615ed3806

Antonello D'Arielli

1    wrote, not always.

2         Q.  (BY MR. PENCU)  Okay, but the answers that

3    you gave to the journalists directly were truthful

4    and accurate, correct?

5         A.  Yes.  As I said, what I said, yes, but what

6    they wrote down sometimes became a bit of a novel

7    and things, the hero, he carried people out in his

8    arms, things that were a little bit larger than

9    reality, than they had been.

10        Q.  Okay.  From what you recall, other than the

11   embellishments regarding your heroic efforts

12   carrying guests out of hotel, was there anything

13   else that was inaccurate as reported by the -- the

14   media?

15             MR. SURYANARYAN:  Objection.

16        A.  To tell you the truth, afterwards, I didn't

17   reread these articles, and in fact, at a later date

18   I was contacted by other magazines and periodicals

19   and I just refused to go to them.

20        Q.  (BY MR. PENCU)  Okay.  I'd like to talk

21   right now about the circumstances relating to his

22   interview to the police the day of the fire.

23        A.  Yes.

24        Q.  You testified that you arrived at the

333083a5-ba8b-48fa-a934-869615ed3806

Page 72

1    police station after the fire sometime in the

2    afternoon, correct?

3        A.  No.  No, it was in the morning the day of

4    the fire.  I can't remember the exact time.  It may

5    have been 10:00, 11 o'clock in the morning, but I

6    don't remember the exact time.

7        Q.  Okay, so it was the morning of the fire?

8        A.  Yes.  I'd say yes.

9        Q.  Okay.  You had previously testified that

10   you were questioned by two police officers,

11   correct?

12       A.  Yes.

13       Q.  Okay.  And this was normal questioning, was

14   it not?

15       A.  I -- yes, I think so.  It had never

16   happened to me, so I think these were normal

17   questions.  I don't know how things go in these

18   cases.

19       Q.  Well, I'm just -- you weren't threatened in

20   any way by the two police officers, correct?

21       A.  No, no, no, no.

22       Q.  Okay.  And you previously testified that

23   you were able to read your statement in Italian,

24   correct?

333083a5-ba8b-48fa-a934-869615ed3806

Antonello D'Arielli

Page 73

1      A.  What do you mean that I -- that I

2   testified?

3      Q.  I'll backtrack.  You were questioned by the

4   two police officers, correct?

5      A.  Yes.

6      Q.  You did not feel threatened, correct?

7      A.  Perfectly correct.

8      Q.  They asked you questions and you gave your

9   answers to those questions, correct?

10      A.  Yes.

11      Q.  And at the end of the questioning, they

12   provided you a printed written statement which was

13   the collection of your answers, correct?

14      A.  Yes, the answers and the questions.

15      Q.  Right.  And you reviewed your statement

16   that morning, correct?

17      A.  Yes.

18      Q.  Okay.  And you did not have any objections

19   with the content of the written statement, correct?

20      A.  Correct.

21      Q.  Okay.  And the police statement that I am

22   referring to is Exhibit 7, a document that you've

23   previously seen, correct?

24      A.  Yes.

333083a5-ba8b-48fa-a934-869615ed3806

Antonello D'Arielli

Page 75

1    bottom, about two paragraphs down, it says I went

2    up to the third floor and when the elevator doors

3    opened I saw smoke in the corridor and Room 305 was

4    open with the two girls screaming?  Do you see

5    that?

6        A.  Yes.

7        Q.  And that's an accurate statement, correct?

8        A.  Yes.

9        Q.  And then the sentence continues, the room

10   filled with smoke and I noticed flames at the other

11   end of the room where the desk should be.  Do you

12   see that?

13       A.  Correct.

14       Q.  Okay.  And that's an accurate statement,

15   right, sir?

16       A.  Correct.

17       Q.  I want to continue with that paragraph.

18   Two sentences later -- three sentences later, you

19   note that I saw the room's door was open and that

20   the girls inside were screaming and visibly panic

21   stricken.  Do you see that, sir?

22       A.  Yes.

23       Q.  Is there anything -- and I'd like you to

24   read your entire statement to yourself -- that is

333083a5-ba8b-48fa-a934-869615ed3806

Antonello D'Arielli

Page 76

1    inaccurate in this witness statement?  You've

2    already testified that you've testified accurately.

3         A.   It could be -- it could be the -- so it

4    could be the fact of the flames, because smoke and

5    light, I thought flames, that may be that -- that,

6    and also, it says here that I would take the girls

7    down and then come back up and I'm not sure about,

8    you know, whether I went down and then came back

9    up, because I was -- I was alone.  I don't

10   remember.  I think that.

11        Q.   So if I understand your testimony, you're

12   unsure about whether you took the girls back down

13   to the lobby from the third floor and whether you

14   stated that you noticed the flames or a light at

15   the end of the room where the desk should have

16   been; is that right?

17        A.   Yes.  Yes.

18        Q.   Other than that, everything else is

19   accurate, as he's previously testified, correct?

20        A.   Yes.  The rest seems all correct.

21        Q.   Okay.  And as you've previously indicated,

22   your memory today is not as good or accurate as it

23   was the day of the fire or the time immediately

24   following the fire, correct?

333083a5-ba8b-48fa-a934-869615ed3806

Antonello D'Arielli

1       A.   Yes.   Yes, there could be the memory

2   factor, but there could also be that now with a

3   fresh mind and not the panic element that one could

4   be looking at things slightly differently.   There's

5   -- there are pros and cons.

6       Q.   Understood, but it's been roughly five

7   years since the fire, correct, sir?

8       A.   Yes.   Yes, that's quite a bit.

9       Q.   And at the time that you were given your

10  written statement, you didn't clarify anything or

11  raise any objections to the police officers,

12  correct?

13      A.   No; also because this sheet I only saw

14  again only a short time ago.   I never had this --

15  this sheet.   I saw this on the day when I made this

16  and then I never saw it again.

17      Q.   Right.   You saw this, your statement, the

18  day of the fire, correct, the morning of the fire?

19      A.   Yes.   And then I saw it again.   Mrs. Ball

20  sent it to me, because she had it and she said do

21  you have it, and I said no.   She said take it.

22      Q.   And Ms. Ball would have been one of the

23  attorneys that you met with from Harvey Industries

24  and Ms. Bouldoukian, that -- those set of

333083a5-ba8b-48fa-a934-869615ed3806

Antonello D'Arielli

Page 78

1    attorneys?

2        A.  Yes.  Yes.

3        Q.  And if you look on the first sentence in

4    your witness statement, it notes that your

5    statement was given on May 1st, 2004, at 9:00 a.m.

6    Is that consistent with your recollection?

7        A.  Yes.  If I said 10:00 or 11:00, it's

8    because I didn't remember, but yes, 9:00, 9:00 in

9    the morning.

10       Q.  It was shortly after the fire, right?

11       A.  Yes.

12       Q.  Sir, you had mentioned your testimony back

13   in September of 2008 for the Italian criminal

14   proceedings for Rachel Castricone.  Do you remember

15   that?

16       A.  Yes.

17       Q.  You remember testifying that both

18   Castricone and Tracey Bouldoukian were drunk the

19   evening of the fire; do you remember that?

20               MR. SURYANARYAN:  Objection.

21       A.  I don't think I said drunk.  I may have

22   seen -- said cheerful, a little bit inebriated, but

23   not drunk.

24       Q.  (BY MR. PENCU)  Okay, but you -- you agree

333083a5-ba8b-48fa-a934-869615ed3806

Antonello D'Arielli

Page 90

1      Q.  So you don't disagree that the girls were

2   drunk; is that right?

3                MR. GILLESPIE:  Objection.

4                MR. SURYANARYAN:  Objection.

5                MR. PENCU:  Let me -- I'll rephrase.

6   Yeah, I'll rephrase.

7      Q.  (BY MR. PENCU)  Do you recall telling the

8   journalist, the reporter for this paper,

9   La Republica, that those girls were a -- were a

10  little drunk, and that's why you didn't think there

11  was a fire?

12     A.  Yes, perhaps.  Yes, yes.

13     Q.  Okay.  And then the next sentence reads

14  sometimes just a cigar can activate the sensors on

15  the sprinklers.  Do you see that, sir?

16     A.  Yes, I was saying what the porter had told

17  me.

18     Q.  Right.  And you're referring to the general

19  alarm system, are you not?

20     A.  Yes.

21     Q.  And I believe you had testified earlier

22  that you remember both girls smoking cigarettes the

23  night of the fire?

24                MR. SURYANARYAN:  Objection.

333083a5-ba8b-48fa-a934-869615ed3806

Antonello D'Arielli

Page 91

1      A.   Yes.

2      Q.   (BY MR. PENCU)   All right.   And I believe

3  you previously testified that one of them even

4  offered you a cigarette, correct?

5      A.   Offered a signify cigarette, yes.

6      Q.   Okay.   And then if you continue looking in

7  the article, it goes on and describes the fact that

8  you went upstairs.   Is there anything that you

9  object to on the first page of the article?

10     A.   They're all things I said, I think.

11     Q.   And you remember, sir, then, that -- do you

12  see the part where the story states that you

13  remember that when the group of young Americans

14  returned to the hotel they were all a little bit

15  high, but in the end, when you're on vacation,

16  drinking a little bit extra is normal?   Do you see

17  that, sir?

18     A.   Yes.

19     Q.   Okay.   And when you say -- okay.   And the

20  high means high on alcohol, correct?

21     A.   Yes.

22     Q.   Okay.   And then do you see in the next

23  paragraph they quote you as saying they had asked

24  for the bar, but it was already closed, so they

Antonello D'Arielli

Page 99

1    shortly after the hotel reopened after the May 1st,

2    2004, fire.

3        A.  Yes.

4        Q.  Okay.  You testified that the second fire

5    came from a grill near the ceiling, correct?

6        A.  Yes, there are these grills over the doors.

7    I think they're for air, for airing.

8        Q.  Right.  And that's high above, right, by

9    the ceiling?

10       A.  Just -- yes, above the doors, two meters,

11   two meters, ten centimeters over the doors.

12       Q.  Right, and you stated in your police

13   statement that the May 1st, 2004, the flames came

14   from the area at the end of the room where the desk

15   was, right?

16       A.  Correct.

17       Q.  Right.  So the first -- so the June 2004

18   fire originated somewhere high near the ceiling and

19   the May 1st, 2004, fire originated somewhere on the

20   ground by the desk; is that correct?

21           MR. SURYANARYAN:  Objection.

22           MR. BRAKE:  Objection.

23       A.  The -- yes, the ceiling of -- in the

24   hallway, yes.  That's -- yes, correct.

333083a5-ba8b-48fa-a934-869615ed3806

Antonello D'Arielli

Page 118

1      Q.   Right.

2      A.   Later there was confirmation.

3      Q.   And later, when you saw the flames, did

4  those flames move with much velocity?

5      A.   Yes.

6      Q.   So when you were quoted in this newspaper

7  article about the flames and much velocity, is that

8  quote about the first time you looked into

9  Room 305, or is it about later?

10     A.   Later.

11     Q.   And you were asked one question about the

12  origin, where the May fire originated in Room 305.

13  As you sit here today --

14     A.   From where -- from where, I don't know.  I

15  can't know.  Where, it was in the corner where the

16  desk was, but from where, I don't know.

17     Q.   Thank you.  That's all I have.

18          MR. GILLESPIE:  No further questions.

19          MR. PENCU:  I have a couple.

20              RECROSS-EXAMINATION

21     Q.   (BY MR. PENCU)  Mr. D'Arielli, leaving

22  aside the semantics of ubriaco and alticci aside,

23  when you described the girls as alticci, you were

24  referring to them before they left to go to the

333083a5-ba8b-48fa-a934-869615ed3806

Antonello D'Arielli

Page 119

1   nightclub; is that correct?

2       A.  Yes, correct, because I didn't see them

3   when they came back.  When they came back, I only

4   saw one of them, who was on the couch with the boy.

5   I didn't see them, and then I passed through and I

6   was -- and I walked away.  I saw them before they

7   left.

8       Q.  And just because there's been some back and

9   forth on your recollection, you stand by your

10  statement that your memory today, five month-- five

11  years after the fire is not as clear and accurate

12  as it was the day of the fire and immediately after

13  the fire, correct?

14      A.  Certainly.  Certainly.

15          MR. BRAKE:  And I have one last

16  question.  Oh, sorry.

17          MR. PENCU:  I have no further

18  questions.  Thank you very much.

19          MR. BRAKE:  Just one last question.

20              REDIRECT EXAMINATION

21      Q.  (BY MR. BRAKE)  This question about your

22  memory, what you told us today was in substance the

23  same as what you told the police on first of May,

24  2004, and what you told the Rome criminal court in

333083a5-ba8b-48fa-a934-869615ed3806

*Questura di Roma*

COMMISSARIATO SEZIONALE COORDINATORE DI.P.S.
"SALARIO PARIOLI "
Via Guido d'Arezzo, nr.22
Tel.06/8440221 – Fax 06/84402229

OGGETTO : Sommarie Informazioni rese da
D'Arielli Antonello, nato a Roma il 10.10.1963, residente in via Della Cincie n. 20
identificato a mezzo di patente di guida ct. B n. Rm 4277647G ril. Prefettura di Roma
il 20.01.1993  tel.06 2674491.

L'anno 2004 addi 1 del mese di maggio alle ore 7.00 egli Uffici del Comm/to di Polizia Salario
Parioli in Roma.

Innanzi a noi sottoscritti Uff. di P.G. Isp. Capo Rossi Luigi è presente il nominato in oggetto io
quale in ordine a quanto occorso in data odierna , nell'Hotel Parco dei principi in merito
dichiara sono addetto al servizio di facchino presso il citato Hotel e questa notte ero di turno. Il mio
lavoro notturno consiste nelle pulizie della Hall nonché assistenza ai clienti.Ho iniziato il mio
servizio alle ore 23.00 e ho avuto modo di notare un gruppo di persone, ovvero cittadini Statunitensi
che sostano presso il Bar della Hall e bevevano alcolici. Tale gruppo formato da circa 8 persone
erano 5 persone di una certa età ovvero 40 ai 50 anni e gli altri ragazzi di circa 20 anni. Verso le 1
di notte il gruppo mi chiedeva dove poteva andare a ballare e divertirsi, e mi sembravano già un po
alticci ovvero avevano passato la serata nella Hall a bere birra ed altri alcolici e a ballare , ma
comunque per venire incontro alle loro richieste ho chiamato due taxi e a quanto ne so l'autista li
ha accompagnati alla discoteca "GILDA".Verso le ore 04.00 il gruppo rientrava ed tutti tranne una
ragazza ed un ragazzo, di cui ho avuto modo di vedere in questi Uffici solo la ragazza, piccola e
mora, che rientrati dalla discoteca non seguivano il resto del gruppo alle loro camere ma mi
chiedevano del Bar, al che facevo presente che era chiuso e loro in modo tranquillo sono saliti in
camera per poi ridiscendere con una birra prelevata dal frigobar, per poi sedersi parlottare ancora
un po'. e verso le ore 04.30 sono risaliti in camera.Dopo circa 5 o 6 minuti che i due giovani erano
risaliti è scattato l'allarme antincendio nella camera 305 occupata dalla ragazza salita poco prima e
divisa con un'altra connazionale Quindi sono salito al piano ed una volta aperti i porta
dell'ascensore ho notato che c'era del fumo nel corridoio e la stanza n. 305 aperta on le due ragazze
che urlavano, la stanza completamente invasa dal fumo e ho notato delle fiamme in fondo alla
camera dove ci dovrebbe essere una scrivania. Quindi facevo uscire le due ragazze e le indirizzavo
verso le scale di sicurezza, per poi scendere precipitosamente nella Hall dove avvertivo il portiere
dell'incendio che era vero ed era in atto pertanto doveva chiamare i Vigili del Fuoco.
Successivamente mi riportavo di sopra al III piano che trovavo quasi completamente invaso da
fumo nero e denso quindi gattonando bussavo in modo deciso alle porte e facevo evacuare i clienti
del piano."

A.D.R."Quando sono arrivato al III piano  per verificare l'allarme antincendio, come ho detto
uscito della dell'ascensore vedevo del fumo che stava invadendo il corridoio e portatomi presso la camera
305 vedevo che la porta della camera era aperta e le due ragazze che la occupavano gridavano ed in
evidente stato di panico uscivano e rientravano nella camera e se ricordo bene indossavano dei
pigiama.

A.D.R."Quando è scattato l'allarme antincendio mi disse i  il portiere me disse i andare a controllare
aggiungendo che si trattava della camera occupata dalla ragazza anzidetta che si era infrattenuta con
ragazzo nella Hall con la birra prelevata dal frigobar.

A.D.R."Ho avuto modo di notare che la ragazza bruna della stanza 305, ovvero l'ultima salire alla
camera fumava sigarette di marca Marlboro Light.

A.D.R."Vi sono degli estintori situati nei corridoi e io non ho mi sono adoperato utilizzare uno
degli estintori in quanto vi era tantissimo fumo  le ragazze che gridavano erano in pieno panico, mi
sono preoccupato innanzi tutto a far uscire le ragazze e poi far evacuare i clienti delle camere che
dovevo indirizzare, o meglio afferrare e spingerli verso l'uscita delle scale di emergenza sita su ogni
piano, in tale circostanza le persone che uscivano dalle camere venivano subito colte dal panico e
dovevo assolutamente farli andare nella direzione giusta ovvero verso la porta di emergenza.

A.D.R."Non ho visto nessuno adoperarsi con estintori o manichette antincendio per spegnere le
fiamme.

A.D.R."Non ho altro da aggiungere"

F.L.C. e S:

