# Exhibit P
# to the Pencu Affidavit

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   - - - - - - - - - - - - - - -x

 5   ICEM S.P.A.

 6   AURORA ASSICURAZIONI S.P.A.

 7            Plaintiff

 8   V.                          Civil Action No.

 9   HARVEY INDUSTRIES, INC.,    1:07-CV-10819 RCL

10   RACHEL CASTRICONE,

11   TRACEY BOULDOUKIAN

12            Defendants

13   - - - - - - - - - - - - - - -x

14

15            DEPOSITION OF ALI REZA

16          Friday, October 16, 2009

17                 9:50 a.m.

18        Nutter McClennen & Fish, LLP

19            155 Seaport Boulevard

20            World Trade Center West

21             Boston, Massachusetts

22                - - - - - - - -

23         Reporter:  Deborah Roth, RPR/CSR

24
```

```
 1   experts.
 2       Q.  You did?
 3       A.  Yes, sir.
 4       Q.  Okay.  And in what respect did you rely
 5   upon them?
 6       A.  The Rome Fire Department, when they did
 7   their initial investigation, concluded very
 8   quickly that there was no evidence that this
 9   was an electrical fire -- that is the Rome
10   Fire Department -- and one challenge that I
11   had is what that really meant.
12           Because I have no independent
13   knowledge of -- I had no independent knowledge
14   of how Italian fire investigators conduct
15   their investigation, I asked an Italian expert
16   retained on this matter, Mr. Vaccaroni, what
17   that statement meant to him; and what
18   Mr. Vaccaroni indicated was that no evidence
19   of electrical fire to him indicated that they
20   did not find evidence of arcing in that room.
21       Q.  I'm sorry, I'm going stop you right
22   there.
23           They don't actually say they did
24   any arc searching or arc mapping at all in
```

```
 1   their report?
 2       A.  Correct.
 3       Q.  So Mr. Vaccaroni told you that he
 4   thinks what they meant was that they did an
 5   arc mapping or arc search for arcing?
 6       A.  Search for arcing.
 7           Please understand that "arc mapping"
 8   is a different term altogether.
 9       Q.  Okay.  I just want to understand.
10           Mr. Vaccaroni told you that what
11   they meant was that they searched for arcing,
12   the prosecutor --
13       A.  What Mr. Vaccaroni told me is that in
14   his experience, when the Italian fire
15   department indicates that they found no
16   obvious evidence that this was an electrical
17   fire -- when the Rome Fire Department
18   indicated that there was no evidence of an
19   electrical fire, based on his knowledge of how
20   investigators in Italy conduct their
21   investigation, they would have made their
22   determination based on whether or not there
23   was arcing in the room or not.
24           In the United States, when we are
```

```
 1   faced with a similar situation, there is a
 2   mechanism by which -- by discovery or by
 3   request for clarification, you can get
 4   clarification on that.
 5            We did try and get clarification on
 6   this multiple times, but apparently the laws
 7   in Italy are that you, independent
 8   investigators, are prohibited from getting
 9   additional information from either the Rome
10   Fire Department or the public prosecutor
11   experts.
12       Q.   You do understand that Mr. Vaccaroni
13   was not present for any portion of this
14   particular investigation, correct?
15       A.   Correct.
16       Q.   You do understand that he himself has
17   never spoken to any of the six experts that
18   assessed in this investigation?
19       A.   That is correct.  And therefore -- and
20   I did not ask him whether he had spoken.  What
21   I wanted to know was, and it's different but
22   subtle, but I think bears repeating, what I
23   wanted to understand was under typical Italian
24   investigation methods, was arcing something
```

1  be a difficult process.
2      Q.  Okay.  Now, we got the thing reset,
3  either by itself or otherwise, and so I guess
4  what I need to know, because I think this
5  is -- I get the sense this is kind of
6  important to people -- is that when the alarm
7  first goes off at 5:08 in the morning, what,
8  in your view, was the cause of the alarm going
9  off?
10     A.  Right.  In my opinion, the reason this
11 alarm went off was because of intermittent
12 smoke that was present in the room, and there
13 are two mechanisms by which intermittent smoke
14 could be present.  One is that there was some
15 smoldering that was going on wherever the
16 cigarette butt had been discarded.  The second
17 is that somebody was actually smoking in the
18 room when the alarm was triggered.
19          I understand that Ms. Castricone and
20 Ms. Bouldoukian have both been asked and have
21 indicated that they were not smoking in the
22 room, but -- and then therefore, I have
23 indicated that I have concluded that this was
24 smoldering that was going on in the area where

```
 1   the cigarette was previously discarded at
 2   4:55.
 3            I think the point here is that
 4   regardless of --
 5       Q.  I missed that.
 6            What was the part about 4:55?
 7       A.  Mr. Fiderio left at approximately 4:55.
 8       Q.  Okay.
 9       A.  And there is an eyewitness account --
10   not eyewitness account, a police statement
11   that he thinks that Ms. Castricone brought the
12   ashtray back in the room.
13       Q.  Oh, okay.
14       A.  Okay?
15            Now, the most important -- from my
16   perspective, the most important point to my
17   investigation in this time is that we know
18   that there was another alarm at approximately
19   5:13 -- 5:12:59, 5:13 for the sake of
20   convenience, in Room 305.  There is only one
21   smoke detector in Room 305.  The way the smoke
22   detector in the Notifier system works is if a
23   smoke detector has detected smoke and has not
24   turned itself off, i.e., it has not been reset
```

1  or it has not reset itself, that's smoke

2  detector does not activate again.

3       So once a smoke detector is

4  activated, it remains activated, okay.

5       So we know that the smoke detector

6  in Room 305 turn off or was reset, and then we

7  know from Mr. Vaccaroni that it takes ten

8  seconds to reset, and therefore between

9  5:09:56 and 5:12:59, there was not sufficient

10 smoke in Room 305 to trigger that smoke

11 detector.

12      So we know there was enough smoke to

13 trigger it once at 5:08, we know there was

14 smoke again to trigger it again at 5:13, but

15 there wasn't enough smoke to trigger it

16 between 5:09:56 and 5:13, and that is very

17 significant because that is characteristic of

18 smoldering combustion, that you have

19 intermittent smoke.

20   Q.  Smoldering combustion in the sense that

21 whatever cigarette embers there were, whether

22 they were in the wastebasket or on clothes or

23 on a sheet, were smoldering in the room at

24 that point?

1    A.   No, there is nothing in his deposition
2    on who made that call.
3    Q.   Okay.  I'm moving on now, sir, to
4    Page 2, and at the bottom of Page 2, the last
5    phrase is, "We have concluded that the fire
6    started due to carelessly discarded smoking
7    material in Room 305," correct?
8    A.   Yes.
9    Q.   And that is really the conclusion at
10   the beginning and at the end of your report?
11   A.   Yes.
12   Q.   Okay.  Who discarded the smoking
13   material, if you know?
14   A.   Right now, the only clear evidence that
15   I have where smoking materials might have been
16   discarded is when Ms. Castricone brought the
17   ashtray back into the room.  Mr. Fiderio has
18   indicated that he recalls that she might have
19   brought the ashtray back into the room, and he
20   does not recall that she had the ashtray in
21   her hand when he left the room.
22        If I accept that the smoldering
23   cigarette was discarded at that point, then it
24   would be Ms. Castricone.

1              The reason I'm hesitating here is if
2      the cigarette was not discarded at that time
3      period, I have no additional mechanism to
4      explain the 5:08 intermittent smoke alarm,
5      unless there was a second instance, an
6      additional instance of somebody smoking in the
7      room.  In other words, if somebody smoked in
8      the room between 5:07, the wake-up call, and
9      the 5:08 alarm, then all bets are off.
10             I'm aware that Ms. Bouldoukian and
11     Ms. Castricone have indicated that they did
12     not smoke in the room.  I'm also aware that a
13     cigarette butt being discarded at
14     approximately 4:55 explains the 5:08 alarm.
15     But if I exclude that cigarette butt, then I
16     do not know which person smoked in the room,
17     but I know that there was intermittent smoke.
18        Q.  At 5:08?
19        A.  At 5:08.
20        Q.  I'm going to take those two theories.
21        A.  Okay.
22        Q.  I'm going ask you the basis, okay.
23        A.  I think I just gave you my basis, but
24     you can --

Page 254

1    Q.  I want to separate the two.

2    A.  Okay.

3    Q.  I want the basis for your opinion,

4    okay.

5    A.  Okay.

6    Q.  Well, first of all, this is what is

7    confusing me.  I would like to get your

8    opinion, to a reasonable degree of certainty,

9    because that's what I'm logically expecting

10   you're going to testify to at trial.

11   A.  Yes.

12   Q.  So now to a reasonable degree of

13   scientific certainty in your area of

14   expertise, I would like to know who discarded

15   the smoking material in Room 305.

16   A.  To a reasonable degree of scientific

17   certainty, it is Ms. Castricone.

18   Q.  Okay.  Not Ms. Bouldoukian?

19   A.  Correct.

20   Q.  To a reasonable degree of scientific

21   certainty?

22   A.  Correct.

23   Q.  Okay.  Now, to a reasonable degree of

24   scientific certainty, okay, when did this