UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-10819-GAO

ICEM S.P.A. and AURORA ASSICURAZIONI S.P.A.,
Plaintiffs,

v.

HARVEY INDUSTRIES, INC., RACHEL CASTRICONE, and TRACEY BOULDOUKIAN,
Defendants.

OPINION AND ORDER
September 30, 2010

O'TOOLE, D.J.

The controversy in this case arises from a fire at the Grand Hotel Parco dei Principi ("Parco") in Rome, Italy which occurred on the morning of May 1, 2004 and resulted in the deaths of three hotel guests. ICEM S.P.A. and Aurora Assicurazioni S.P.A., the hotel's owner and insurer, respectively, brought this action against two women, Rachel Castricone and Tracey Bouldoukian, who were staying in the room in which the fire began, and Harvey Industries, an American-based company which sponsored the women's trip to Italy. After several years of litigation, three claims remain, all arising under the Italian Civil Code: claims under Article 2043 against all defendants, under Article 2051 against all defendants, and Article 1588 against Harvey.[1]

Before the Court are three cross-motions for summary judgment. Harvey and Bouldoukian seek summary judgment as to all claims against them, while ICEM and Aurora move for summary judgment only on their Article 1588 and 2051 claims.

---

[1] Additionally, Harvey has filed cross-claims against Bouldoukian and Castricone for contribution under Civil Code Article 2055.

**I.     Background**[2]

Harvey Industries is a window manufacturer based in Waltham, Massachusetts. The company markets directly to its customers, principally contractors. Harvey runs a sales incentive travel program, the "Executive Home Remodeling Conference," whereby customers who have purchased a benchmark amount of Harvey's products are invited to attend a conference, often abroad, for which Harvey pays the airfare, lodging, tour tickets, nightly social functions, and at least some meals. Customers may also earn the ability to bring guests, such as friends or family members.

In the spring of 2004, Harvey hosted two trips to Italy as part of its travel program. The second trip ran from late April to early May and included short stays in Venice, Rome, and Sorrento. Several of Harvey's senior management and sales staff participated in the trip, and representatives of Harvey were present in Italy throughout its duration. Harvey chose the program content for the trip, such as itineraries and accommodations.[3] Invitees did not deal directly with airlines or hotels. For the Rome leg, Harvey selected the Parco, a luxury five-star hotel, for its guests' lodging from April 29 through May 2. Harvey initially contracted for 125 rooms, but ultimately reserved fewer rooms, approximately ninety-seven.

Rachel Castricone and Tracey Bouldoukian were invitees on the second trip. Castricone's father, the owner of Castricone Roofing and Siding, was a customer of Harvey's and had purchased enough products to be invited to participate in the trip and to bring his wife and daughter, as well as Bouldoukian and her parents, who were family friends. Upon arrival, Castricone and Bouldoukian were assigned to Room 305. Harvey welcomed and provided

---

[2] Facts described here are undisputed unless otherwise noted.
[3] Although Harvey delegated some responsibility to a travel agency, the fact is of no moment to the resolution of these motions.

information packets to the women, and either Harvey or the hotel provided their room keys. Harvey also maintained a hospitality desk at the hotel.

On April 30, 2004, at around 7:00 p.m., Castricone and Bouldoukian ate dinner at a local restaurant. Drinks, including beer and wine, were included with the meal and paid for by Harvey. ICEM estimates that the two women drank between one and two glasses of wine at dinner.[4] Bouldoukian maintains, however, that she only drank between one and one and a half glasses of wine.

After dinner, around 10:00 p.m., Castricone and Bouldoukian returned to the Parco and joined a group of Harvey employees and guests who had congregated at the Parco's bar. There, the two women each drank at least one glass of wine. ICEM offers testimony that they consumed more than one glass of wine, and points to the hotel bartender's testimony in which he relates that he stopped serving them alcohol because they were visibly drunk and disruptive, a fact with which the defendants disagree through the testimony of the two women. Likewise, a concierge on duty that night, Maurizio Scarano, reported that they appeared drunk. Additionally, at the bar and at various times that evening, Bouldoukian and Castricone smoked cigarettes. Although Castricone carried the cigarettes, it is disputed whether she alone or whether they together bought the cigarettes.

The group stayed in the bar lounge until about 1:50 a.m. and then a small group of eight individuals, including Bouldoukian and Castricone, went to local nightclub. Michael Pitre, a Harvey sales representative, accompanied the group to the nightclub, where he paid for their drinks. Harvey later reimbursed his expenses.

---

[4] Castricone does not specifically deny the amount of alcohol she is alleged to have consumed, but rather denies them only to the extent that the facts suggest that in total she would have drunk more than four glasses of wine and a portion of a "mini-bottle" between 7:00 p.m. and 4:30 a.m.

Around 3:30 a.m., the group returned to the hotel. Bouldoukian, Castricone, and Matthew Fiderio, another invitee of Harvey who had gone to the club with the group, went upstairs to Room 305. Castricone took a mini-bottle of wine and a bottle of beer from the mini-refrigerator in the room, and she and Fiderio returned to the lobby at 3:35 a.m. While they were downstairs talking, Bouldoukian stayed in the room and tried to call her boyfriend. She made several attempts before she was able to successfully connect to her boyfriend. She spoke to him for about twenty or twenty-five minutes, checked her messages, and went to sleep.

Castricone and Fiderio returned to the room at about 4:41 a.m. They each smoked a cigarette on the balcony. Bouldoukian claims to have been sleeping while they smoked their cigarettes, but ICEM disputes her averment, pointing to her admission to the police that she was half-awake when they entered the room and her detailed description of what transpired while they were there. In any event, at 4:55 a.m., Fiderio left to return to his own room, and according to the concierge Scarano, someone from Room 305 placed a wake-up call about ten minutes later.

What exactly transpired in Room 305 at that point is a pivotal issue and subject of significant contention between the parties. What the parties agree upon is that at approximately 5:18 a.m., Castricone and Bouldoukian opened the door and rushed out of Room 305. Shortly thereafter, they briefly reentered for Bouldoukian to retrieve a pair of pants. At neither time did they close the door when they exited the room. A surveillance camera located in the hallway recorded a glowing light in the back corner of the room through the open door before smoke obstructed the camera's view. ICEM describes the light as a flame, but the defendants disagree with the characterization.

At about the same time as the women left Room 305, Scarano directed Parco's late night porter, Antonello D'Arielli, to investigate because the fire alarm located at the front desk alerted to the presence of smoke by illuminating and/or buzzing. The alarm had also alerted earlier at 5:08 and 5:12 a.m., but Scarano did not send D'Arielli to investigate until it activated again at 5:18 a.m., because, according to Scarano, the alarm pattern indicated the intermittent presence of smoke consistent with someone smoking a cigarette. There is conflicting evidence in the record upon which the parties rely regarding whether D'Arielli saw fire when he investigated the third floor.

In any event, fire and smoke spread, and tragically, three guests located on the fifth floor died. Two succumbed to smoke inhalation and one fell to his death after attempting to scale down the outside of the hotel with bed sheets tied together. Additionally, the hotel suffered damage from both the fire and water from the fire hoses.[5] Aurora, the Italian insurance company that insured ICEM on the date of the fire, paid ICEM, the Italian corporation that owns the Parco, for property damage and other injuries, including the settlement of wrongful death claims. ICEM also sustained damages that were not covered by the insurance policy.

Italian authorities brought criminal charges against Bouldoukian, Castricone, and several members of the Parco's management for conduct related to the fire. The parties have different descriptions of what happened to Bouldoukian, but in any event, Italian authorities are no longer prosecuting her. The case is ongoing as to Castricone. Additionally, several Parco managers were convicted for inadequate emergency response procedures and staffing the morning of the fire.

---

[5] Harvey disputes the damage sustained by the Parco because it did not have the opportunity to assess the damage as evidence of the fire was destroyed prior to this lawsuit, but the conflict is not significant to the resolution of these motions.

ICEM and Aurora filed this civil suit in 2007, about three years after the fire.

## II. Article 1588

Article 1588 of the Civil Code[6] provides that a lessee is liable for the loss of and damage to a "*cosa locata*," or leased thing, which occur during the lease, including loss caused by fire, unless the lessee proves that the loss or damage was due to causes for which he is not responsible. A lessee is also liable for loss and damage caused by persons whom he allowed to use the leased thing, even if temporarily. C.C. Art. 1588. Article 1588 imposes an obligation on lessees to return the leased thing in substantially the same condition as when the lease began, and ensures that a lessor will be made whole in the event of loss or damage.

The central issue presented by this portion of the cross-motions is whether Article 1588 applies to the agreement between the Parco and Harvey. It is undisputed that Parco and Harvey executed a contract regarding a large number of rooms for which Harvey paid and that Bouldoukian and Castricone stayed in Room 305, one of the rooms for which Harvey paid. ICEM and Aurora (hereinafter "ICEM") argue that Harvey is liable to them under Article 1588 by virtue of having "leased" the rooms, including Room 305, for guests on its travel program. Harvey contends instead that the short-term hotel contract, as a mixed or hybrid agreement, is not a lease to which Article 1588 would apply.

Under Italian law, decided cases are not themselves precedential, but they do serve as instructive illustrations of the appropriate application of the Civil Code provisions to concrete

---

[6] Article 1588 provides:

> **Loss of and damage to leased thing.** The lessee is liable for loss of and damage to the leased thing which occur during the lease, even if caused by fire, unless he proves that such loss or damage was due to causes for which he is not responsible.
>
> He is also liable for loss and damage caused by persons whom he has admitted, even temporarily, to the use or enjoyment of the thing.

6

circumstances. Neither party draws attention to any decided case that applied, or refused to apply, Article 1588 to a three-day vacation stay at a hotel. The two cases the parties urge the Court to examine in support of their arguments are cases they refer to as "<u>Luxardo</u>," (<u>see</u> Ex. A to Docket No. 166 (dkt. no. 179)), and "<u>Naples</u>," (<u>see</u> Aff. Sarah P. Kelly Ex. 2 (dkt. no. 102-3)). Both are distinguishable from the facts of the present case. The contract in <u>Luxardo</u>, where the court found Article 1588 applicable, was for a long-term arrangement for the hotel keeper to make commercial use of an entire property, not one for a short-term stay for guests of a hotel to vacation as tourists. Likewise, in <u>Naples</u>, the City of Naples entered into a contract for over five years with a private boarding house to provide lodging for city residents who had been displaced by an earthquake. This is much more similar to a long-term arrangement traditionally associated with leases than the short-term three-day vacation stay at issue here. Moreover, although the court in the Naples case held that certain lease provisions of the Civil Code should apply, though not Article 1588, it also noted that they did not do so automatically, and only by analogy because the transaction in question was not a "typical" transaction.

Here, whether the agreement between the hotel and Harvey is a hybrid contract, mixed contract, or some other form of agreement is not a question necessary to resolve. It is sufficient for these purposes to say what it is not: it is not a lease within the sensible meaning of Article 1588, either automatically or by analogy. Harvey and its guests were patrons who paid a fee to use some of the hotel's facilities and receive its services. Their status was not analogous to that of tenants under a typical lease. The contract provided for a mere three-day stay, not a long-term rental. Harvey contracted for the right to enjoy use of some of the hotel and its services, rather than for the right to utilize the entire building for a commercial purpose, and the hotel maintained continuous control over the entire premises, including the rooms assigned to Harvey. As

overnight guests in the hotel, Harvey and the women acquired no substantial interest in the hotel room.

While there may be situations in which an innkeeper and guest enter into a contract best described as a "lease," that factual scenario is not presented here. Article 1588 does not apply to these circumstances, and Harvey is entitled to judgment as a matter of law as to ICEM's Article 1588 claim.

### III. Article 2051

Article 2051[7] provides that individuals are liable for injuries caused by things in their custody. A "thing" can be either movable or immovable property, and therefore, a hotel room can be considered a "thing" under Article 2051. Because the "purpose of this provision . . . is to attribute liability to the party who is in a position to control the risks inherent in the thing," (see Aff. James Gordley Ex. 1 at 8 (dkt. no. 103-2) (internal quotation marks omitted)), the key element is a custodial relationship between the thing and the person. Characteristics of a custodial relationship include the custodian's ability to use the thing, control the thing, eliminate dangerous situations that may arise, and limit access of third-parties.

Once the injured party establishes that a defendant had a custodial relationship over a thing, liability attaches if the claimant shows that its damage was produced by the thing in the custody. (Aff. Sarah P. Kelly Ex. 6 at 7 (dkt. no. 102-7).) However, a thing has not produced the damage if it was a mere conduit facilitating the occurrence or the damage. (Id.; see also Aff. John T. Tener Ex. T at 6 (dkt. no. 147-21).)

---

[7] Article 2051 provides:

> **Damage caused by things in custody.** Everyone is liable for injuries caused by things in custody, unless he proves that the injuries were the result of a fortuitous event.

Although the parties contest the primary issue of custody, regardless of whether Harvey and/or Bouldoukian and Castricone had custody of the room under Article 2051, ICEM here has not offered evidence to show that the damage was produced by the "thing" in their custody, i.e., Room 305. Under ICEM's theory of liability, which is that an improper disposal of a cigarette started the fire, to argue that Room 305 is the "thing" that caused the fire is a stretch at best. A more appropriate application of Article 2051 would be to say that the carelessly disposed-of cigarette was the "thing" that caused the fire. In that circumstance, the burned room would be part of the damage caused, not the cause of the damage. But ICEM sticks with its theory, and under it the evidence offered is that the room itself was not the cause, but a "mere conduit" of the damage. Harvey and Bouldoukian describe a case involving scaffolding that is illustrative. (Aff. Sarah P. Kelly Ex. 6 (dkt. no. 102-7).) There, thieves used scaffolding which had previously been erected for repair purposes in order to enter and rob a bank. (Id. at 3.) The court found that Article 2051 did not apply because the scaffolding did not cause the robbery; it was merely an instrument, or conduit, through which the robbery could take place. (Id. at 7.) The court noted that the scaffolding "had, if anything, the function of enabling or facilitating the perpetration of the offense, but did not produce directly the alleged damage." (Id.) Because the harm was not caused "by the property," but merely "with the property," the court held that Article 2051 was inapplicable. (Id.) Similarly, here the room was not the cause simply because by being burned it permitted the fire to spread. The room may have facilitated the spreading of the fire, but it did not cause the fire.

ICEM, in contrast, attempts to analogize this case to two others, "Supermercati," (see Aff. John T. Tener Ex. S (dkt. no. 147-20)), and "Haas," (Aff. John E. Tener Ex. T (dkt. no. 147-21)). In Supermercati, a company was held liable under Article 2051 after someone slipped on a

slippery substance on the floor of its supermarket. The case is distinguishable, however, because while many factors may have led to the harm, liability was apparently premised on the failure to keep the floor of the market safe. That is, it was the condition of the premises that directly caused the injury. In this case, there was nothing about the maintenance of Room 305 that was responsible for the disaster, but rather a separate cause entirely. In Haas, the court found Article 2051 applicable where a woman fell through a meter-wide gap in the stairs of a house that was under repair. Again, the defect was in the structure of the premises itself, and that defect directly caused the harm to the woman who fell through it. Harvey and Bouldoukian are entitled to judgment as a matter of law on the Article 2051 claims against them.

## IV.    Article 2043

Article 2043,[8] a general tort provision of the Italian Civil Code, provides that any negligent act that causes unjust damage to another obliges the person who has committed the act to compensate for those damages. To establish a cause of action under Article 2043, the plaintiff bears the burden of proving that an act or omission attributable to the negligence of the defendant caused unjust damage. The inquiry hinges, as it does in American law, in large part on the foreseeability of the injury allegedly caused by the conduct in question. An individual who breaches his duty may be relieved of liability for damages caused by intervening events, but only if those events were so unforeseeable that they break the causal chain.

Harvey moves for summary judgment on the Article 2043 claim against it. Harvey essentially argues that it owed no duty because there was no contract or other legal provision

---

[8] Article 2043 provides:

> **Compensation for unlawful acts.** Any fraudulent, malicious, or negligent act that causes an unjustified injury to another obliges the person who has committed the act to pay damages.

10

imposing on it a duty to supervise the actions of Bouldoukian and Castricone. In particular, Harvey contends that Italy does not recognize a "social host liability" theory which would impose a duty to supervise Castricone's and Bouldoukian's alcohol consumption. What Harvey ignores, however, is that unlike other parts of the Civil Code which impose specific duties in particular circumstances, Article 2043 imposes a broad duty to avoid negligent conduct which may increase the risk of injury to third-parties. (Aff. John T. Tener Ex. S at 4 (dkt. no. 147-20).) Here, Harvey arguably had a duty to avoid conduct, such as the affirmative act of supplying alcohol to visibly intoxicated women even after a bartender refused to serve them, that would increase the risk of injury to others. The question then is whether it was foreseeable that Harvey's conduct would cause the harm that ICEM sustained. As there may be reasonable differences of opinion as to the evaluation, that question is properly left to the jury.

Harvey also makes a passing reference to a lack of causation by arguing that even had Harvey limited the amount of alcohol that the women drank, there is no evidence that this would have prevented the negligent disposal of the cigarette. However, ICEM has provided evidence that Harvey supplied alcohol to the two already-inebriated women who had been observed smoking, which is sufficient evidence from which a rational jury could infer that Harvey's allegedly negligent conduct caused ICEM's injuries.

Bouldoukian similarly moves for summary judgment on the Article 2043 claim against her. She maintains that there is no evidence that she acted or failed to act in any way which caused the fire because she was asleep when Castricone and Fiderio smoked on the balcony and disposed of their cigarettes. However, there is much debate about what happened in Room 305 that night. Although she now claims to have been asleep when the fire started, ICEM has provided evidence that Bouldoukian stated in the past that she was half-awake at the time, her

detailed accounts about what happened during the time she claims to have been asleep suggest an awareness inconsistent with slumber, and a wake-up call was placed around the time the fire started from someone in the room. There are disputed factual issues as to what happened in Room 305 material to the question of Bouldoukian's negligence that preclude the entry of judgment in her favor as a matter of law.

Bouldoukian also argues that even if there were an act or omission attributable to her, the failure of hotel management to timely notify the fire department and take other fire safety measures broke the chain of causation. Italy, however, is a pure comparative fault jurisdiction. C.C. Art. 1227. On this record, the Court cannot conclude that the hotel's response rendered Bouldoukian's conduct immaterial to the damages incurred by the fire.

## V.    Conclusion

For the foregoing reasons, the Plaintiffs ICEM S.P.A. and Aurora Assicurazioni S.P.A.'s Motion for Partial Summary Judgment (dkt. no. 94) is DENIED. Harvey Industries' Motion for Summary Judgment (dkt. no. 99) and Bouldoukian's Motion for Summary Judgment (dkt. no. 89) are each GRANTED as to ICEM's claims under Civil Code Articles 1588 and 2051, but DENIED as to ICEM's claims under Civil Code Article 2043.

## VI.   Other Motions

As the Court need not reach the spoliation and expert witness testimony arguments advanced by Harvey in its reply papers, the Plaintiffs' Motion to Strike Defendant Harvey Industries Inc.'s Reply-Papers Filed in Support of Its Summary Judgment Motions (dkt. no. 176) and Plaintiffs' Motion for Leave to File a Reply-Brief in Support of Their Motion to Strike (dkt. no. 181) are MOOT. Additionally, because replies have already been filed, the Plaintiffs' Motion for Clarification of the Court's Order Regarding the Page Limit for Reply Papers to All Pending

Motions (dkt. no. 157) is MOOT. Finally, to the extent that Castricone's Motion to Include Rachel Castricone to Co-Defendant, Tracey Bouldoukian's Motion *in Limine* to Preclude the Testimony of Alessandro Vaccaroni (dkt. no. 126), Castricone's Motion to Include Rachel Castricone to Co-Defendant, Tracey Bouldoukian's Motion *in Limine* to Preclude the Testimony of Cristiano Gandini, M.D. (dkt. no. 127), Bouldoukian's Motion to Include Tracey Bouldoukian to Co-Defendant, Harvey Industries', Motion for Summary Judgment on the Issue of Plaintiff's Lack of Ordinary Diligence (dkt. no. 128), Harvey Industries Inc.'s Conditional Joinder Concerning Plaintiffs' Offered Expert Testimony (dkt. no. 140), and Castricone's Motion to Include Rachel Castricone to Co-Defendant, Harvey Industries, Inc.'s Motion *in Limine* to Exclude the Testimony of Ali Reza (dkt. no. 194) seek to join other pending motions, they are GRANTED.

    It is SO ORDERED.

    /s/ George A. O'Toole, Jr.
    United States District Judge